UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

MARIA MICHAILIDOU,           )
                             )
         Plaintiff,          )
                             )
    v.                       )          No. 1:23-cv-00352-JAW
                             )
EASTERN MAINE MEDICAL        )
CENTER, et al.,              )
                             )
         Defendants.         )

**ORDER ON MOTION TO DISMISS**

Defendants, a medical center and one of its doctors, move to dismiss claims for breach of contract and intentional infliction of emotional distress brought by a former employee. The court dismisses the breach of contract claim as to the doctor as he was not a signatory to any agreement, and none of the nonsignatory exceptions for liability applies. The court does not dismiss the breach of contract claim against the medical center or the intentional infliction of emotional distress claim against both defendants because the complaint contains sufficient facts, accepted as true, to plausibly allege both claims.

I.    **PROCEDURAL BACKGROUND**

On August 4, 2023, Maria Michailidou, M.D. filed a complaint against Brad Waddell, M.D. and the Eastern Maine Medical Center (EMMC)[1] in the Penobscot

---

[1]    Eastern Maine Medical Center (EMMC) is also known as Northern Light Eastern Maine Medical Center (NLEMMC or Northern Light). *Compl.* ¶ 2. The original contract was between EMMC and Dr. Michailidou and the later separation agreement between Northern Light Eastern Maine Medical Center (NLEMMC) and Dr. Michailidou. *Compare State Ct. R.*, Attach. 10, *Physician Employment Agreement, with* Attach. 11, *Confidential Separation Agreement* (ECF No. 2). The Court

County Superior Court, alleging: 1) sex discrimination and ancestry and national origin discrimination in violation of the Maine Human Rights Act, 5 M.R.S. § 4572(1)(a), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.; 2) retaliation in violation of the Maine Whistleblower Protection Act, 26 M.R.S. § 833, et seq.; 3) breach of contract; and 4) intentional infliction of emotional distress.  *See State Ct. R.*, Attach. 9, *Compl.* (ECF No. 2) (*Compl.*).  On September 19, 2023, the Defendants filed a notice of removal to this Court.  *Notice of Removal* (ECF No. 1).

On September 27, 2023, the Defendants moved to dismiss Counts VI and VII, the breach of contract and intentional infliction of emotional distress claims, against Dr. Waddell and EMMC.[2]  *Mot. to Dismiss* (ECF No. 5) (*Defs.' Mot.*).  On October 25, 2023, Dr. Michailidou opposed the motion to dismiss.  *Resp. in Opp'n* (ECF No. 12) (*Pl.'s Opp'n*).  On November 13, 2023, Defendants replied.  *Reply to Resp. to Mot.* (ECF No. 15) (*Defs.' Reply*).

---

has used Eastern Maine Medical Center, EMMC, Northern Light, or NLEMMC in this order as the context has required.

[2]      The Complaint contains seven counts.  *Compl.* ¶¶ 64-89.  In the Complaint, Dr. Michailidou specifies that Counts I, II, and V are against only EMMC and Counts VI and VII are against both Dr. Waddell and EMMC.  *Id.*  Although phrased against defendant, not defendants, Counts III and IV do not specify whether they are against Dr. Waddell, EMMC, or both.  *Id.* ¶¶ 71-76.  Uncertain whether Counts III and IV were against Dr. Waddell, the Defendants moved to dismiss all claims against him. *Defs.' Mot.* at 1.  In her response, however, Dr. Michailidou clarified that "Counts III and IV are asserted solely against EMMC.  Only Counts VI and VII apply to Dr. Wad[d]ell."  *Pl.'s Opp'n* at 13. The Court accepts Dr. Michailidou's clarification and treats the Complaint as alleging all Counts against EMMC and only Counts VI and VII against Dr. Waddell.

## II.    FACTUAL BACKGROUND[3]

Dr. Michailidou is a Greek national who previously resided in Penobscot County in the state of Maine, but now resides in Greece, where she is originally from and completed medical school. *Compl.* ¶¶ 1, 4. As a foreign medical graduate, she completed a general surgery residency, two years of clinical research, and a fellowship in colorectal surgery at institutions in the United States under a J-1 visa. *Id.* ¶¶ 5-7. Dr. Michailidou is double board certified in general and colorectal surgery and is a fellow of the American College of Surgeons. *Id.* ¶ 6.

Dr. Michailidou signed a three-year contract with EMMC, a Maine nonprofit corporation with its principal place of business in Bangor, Maine that does business as Northern Light Eastern Maine Medical Center (NLEMMC or Northern Light), and began working there as a colorectal surgeon in August of 2018. *Id.* ¶¶ 2, 10, 12. Despite having professional and patient-care oriented interactions with patients and colleagues—and her decision-making, treatment plans, and surgeries being consistent with accepted standards of care—Dr. Michailidou was repeatedly demeaned, yelled at, and blamed for issues she did not create. *Id.* ¶ 12.

Chief of Surgery Dr. Brad E. Waddell was the chief architect of the bullying against Dr. Michailidou. *Id.* ¶ 13. Dr. Waddell persistently treated Dr. Michailidou

---

[3]     Consistent with the motion to dismiss standard, the Court relied on the Complaint's well-pleaded facts. "[T]he court must distinguish 'the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'" *García-Catalán v. United States*, 734 F.3d 100, 103 (1st Cir. 2013) (quoting *Morales-Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012)); *see also Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (stating that a court may "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements"). The Court also limits its recounting of the facts to those relevant to the two claims at issue: breach of contract and intentional infliction of emotional distress.

in a hostile, insulting, and demeaning manner. *Id.* ¶ 14. Dr. Michailidou believed that Dr. Waddell did not want her employed by the hospital and that he preferred male, U.S.-born surgeons. *Id.* Dr. Waddell would frequently send Dr. Michailidou emails written in an unprofessional and condescending tone, inaccurately stating that she had made mistakes. *Id.* When Dr. Michailidou would speak up for herself, Dr. Waddell called her unprofessional and reprimanded her for not accepting constructive criticism. *Id.* ¶ 15.

Dr. Michailidou felt she had no choice but to accept the unjustified criticism and that any defense or action would be called "talking back," leading to further reprimand, potentially putting her visa at risk. *Id.* ¶ 16. She believed Dr. Waddell was setting her up for failure, and this belief increased when Dr. Waddell placed her on a Focused Professional Practice Evaluation (FPPE or Evaluation) to seed her failure at Northern Light. *Id.* ¶ 17. In retrospect, Dr. Michailidou determined that failure was orchestrated to justify replacing her with a U.S.-born man, in line with Dr. Waddell's preference. *Id.*

Dr. Michelle Toder's treatment mirrored Dr. Waddell's; she yelled at and insulted Dr. Michailidou for seeking assistance in doing her work. *Id.* ¶ 18. Dr. Toder would frequently treat Dr. Michailidou as a subordinate rather than a junior partner, overload her with work by directing her to look at colorectal results and talk to consulting physicians while she was on call, and direct patients to her outpatient clinic without first communicating the referrals. *Id.* ¶ 18. Dr. Toder would also verbally accost Dr. Michailidou in public areas and dress her down, calling her "worse

4

than an intern." *Id.* Certain physician assistants had a diminished level of respect for Dr. Michailidou, treated her less fairly, and trusted her less in surgeries. *Id.* ¶ 32. Dr. Michailidou believes nurses and surgical residents mirrored this treatment and degrading behavior toward her and other foreign doctors and it became pervasive within the hospital, as Drs. Toder and Waddell undermined her authority. *Id.* ¶ 18.

NLEMMC has a history of using the FPPE process to achieve objectives that have little to do with patient care. *Id.* ¶ 19. For example, Dr. Waddell has a history of using the FPPE as a form of bullying. *Id.* In one case, he imposed an 18-month evaluation to get a surgeon to "hold his lane," and in another case he imposed a 12-month evaluation to frustrate a surgeon into leaving the institution. *Id.* When the latter surgeon did not leave as hoped, his contract was terminated. *Id.* In Dr. Michailidou's case, the FPPE process, which was primarily based on Dr. Waddell's viewpoint, was supported by limited peer reviews, not supported by the surgical literature, used as a tool to bully, and served as pretext for her ultimate termination by forced resignation. *Id.* ¶ 20. While discussing the FPPE, Dr. Waddell said, "I still think the best overall strategy is to gently convince her that she should start looking for a new job ASAP." *Id.* ¶ 22.

Dr. Waddell stated that the FPPE was not corrective or punitive, but very soon after it took effect, it became apparent to Dr. Michailidou that his motives were different as the FPPE had little do with her growth as a surgeon. *Id.* ¶ 23. One of the hospital's most senior gastroenterologists said, "Brad was out to get you out of EMMC and make it as onerous as possible to practice." *Id.*

5

Dr. Michailidou's FPPE had several components, some she initially questioned. *Id.* ¶¶ 24-25. These include a case review component, robotic surgery training, and case observation. *Id.* ¶ 25. At the start of the FPPE, she had excellent outcomes from those cases. *Id.* Dr. Waddell never provided her any explanation or objective data regarding the decision to include those components. *Id.* After several encounters that produced no answers, Dr. Michailidou accepted the bullying because she feared that protesting would result in extending the FPPE and adverse consequences regarding her visa. *Id.*

Frank Bailey, who had ten hours of emotional intelligence training with Dr. Michailidou, verbally told her and Senior Lead Physician Dr. Peter Huang that she had successfully completed the training and they had no concerns. *Id.* ¶ 26.

When her FPPE went into effect, Dr. Michailidou asked to discuss all elective cases with one of the three senior members of the NESM[4] group for the first month of the FPPE. *Id.* ¶ 27. Dr. Waddell stated that "at the end of the month, Dr. Huang and Dr. Villanueva will decide whether the case selection discussion continues or whether the former case selection review process can be terminated." *Id.* However, after a month, they did not, orally or in writing, make Dr. Michailidou aware of any case review extension. *Id.* In or around December of 2019, Dr. Michailidou's FPPE was extended without any explanation, documentation, or reason. *Id.* ¶ 28.

The FPPE required that Dr. Waddell, Dr. Huang, or Dr. Villanueva—Dr. Michailidou's senior colorectal partner—observe ten major colon resections over a

---

[4]     Plaintiff does not explain what NESM stands for in her complaint.

four-month period. *Id.* ¶ 29. Although the ten observations were completed, Dr. Michailidou was not provided written documentation of the evaluations. *Id.* When Dr. Michailidou met with Dr. Huang, he told her that the cases went well, but no documentation was provided. *Id.* In addition, Dr. Villanueva confirmed she discussed the cases with Dr. Huang and that they had gone well. *Id.*

Dr. Huang approached Dr. Michailidou approximately midway through her FPPE and said that NLEMMC was thinking of hiring an additional colorectal surgeon. *Id.* ¶ 30. Dr. Michailidou responded that there were not enough cases to accommodate a third colorectal surgeon. *Id.* Dr. Michailidou discussed this with Dr. Villanueva, who concurred that there were not enough cases to justify the hiring. *Id.*

In or around April of 2020, Dr. Michailidou sent a follow-up email to Dr. Waddell, Dr. Huang, and Dr. Villanueva regarding her FPPE, to which Dr. Waddell never responded. *Id.* ¶ 31. Despite multiple attempts to inquire about the FPPE results, Dr. Michailidou was unable to obtain any feedback on the FPPE's progress or final evaluation. *Id.*

During the COVID pandemic, Dr. Huang suggested a certain rounding pattern of patients, which included that patients would be seen either by the physician on call or the physician assistants on a daily basis, in order to minimize exposure of the staff to potential COVID. *Id.* ¶ 33. While Dr. Michailidou agreed that exposure should be minimized, she felt an obligation to provide her patients with the standard of care requested by the hospital policy that states that all patients should be seen by a physician every day. *Id.* ¶ 34. Accordingly, Dr. Michailidou agreed to see her own

patients daily to decrease the physician assistants' workload and to decrease the potential exposure to COVID infections. *Id.* ¶ 35.

Dr. Michailidou's actions in meeting the standard of care established by hospital policy was met with some consternation leading to a chain of emails regarding daily rounds. *Id.* ¶ 36. In a long round of emails on the subject, Dr. Waddell went so far as to instruct other physician or physician assistants to lie in case a Joint Commission surveyor visited the institution, saying "but we all do need to remember what the textbook answer is if a Joint Commission surveyor drops out of the sky and starts asking questions." *Id.* Dr. Waddell went on to say "[e]veryone please recall that the official hospital policy is that every impatient (sic) is 'seen' by a physician every day." *Id.*

Dr. Michailidou found the notion that physicians would not see their patients daily but would lie if asked to be an outrageous, dangerous, and unethical request and therefore she continued to stand her ground and see patients. *Id.* ¶ 37. As a result of her insistence that she continue to see patients, Dr. Waddell coldly and angrily retaliated against her and encouraged other physician assistants to react similarly based on her actions. *Id.* ¶ 38. In subsequent months, Dr. Villanueva texted Dr. Michailidou and told her that she was glad that Dr. Michailidou had rounded on her patient on her administrative day since physician assistants had patients with complex medical issues. *Id.* ¶ 39. In Dr. Michailidou's view, this was another instance where her legitimate concern for the safety of patients, and her willingness

to address those without simply accepting Dr. Waddell's unjustified orders, were met with contempt and retaliation.  *Id.*

Dr. Michailidou, having endured verbal and emotional abuse and concerned that Dr. Waddell would further retaliate against her resulting in her no longer being able to practice medicine in the United States, hesitantly discussed Dr. Waddell's behavior with several colleagues in different specialties, including Dr. Villanueva. *Id.* ¶ 40.  Dr. Villanueva confided in Dr. Michailidou that she had similar negative experiences with Dr. Waddell and also felt bullied by him.  *Id.* ¶ 41.  Dr. Villanueva once texted Dr. Michailidou: "Brad was rude to me today.  Talked to me like I was 5 years old.  Can't stand this place.  You are not alone." *Id.*  Dr. Villanueva also relayed: "I want to help you but I am still working for them and I don't want to get in trouble. I'm keeping my head down until I leave.  These people are so vindictive who knows what they can do." *Id.* ¶ 42.

Dr. Michailidou is aware of several female colleagues Dr. Waddell berated until they were on the verge of tears.  *Id.* ¶ 43.  One of the senior medical oncologists, Dr. Chodkiewicz, who moderates the tumor board, apologized to Dr. Michailidou about the way Dr. Waddell had publicly treated her regarding a case she presented to the tumor board.  *Id.*  Dr. Chodkiewicz mentioned that this was a well-known bullying tactic by Dr. Waddell.  *Id.*

In September of 2020, Dr. Michailidou met with Dr. Huang for the first time in a year regarding her FPPE, and he informed her that her FPPE performance was suboptimal but provided no explanation.  *Id.* ¶¶ 47-48.  Dr. Huang also told Dr.

9

Michailidou she should begin looking for another job otherwise he could not guarantee that senior leadership would keep her privileges unchanged. *Id.* ¶ 48. When Dr. Michailidou asked what was wrong with the cases Dr. Huang observed, he provided no answer. *Id.* ¶ 49. Dr. Villanueva expressed several times to Dr. Michailidou that she had discussed the cases with Dr. Huang, and he stated that they went well. *Id.* Following the meeting with Dr. Huang, Dr. Michailidou felt helpless and extremely scared as it would be impossible for her to find a new job for the 10 remaining months required to finish her J-1 waiver. *Id.* ¶ 50. She also thought it was clear that leadership wanted to dismiss her and was trying to find new false deficiencies. *Id.* A few weeks later, Dr. Michailidou met with Dr. Villanueva, who was very supportive and collegial and told her that she was there to support Dr. Michailidou and ensure that she would be successful for the remainder of her waiver. *Id.* ¶ 51.

After one of her cases, in which Dr. Michailidou's actions fully complied with the applicable standard of care—as determined by Dr. Villanueva, an independent third-party medical reviewer, and the Maine Board of Licensure in Medicine (Licensure Board)—the practice manager emailed Dr. Michailidou stating that Jim Clarke, Northern Light's Senior Vice President and Senior Physician wanted to meet with Dr. Michailidou, without specifying why. *Id.* ¶¶ 52-53.

The following day, Dr. Clarke gave Dr. Michailidou a letter of administrative suspension, forbade her from checking on a patient she had just operated on, and asked her to not come back to the hospital until further notice. *Id.* ¶ 54. A NLEMMC

Human Resources person was also present. *Id.* Dr. Michailidou was shocked and surprised, and asked for an explanation, which was not given. *Id.* Dr. Michailidou also asked why they were destroying her career and ability to stay in the United States. *Id.* Dr. Michailidou spoke with Dr. Villanueva, who said that when she asked Dr. Waddell about the administrative suspension, he stated "I did it." *Id.* ¶ 55. NLEMMC never provided Dr. Michailidou with any explanation or documentation of what led to their decision. *Id.* ¶ 56.

At the time NLEMMC had suspended Dr. Michailidou, it had hired a new colorectal surgeon, a U.S-born man, who started his employment days after Dr. Michailidou left NLEMMC. *Id.* ¶ 58. Within days, this new surgeon had an issue similar to the issue that led Dr. Waddell to discipline Dr. Michailidou. *Id.* However, at the mortality and morbidity meeting, Dr. Waddell supported the new surgeon. *Id.* Dr. Villanueva texted Dr. Michailidou and wrote that "the fact that Brad spoke up in support tells you how biased he is." *Id.*

NLEMMC forced Plaintiff to resign and sign a separation agreement on December 10, 2020. *Id.* ¶ 57. The separation agreement provided that no disparaging comments or statements would be made by Northern Light Management and Physician Leaders. *Id.* ¶ 59. Nevertheless, Dr. Waddell, who was the chair of the Maine Board of Licensure in Medicine at the time, contributed to a substantial document on December 9, 2020, indicating that Northern Light, and Dr. Waddell specifically, had concerns about Dr. Michailidou's technical skills, professional behavior, and clinical judgment, noting that she was a danger to the safety of

11

patients. *Id.* This action placed Dr. Michailidou under a cloud of suspicion and prevented her from practicing in the United States without reporting the potential discipline by the Licensure Board, harming her ability to practice medicine in the United States to this day. *Id.* ¶ 60.

Two-and-a-half years after her administrative suspension and termination from Northern Light, the Licensure Board unanimously dismissed the complaints against Dr. Michailidou in their entirety after an outside expert review found that none of her actions deviated from the applicable standard of care. *Id.* ¶ 62.

## III.   THE PARTIES' POSITIONS

### A.   Maria Michailidou's Allegations

The two claims before the Court are Dr. Michailidou's allegations of breach of contract and intentional infliction of emotional distress. *See Compl.* ¶¶ 81-89. As regards the breach of contract claim, Dr. Michailidou alleges Defendants failed to honor the employment contract, as amended by the separation agreement, by disparaging her. *Id.* ¶¶ 83-84.

As regards her intentional infliction of emotional distress claim, Dr. Michailidou alleges that: Defendants engaged in conduct that intentionally or recklessly caused her emotional distress, Defendants were certain or substantially certain that severe emotional distress would result from their conduct, many of these instances occurred outside the scope of and not in the course of her employment, Defendant's conduct was so extremely outrageous so as to exceed all possible bounds

of decency, all of which resulted in her suffering and continuing to suffer severe emotional distress. *Id.* ¶¶ 86-89.

### B.   Defendants' Motion to Dismiss

Defendants Northern Light and Dr. Waddell move to dismiss both claims discussed above. *Defs.' Mot.* at 1.  In other words, "Defendants ask that Dr. Waddell be dismissed entirely from the lawsuit and that Plaintiff's claims against EMMC be limited to Counts I-V." *Id.* at 7.

### 1.   The Breach of Contract Claim

First, Defendants argue that insofar as Count VI alleges breach of the Employment Agreement, "it is barred by Plaintiff's covenant not to sue." *Id.* (emphasis omitted).  Defendants add that Dr. Michailidou "expressly alleges that she resigned and therefore received the consideration promised to her in exchange for her covenant not to sue." *Id.* at 9-10.

Next, Defendants argue that insofar as Count VI alleges breach of the Separation Agreement, "Plaintiff has failed to allege facts constituting a breach." *Id.* at 10 (emphasis omitted).  Defendants argue that "[i]f the Court finds that the recipient and nature of the 'substantial document' cannot be inferred from the Complaint," *id.*, Count VI should be dismissed because "Plaintiff has failed to adequately allege that the Defendants made, shared, or reproduced disparaging statements about her to 'any other person' and therefore failed to allege a breach of the Separation Agreement." *Id.* at 11.

Defendants then argue that "[t]he Complaint, Exhibit B, and the administrative suspension letter Plaintiff expressly references in the Complaint establish that Plaintiff resigned her employment under circumstances that triggered a statutory duty to report to the Board of Medicine." *Id.* at 12.  Defendants posit that "[i]f Plaintiff's claims for breach of the Separation Agreement . . . are premised on Defendants' communications with the Board of Medicine concerning Plaintiff's resignation while under investigation, then these claims should be dismissed," *id.*, because they are "barred by the immunity provisions of the Maine Health Security Act." *Id.* at 10 (emphasis omitted).

Finally, Defendants say the breach of contract claim against Dr. Waddell should be dismissed "as Plaintiff fails to allege he was a party to either contract." *Id.* at 13 (emphasis omitted).  By Defendants' estimation, "[i]t is clear from the face of" the employment and separation agreements that "Dr. Waddell was not a party to either contract." *Id.*  Defendants argue, "Plaintiff has therefore failed to state a claim for breach of contract against Dr. Waddell." *Id.*

### 2.    The Intentional Infliction of Emotional Distress Claim

Defendants contend that the Maine Worker's Compensation Act's (MWCA) exclusivity and immunity provisions bar Dr. Michailidou's intentional infliction of emotional distress claim.  *Id.* at 7-9.  Defendants say the MWCA contains a "broad grant of immunity" that "extends to the employees of a covered employer, as well as the employing entity, whether the workplace injury alleged is caused by negligence

or an intentional tort." *Id.* at 7 (citing 39-A M.R.S. § 104; and *Li v. C.N. Brown Co.*, 645 A.2d 606, 608 (Me. 1994)).

Defendants cite *Frank v. L.L. Bean, Inc.*, 352 F. Supp. 2d 8 (D. Me. 2005), as an example of a case where this Court barred a plaintiff's common law claims and granted an employer's motion to dismiss for lack of subject-matter jurisdiction. Defendants say that while "Plaintiff baldly asserts that 'many instances [of conduct causing severe emotional distress] occurred outside the scope or not in the course of Plaintiff's employment with [] EMMC,' she has not alleged any." *Id.* at 8. "To the contrary," Defendants continue, "every reference to emotional distress in the Complaint concerns harm arising out of alleged bullying, discrimination, or retaliation by EMMC employees in the workplace or over EMMC e-mail." *Id.* To Defendants, Dr. Michailidou's "reli[ance] on the same alleged conduct to support her statutory employment discrimination and retaliation claims, bel[ies] any argument that her injuries are not work-related." *Id.*

### C.   Maria Michailidou's Opposition

#### 1.   The Breach of Contract Claim

Dr. Michailidou argues Defendants cannot enforce the covenant not to sue in the Employment Agreement because it is "an unenforceable promise" because "she received no consideration for her covenant not to sue." *Pl.'s Opp'n* at 12. She argues that "[t]he covenant not to sue was provided in exchange for the benefits to be derived from resigning rather than being terminated," but in her view, the Defendants' subsequent disparagement, occurring outside of their obligations to provide

15

information to the Licensure Board, "fully destroyed" those benefits. *Id.* Dr. Michailidou adds that for this affirmative defense to carry the day at the motion to dismiss stage, "it must be apparent from the four corners of the Complaint that Defendants will prevail in their defense under any set of circumstances" but "[t]hat is not the case here." *Id.* at 13.

As far as whether Defendants breached the Separation Agreement by making disparaging comments about her to the Licensure Board, Dr. Michailidou says that Dr. Waddell participated in the creation of "that document stating—beyond the reporting requirements of 24 M.R.S. § 2506—a host of unproven assertions," and "then also participated in the creation with EMMC of a subsequent filing to the Board of Medical Practice [that] contained a host of disparaging statements regarding Plaintiff's competence and the . . . alleged safety risk she presented." *Id.* at 11.

Turning to whether the Maine Health Security Act's immunity provision, 24 M.R.S. § 2511, bars her challenge, Dr. Michailidou says that Defendants have the burden of proving that their actions are within the statute to be afforded immunity. *Id.* at 11 (citing *Argereow v. Weisberg*, 2018 ME 140, 195 A.3d 2018). In short, Dr. Michailidou argues that Defendants' "assertion of the health security act affirmative defense is insufficiently developed to be decided at the motion to dismiss stage." *Id.* at 12 (citing *Strong v. Brakeley*, 2016 ME 60, 137 A.3d 1007)

Regarding Defendants' claim that Dr. Waddell was not a party to either contract and therefore could not have breached either contract, Dr. Michailidou responds that "[o]n its face, the contract binds all individuals, including Dr. Waddell,

16

to its terms as it regards non-disparagement.  In such instances, one needn't be an actual signatory to an agreement to be bound by it." *Id.* at 13.  She adds that [a]s worded, it appears that the signatory . . . had apparent authority to bind each of the management and physician leaders listed." *Id.*  Therefore, she insists, "a reasonable person could conclude from its language that it meant to bind not only EMMC, but each of the individuals who it sought to prevent from disparaging the plaintiff." *Id.*

### 2.    The Intentional Infliction of Emotional Distress Claim

Dr. Michailidou contends that the MWCA's exclusivity and immunity provisions do not bar her intentional infliction of emotional distress claim.  First, she says that workers' compensation exclusivity is not applicable to many actions that occurred before her forced resignation because they "occurred outside of the context of employment." *Id.* at 1.  Relatedly, she argues that "none of those actions occurring after her termination are precluded . . . because they necessarily took place *outside* the context of employment." *Id.* (emphasis in original).

Dr. Michailidou also contends the MWCA is not enough to dismiss her claim for another reason: "Workers' compensation exclusivity is an affirmative defense, on which Defendant has the burden of proof" and that "[i]t is a factual issue on which factfinders can differ.  It most certainly should not be resolved here on a 12(b)(6) or 12(b)(1) motion." *Id.* at 7.  She argues that "[i]t is Defendants' burden to demonstrate as a matter of law that being in Plaintiff's employment position inherently puts one at an increased risk of the behavior she sustained." *Id.* at 8.  Dr. Michailidou adds that "while Maine Courts have not adopted an outright rejection of the exclusion in this context, Maine Courts have expressed they are 'skeptical as to whether torts

based on employment discrimination fall within the ambit of the Worker's Compensation Act.'" *Id.* at 9 (citing *Caldwell v. Fed. Express Corp.*, 908 F. Supp. 29, 33 (D. Me. 1995)).  Regardless, it is Dr. Michailidou's position that it is "far too early based on the set of facts pled, to find that Defendant has proven their affirmative defense as a matter of law." *Id.*

### D.     Defendants' Reply

Defendants argue that "[t]he question is not whether workers' compensation exclusivity and immunity is a 'factual issue' or a 'legal issue,' but rather whether Plaintiff has alleged conduct by Defendants (her employer and supervisor) that occurred while she was employed, but was nonetheless outside the scope of and not in the course of her employment." *Defs.' Reply* at 2.  They insist Dr. Michailidou "has not." *Id.*  By Defendants' estimation, "[t]he factual allegations in the Complaint and the language Plaintiff chose to express them are inherently grounded in the employment relationship." *Id.*  Defendants maintain that "Plaintiff cannot evade the workers' compensation bar by reciting a legal conclusion." *Id.* (citing *Compl.* ¶ 87; and *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)).

Defendants contend that "Plaintiff's advocacy for an exception to the workers' compensation bar for intentional torts is misplaced, as that ship sailed long ago." *Id.* at 3 (citing *Li v. C.N. Brown Co.*, 645 A.2d 606, 608 (Me. 1994)).  They add that "recent amendments to the Workers' Compensation Act . . . reinforce that the exclusivity and immunity provisions bar all other intentional torts for personal injuries arising out of and in the course of employment." *Id.*

18

Defendants next argue that "Plaintiff's concession that the 'substantial document' criticizing her clinical competence was sent to the Maine Board of Medicine is dispositive of the issue of Maine Health Security Act immunity." *Id.* at 4 (emphasis omitted).  This is so, they argue, because "[t]he factual allegations in the Complaint give rise to only one inference[:] that the 'substantial document' was a report of Plaintiff's suspension and resignation and the reasons therefore, required by Section 2506." *Id.* at 5.  Regardless, Defendants claim "it does not matter whether the substantial document was in accordance with Section 2506 . . . because [Maine Health Security Act] immunity is not limited to mandatory reports." *Id.* (quoting 24 M.R.S. § 2511).  They then reiterate their position that "[u]nder the [Maine Health Security Act], hospitals and physicians who report concerns about a doctor's clinical competence to the Board of Medicine following that doctor's suspension and resignation are immune from suit, as a matter of law." *Id.* at 6.

As far as "Plaintiff's contention that she received no consideration for her promises in the Separation Agreement," Defendants say the contention "finds no support in the Complaint," as the "Separation Agreement expressly provides that Plaintiff's promise not to pursue a claim for breach of the Employment Agreement is 'in exchange for Northern Light allowing her to resign.'" *Id.* at 7 (quoting *Compl.*, Ex. B).  Defendants add "EMMC made good on its promise and Plaintiff has breached hers." *Id.*

Finally, Defendants reiterate that Dr. Waddell cannot be held liable for breach of the Separation Agreement because he was not a signatory to it.  Insofar as the

Separation Agreement extends to Northern Light management and physician leaders, Defendants contend "this provision establishes only that EMMC has accepted contractual responsibility for any disparagement by Dr. Waddell and the other identified individuals, not that Dr. Waddell has assumed any enforceable obligations himself." *Id.* at 7-8.

## IV.   LEGAL STANDARD

### A.   Federal Rule of Civil Procedure 12(b)(1)

Regarding the defense of workers' compensation exclusivity, the Defendants rely on Federal Rule of Civil Procedure 12(b)(1), which requires dismissal of a complaint "over which [the Court] lacks subject-matter jurisdiction." FED. R. CIV. P. 12(b)(1).   "The plaintiff, as the party asserting subject matter jurisdiction, has the burden of demonstrating its existence." *Me. Council of the Alt. Salmon Fed'n v. Nat'l Marine Fisheries Serv. of the Nat'l Oceanic Atmospheric Admin.*, 203 F. Supp. 3d 58, 75 (D. Me. 2016); *Fábrica de Muebles J.J. Álvarez, Incorporado v. Inversiones Mendoza, Inc.*, 682 F.3d 26, 33-34 (1st Cir. 2012); *see also* FED. R. CIV. P. 12(b)(1).

### B.   Federal Rule of Civil Procedure 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) requires dismissal of a complaint that "fail[s] to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6).   To state a claim, a complaint must contain, among other things, "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2).   In other words, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

A claim is facially plausible when "the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  Plausible means "'something more

than merely possible' or 'merely consistent with a defendant's liability.'"

*Germanowski v. Harris*, 854 F.3d 68, 71-72 (1st Cir. 2017) (internal citation omitted)

(quoting *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir.

2012)); *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 11 (1st Cir. 2011)).  This is

a "'context-specific' job that compels [judges] 'to draw on' [their] 'judicial experience

and common sense.'"  *Schatz*, 669 F.3d at 55 (quoting *Iqbal*, 556 U.S. at 679).

This is a "two-step analysis."  *Cardigan Mountain Sch. v. N.H. Ins. Co.*, 787

F.3d 82, 84 (1st Cir. 2015).  "First, the court must distinguish 'the complaint's factual

allegations (which must be accepted as true) from its conclusory legal allegations

(which need not be credited).'"  *García-Catalán v. United States*, 734 F.3d 100, 103

(1st Cir. 2013) (quoting *Morales-Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir.

2012)); *see also Schatz*, 669 F.3d at 55 (stating that a court may "isolate and ignore

statements in the complaint that simply offer legal labels and conclusions or merely

rehash cause-of-action elements").  "Second, the court must determine whether the

factual allegations are sufficient to support 'the reasonable inference that the

defendant is liable for the misconduct alleged.'"  *García-Catalán*, 734 F.3d at 103

(quoting *Haley v. City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011)).

### C.      Documents Outside the Complaint

When addressing a Rule 12(b)(1) motion to dismiss on subject matter jurisdiction, a court may consider "facts outside the pleadings." *Martínez-Rivera v. Puerto Rico*, 812 F.3d 69, 74 (1st Cir. 2016); *Aversa v. United States*, 99 F.3d 1200, 1210 (1st Cir. 1996).   A court is more limited in considering matters outside the pleadings in a Rule 12(b)(6) motion; however, a court may consider "documents the authenticity of which is not contested by the parties" and "documents sufficiently referred to in the complaint." *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993).

Here, the Defendants attached to their motion to dismiss a sworn declaration by Ali Worcester, Vice President of Human Resources at EMMC, authenticating documents that establish that EMMC was insured under a workers' compensation policy during the time in question and attaching a copy of a suspension letter from her to Dr. Michailidou dated October 9, 2020. *Decl. of Ali Worcester* (ECF No. 6).   The Court has considered these documents in its analysis under both subsections of the rule.   The Court has also reviewed the employment and separation agreements attached to the complaint.   *Watterson*, 987 F.2d at 3 (allowing consideration of documents in a Rule 12(b)(6) motion attached to the complaint or expressly incorporated therein).

## V.      DISCUSSION

### A.      Breach of Contract

"Under Maine law, to recover under a breach of contract claim, a plaintiff must establish (1) breach of a material contract term; (2) causation; and (3) damages." *Tate*

& *Lyle Ingredients Ams., Inc. v. Transp. Distrib., LLC*, 746 F. Supp. 2d 189, 196 (D. Me. 2010); *accord Tobin v. Barter*, 2014 ME 51, ¶10, 89 A.3d 1088, 1092.

Dr. Michailidou contends that Defendants breached the Employment Agreement and the Separation Agreement. Before turning to the question of breach, the Court deals with the preliminary issue of whether Dr. Waddell is liable under either agreement.

### 1.    Dr. Waddell's Liability Under the Agreements

On February 12, 2018, EMMC and Dr. Michailidou entered into an employment agreement. *State Ct. R.*, Attach. 10, *Physician Employment Agreement* at 1 (*Employment Agreement*). On December 20, 2020, NLEMMC and Dr. Michailidou entered into a confidential settlement agreement that contained a mutual non-disparagement clause. *State Ct. R.*, Attach. 11, *Confidential Settlement Agreement* ¶ 6 (*Separation Agreement*). The clause contained the following language:

> This non-disparagement clause applies to Northern Light management and physician leaders (chief of staff, medical staff office, department chair, human resources and hospital executives.

*Id.* ¶ 6.

The parties to the Employment Agreement were EMMC and Dr. Michailidou, *Employment Agreement* at 1, and the Agreement was signed by Dr. Michailidou; Michael Reid, Vice President of Provider Services; James Clarke, M.D., Interim President, EMMC Medical Group; and Lawrence E. McManus, Senior Vice President and Chief Financial Officer. *Id.* at 14. The parties to the Separation Agreement were NLEMMC and Dr. Michailidou, *Separation Agreement* at 1, and the signatories were

Dr. Michailidou and James Clarke, M.D., Senior Physician Executive at NLEMMC. Dr. Waddell is neither a named party nor signatory to either agreement.

By Defendants' estimation, "[i]t is clear from the face of Exhibits A and B of the Complaint—the Employment Agreement and Separation Agreement, respectively—that Dr. Waddell was not a party to either contract." *Defs.' Mot.* at 13.

Dr. Michailidou disagrees. She responds that "[o]n its face, the contract binds all individuals, including Dr. Waddell, to its terms as it regards non-disparagement. In such instances, one needn't be an actual signatory to an agreement to be bound by it." *Pl.'s Opp'n* at 13. Dr. Michailidou adds that "[a]s worded, it appears that the signatory . . . had apparent authority to bind each of the management and physician leaders listed." *Id.*

Defendants cite *Barbosa v. Midland Credit Management, Inc.*, 981 F.3d 82 (1st Cir. 2020), for the proposition that for a party to be liable for a breach of contract, they must have been a party to that contract. This characterization is a step too far.

In *Barbosa*, the Court of Appeals for the First Circuit, wrote that "[t]here is no doubt that [the parties'] *non-signatory status to the [] Agreement is not in and of itself dispositive for this issue*." 981 F.3d at 88 (emphasis supplied). The next few words explain why: "there are exceptions." *Id.* (quoting *Grand Wireless, Inc. v. Verizon Wireless, Inc.*, 748 F.3d 1, 9-10 (1st Cir. 2014)). Despite the general, well-settled principal that a contract cannot generally bind a non-signatory, "many courts have held that a contract can bind a non-signatory where it was signed by the non-signatory's agent, or assigned to the non-signatory, or where the party who signed

24

the contract is the 'alter ego' of the non-signatory." *iPayment Inc. v. Goodrich*, No. CV-05-114, 2005 WL 2713727, at *2 (Me. Sup. July 11, 2005) (cleaned up) (citing *Paper v. Allied Textile Cos.*, 235 F. Supp. 2d 8, 20 (D. Me. 2002)).  However, Dr. Michailidou does not contend that any of those exceptions apply here.

Instead, Dr. Michailidou relies on a different theory.  She says that by its plain language, the non-disparagement provision applies to Northern Light management and physician leaders.  *Pl.'s Opp'n* at 13.  As Chief of Surgery, Dr. Waddell reasonably fits into the role of physician leader.  Therefore, Dr. Michailidou says, the contract binds Dr. Waddell "to its terms as it regards non-disparagement."  *Id.*  Dr. Michailidou adds that the signatory "had apparent authority to bind each of the management and physician leaders listed."  *Id.*

Dr. Michailidou may very well be right that the terms of the contract include physician leaders like Dr. Waddell in the contract's non-disparagement clause; however, that is not the issue at hand.  The question is whether Dr. Michailidou has a right to sue Dr. Waddell individually, even though he did not sign either contract at issue.  As discussed above, she has not articulated what legal theory applies here that would create an exception to the general rule that non-signatories are not liable for a breach of contract claim.  That, of course, does not foreclose Dr. Michailidou's argument that Northern Light breached the contract by failing to ensure those in its employ, like Dr. Waddell, did not breach the contract.  If they did, however, Dr. Michailidou's remedy would run against NLEMMC, not the disparaging individual, especially if he were not a signatory to the agreement.

With the understanding that Dr. Waddell was a non-signatory to the agreements and fits under none of the exceptions that would bind him to the contract, the Court concludes Dr. Waddell cannot be held liable individually for breach of contract. The Court turns to analyzing whether Dr. Michailidou has plausibly alleged that Northern Light breached the agreements.

### 2.    Whether Northern Light Breached the Agreements

Defendants argue that the Separation Agreement includes a covenant not to sue that bars Dr. Michailidou from bringing a breach of contract claim. *Defs.' Mot.* at 7. They add that Dr. Michailidou "expressly alleges that she resigned and therefore received the consideration promised to her in exchange for her covenant not to sue." *Id.* at 9-10.

Dr. Michailidou concedes there is a covenant not to sue in the Employment Agreement, and that she was allowed to resign, but retorts that Defendants cannot enforce the covenant, arguing that it is "an unenforceable promise" because "she received no consideration for her covenant not to sue." *Pl.'s Opp'n* at 12. She argues that the covenant "was provided in exchange for the benefits to be derived from resigning rather than being terminated." *Id.* However, in her view, "[t]hose benefits were fully destroyed" by Defendants' "subsequent disparagement . . . occurring outside of their obligations to provide information to the Medical Board." *Id.* Dr. Michailidou adds that for Defendants' affirmative defense to carry the day at the motion to dismiss stage, "it must be apparent from the four corners of the Complaint

that Defendants will prevail in their defense under any set of circumstances" but "[t]hat is not the case here." *Id.* at 13.

"As a general rule, a properly raised affirmative defense can be adjudicated on a motion to dismiss so long as: (1) the facts establishing the defense are definitively ascertainable from the complaint and the other allowable sources of information, and (2) those facts suffice to establish the affirmative defense with certitude." *SBT Holdings, LLC v. Town of Westminster*, 547 F.3d 28, 36 (1st Cir. 2008).

In this case, for the affirmative defense to be adjudicated at this stage, the facts would have to establish that the covenant not to sue is enforceable.  The first part of the Separation Agreement makes clear that Dr. Michailidou "agrees that in exchange for Northern Light allowing her to resign, Physician will not pursue any potential breach of contract claims regarding the Employment Agreement." *Separation Agreement* at 1.

Dr. Michailidou disagrees that simply being allowed to resign is all the consideration she bargained for.  Instead, she contends that the covenant not to sue was provided in exchange for the *benefits to be derived* from resigning rather than being terminated.

Although she does not specifically articulate what those benefits were, the Separation Agreement's non-disparagement,[5] references and credentialing

---

[5]     The mutual non-disparagement provision states:

Neither party will make, nor share, nor reproduce in any way any new or existing disparaging statements or references, orally or in writing, directly or indirectly, to any other person about the other party by any means or in any forum.  The parties agree that references and credentialing inquiries will be handled pursuant to Paragraph 7 below.  This non-disparagement provision applies to Northern Light management and

inquiries,[6] and reference letter[7] provisions could apply.  As they are all parts of the

agreement, if NLEMMC breached any of the provisions, the covenant not to sue would

cease to be enforceable.[8]  The current facts before the Court are not clear as to

whether NLEMMC breached its duties not to disparage and only to restate mutually

agreed-upon language to those requesting references or credentialing information.

This does not meet the certitude requirement articulated in *SBT Holdings*.  547 F.3d

at 36.  That leaves two other arguments Defendants make.

  The first is that Dr. Michailidou's complaint does not adequately indicate what

the "substantial document" is, making it impossible to know if it was shared with

---

   physician leaders (chief of staff, medical staff office, department chair, human
   resources and hospital executives.)

*State Ct. R.*, Attach. 11, *Separation Agreement* at 2.

[6] The references and credentialing inquiries provision states:

   If any third parties (e.g., potential employers, credentialing organizations, professional
   membership societies, etc.), formally or informally, request reference or credentialing
   information about Physician, Northern Light will confirm the dates of employment and
   position held and restate the content of the mutually agreed-upon language set forth
   in Exhibit A hereto and incorporated herein by reference.

*Id.*

[7] The reference letter provision states: "Northern Light agrees to provide Physician with a
mutually acceptable letter of reference.  A copy of the mutually acceptable letter of reference is
attached as Exhibit A."  *Id.*

[8] The separation from employment provision states:

   Physician will end her employment and resign her medical staff privileges voluntarily,
   pursuant to Section 7.2.6 of the Employment Agreement, effective November 17, 2020,
   ("Separation Date").  After the Separation Agreement, Physician's status as an
   employee of Northern Light will cease and no further payments of any matter will be
   due from Northern Light as of that date.  *Physician agrees that in exchange for*
   *Northern Light allowing her to resign, Physician will not pursue any potential breach*
   *of contract claims regarding the Employment Agreement.*  Physician acknowledges that
   NLEMMC is required by law to report her suspension and resignation of employment
   to the Maine Board of Medicine.

*Id.* at 1 (emphasis supplied).

anyone, a necessary part of breach. *Defs.' Mot.* at 10-11. This concern, however, is remedied by Dr. Michailidou's opposition brief, wherein she clarifies that the substantial document is the report submitted to the Licensure Board. *See Pl.'s Opp'n* at 11; *cf. Scott v. Okla. Student Loan Auth.*, No. 23-cv-10841-PBS, 2024 U.S. Dist. LEXIS 660904, at *6 (D. Mass. Feb. 22, 2024) (stating that as the opposition did not meaningfully respond to the argument or clarify the allegations, the Court would rely on the amended complaint on its face).

That leaves Defendants' final argument: that the Maine Health Security Act's (MHSA) immunity provisions bar the suit as Defendants had a statutory duty to report to the Licensure Board because Dr. Michailidou resigned while under investigation. *Defs.' Mot.* at 11-12. Further, Defendants claim that "it does not matter whether the substantial document was in accordance with Section 2506 . . . because MHSA immunity is not limited to mandatory reports." *Defs.' Reply* at 5 (quoting 24 M.R.S. § 2511). They then reiterate their position that "[u]nder the MHSA, hospitals and physicians who report concerns about a doctor's clinical competence to the Board of Medicine following that doctor's suspension and resignation are immune from suit, as a matter of law." *Id.* at 6. Dr. Michailidou argues that Defendants have the burden of proving their actions were within the statute to be afforded immunity, *id.* at 11 (citing *Argereow v. Weisberg*, 2018 ME 140, 195 A.3d 2018), and that their immunity assertion "is insufficiently developed to be decided at the motion to dismiss stage." *Id.*

The Maine Health Security Act, 24 M.R.S. § 2501, et seq., has mandatory reporting provisions. *See* 24 M.R.S. §§ 2505-2507. Section 2505 states that:

> Any professional competence committee within this State and any physician or physician assistant licensed to practice or otherwise lawfully practicing within this State shall . . . report the relevant facts to the appropriate board relating to the acts of any physician or physician assistant in this State if, in the opinion of the committee, physician, physician assistant or other person, the committee or individual has reasonable knowledge of acts of the physician . . . amounting to gross or repeated medical malpractice, misuse of alcohol, drugs, or other substances that may result in the physician's . . . performing services in a manner that endangers the health or safety of patients, professional incompetence, unprofessional conduct or sexual misconduct identified by board rule.

*Id.* § 2505. Section 2506 states that:

> A health care provider or health care entity shall, within 60 days, report in writing to the disciplined practitioner's board or authority the name of any licensed . . . employee or person privileged by the provider or entity whose employment . . . or privileges have been revoked, suspended, limited or terminated or who resigned while under investigation or to avoid investigation for reasons related to clinical competence or unprofessional conduct, together with pertinent information relating to that action. Pertinent information includes: a description of the adverse action; the name of the practitioner involved; the date, the location and a description of the event or events giving rise to the adverse action; and identification of the complainant giving rise to the adverse action.
> . . .
> The report must include situations in which employment . . . or privileges have been revoked, suspended, limited or otherwise adversely affected by action of the health care practitioner while the health care practitioner was the subject of a proceeding regarding employment or a disciplinary proceeding, and it also must include situations where employment . . . or privileges have been revoked, suspended, limited or otherwise adversely affected by act of the health care practitioner in return for the health care provider's or health care entity's terminating such proceeding. Any reversal, modification or change of action reported pursuant to this section must be reported immediately to the practitioner's board or authority, together with a brief statement of the reasons for that reversal, modification or change. If the adverse action

> requiring a report as a result of a reversal, modification or change of action consists of the revocation, suspension or limitation of employment . . . or clinical privileges of a physician . . . by a health care provider or health care entity for reasons relating to clinical competence or unprofessional conduct and is taken pursuant to personnel or employment rules or policies, medical staff bylaws or other credentialing and privileging policies, whether or not the practitioner is employed by that health care provider or entity, then the provider or entity shall include in its initial report to the disciplined practitioner's licensing board or authority the names of all patients whose care by the disciplined practitioner gave rise to the adverse action.
>
> Carriers providing managed care plans are subject to the reporting requirements of this section when they take adverse actions against a practitioner's credentials or employment for reasons related to clinical competence or unprofessional conduct that may adversely affect the health or welfare of the patient.

*Id.* § 2506.

The Maine Health Security Act also has an immunity provision.  *See* 24 M.R.S. § 2511.  It states, in part, that "any physician, podiatrist, health care provider, health care entity or professional society, any member of a professional competence committee or professional review committee, any board or appropriate authority and any entity required to report under this chapter are immune from civil liability" under certain circumstances.  *Id.*  These circumstances include "making any report or other information available to any board, appropriate authority, professional competence committee or professional review committee pursuant to law."  *Id.*

While Defendants claim that Dr. Waddell's report to the Licensure Board was required by law, they do not indicate which provision of the MHSA required it. Section 2025 requires "report[ing] the relevant facts to the appropriate board relating to the acts of any physician or physician assistant in this State" under certain

31

circumstances.  *Id.* § 2505.  Section 2506, which seems to be the provision Defendants rely on, requires reporting the name and other "pertinent information" of physicians whose "employment . . . or privileges have been revoked, suspended, limited or terminated or who resigned while under investigation or to avoid investigation for reasons related to clinical competence or unprofessional conduct."  *Id.* § 2506. Regardless, the Court does not have before it what precisely Dr. Waddell's report said. As a result, the Court is unable to ascertain whether Dr. Waddell's submission conformed with the statutory requirements of "relevant facts" and "pertinent information" or crossed into non-mandated comments that disparaged Dr. Michailidou, thereby running afoul of NLEMMC's agreement to not disparage.

The parties have not sufficiently addressed the issue here: whether if a hospital and physician are at odds about whether the physician's conduct amounts to professional misconduct that should be reported to the Licensure Board and they enter into negotiations in which the hospital agrees not to make a report to the Licensure Board in exchange for the physician's resignation, the hospital would be entitled to statutory civil immunity for making the report to the Licensure Board after the physician resigned.  The Court suspects that the answer to this question is that the hospital could not assert statutory immunity because it agreed with the physician that her conduct did not require a report and it separately waived its right to assert statutory immunity.  However, the Court cannot resolve this issue in favor of either party without more robust briefing and further factual development, and in the context of the motion to dismiss, this means the motion must fail.

32

Consequently, while an affirmative defense could be adjudicated on a motion to dismiss if there were sufficient facts to establish the affirmative defense with certitude, *SBT Holdings*, 547 F.3d at 36, that is not the case here.  Accordingly, the Court dismisses Defendants' motion to dismiss as to Count VI, the breach of contract claim, insofar as Defendants seek dismissal of the breach of contract claim against NLEMMC.  This conclusion is buttressed by the fact that Dr. Michailidou has alleged sufficient facts that would allow the reasonable inference that Defendants are liable for the misconduct alleged.  *See García-Catalán*, 734 F.3d at 103.

## B.     Intentional Infliction of Emotional Distress

Defendants contend that the Maine Worker's Compensation Act's (MWCA) exclusivity and immunity provisions bar Dr. Michailidou's intentional infliction of emotional distress claim.  *Defs.' Mot.* at 7-9.  Defendants say the MWCA contains a "broad grant of immunity" that "extends to the employees of a covered employer, as well as the employing entity, whether the workplace injury alleged is caused by negligence or an intentional tort."  *Id.* at 7 (citing 39-A M.R.S. § 104; and *Li v. C.N. Brown Co.*, 645 A.2d 606, 608 (Me. 1994)).  Defendants continue, "every reference to emotional distress in the Complaint concerns harm arising out of alleged bullying, discrimination, or retaliation by EMMC employees in the workplace or over EMMC e-mail."  *Id.*  Defendants say Dr. Michailidou's "reli[ance] on the same alleged conduct to support her statutory employment discrimination and retaliation claims, bel[ies] any argument that her injuries are not work-related."  *Id.*

33

Dr. Michailidou says that workers' compensation exclusivity is not applicable to many of the actions that occurred before her forced resignation because they "occurred outside of the context of employment." *Pl.'s Opp'n* at 1. Relatedly, she argues that "none of those actions occurring after her termination are precluded . . . because they necessarily took place *outside* the context of employment." *Id.* (emphasis in original). Dr. Michailidou also contends the MWCA is not enough to dismiss her claim for another reason: "Workers' compensation exclusivity is an affirmative defense, on which Defendant has the burden of proof," and "is a factual issue on which factfinders can differ. It most certainly should not be resolved here on a 12(b)(6) or 12(b)(1) motion." *Id.* at 7.

There is no question that the MWCA "bars employees from bringing civil actions against insured employers for work-related injuries." *Caldwell v. Fed. Express Corp.*, 908 F. Supp. 29, 32 (D. Me. 1995) (citing 39-A M.R.S. § 104). However, "for the injury to be 'work-related' under the Act, it must 'arise out of' and be 'in the course of' employment.'" *Frank v. L.L. Bean, Inc.*, 352 F. Supp. 2d 8, 11 (D. Me. 2005) (quoting 39-A M.R.S. § 104; and citing *Comeau v. Me. Coastal Servs.*, 449 A.2d 362, 365 (Me. 1982)). "In other words, the injury must be 'suffered both while and because the employee was at work.'" *Id.* at 12 (citing *Knox v. Combined Ins. Co. of Am.*, 542 A.2d 363, 366 (Me. 1988)). Maine courts have held that this bar applies not only to negligence, but also to intentional torts like intentional infliction of emotional distress. *See id.* at 11 (quoting *Li.*, 645 A.2d at 608).

34

The question, then, is whether Dr. Michailidou has pleaded sufficient facts that allow the Court to "draw the reasonable inference that the defendant is liable for the misconduct alleged," *Iqbal*, 556 U.S. at 678, because the alleged misconduct was not suffered while at work and because she was at work.

Here, Dr. Michailidou is claiming that NLEMMC and Dr. Waddell discriminated against her due to her sex and national origin. NLEMMC and Dr. Waddell contend that the actions Dr. Michailidou complains of occurred during the course of her employment because they involved the medical center and Dr. Waddell's obligation to oversee its physicians to assure they are providing adequate care to patients. NLEMMC is not asserting that if Dr. Waddell actively discriminated against Dr. Michailidou because she is a woman and because she was born in Greece, he was doing what NLEMMC employed him to do. The lines here between actions occurring during the course of and arising out of employment and those outside the scope of employment are too subtle to be resolved in a motion to dismiss, especially without the aid of discovery.

Moreover, Dr. Michailidou's second argument that "none of those actions occurring after her termination are precluded . . . because they necessarily took place *outside* the context of employment" is also persuasive. On December 9, 2020, Dr. Waddell contributed to a substantial document that indicated he had concerns about Dr. Michailidou's technical skills, professional behavior, and clinical judgment, noting that she was a danger to patient safety. Dr. Michailidou was no longer employed by Northern Light as of November 17, 2020. *See Separation Agreement* at

35

1.  As a result, Dr. Waddell's conduct, which at first blush might seem work-related as it arises out of the employment relationship, is not actually work-related because it did not occur "in the course" of employment.  *See Frank*, 352 F. Supp. 2d at 11 ("In order for the injury to be 'work-related' under the Act, it must 'arise out of' and be *'in the course of' employment'"* (emphasis supplied) (quoting 39–A M.R.S. § 104)).

Having found there is no immunity under the MWCA as to at least some of the Defendants' actions, the Court denies Defendants' motion to dismiss for lack of subject matter jurisdiction.  In reaching this conclusion, the Court notes that while Defendants name both the immunity and exclusivity provisions of the MWCA, their argument both in their motion and reply focus on the immunity provision applying to work done in the course of employment.  Therefore, insofar as they mean to assert that that the exclusivity provision of the MWCA bars Dr. Michailidou's claim, their position is not sufficiently articulated for the Court to address.

## VI.   CONCLUSION

The Court GRANTS in part and DISMISSES in part Eastern Maine Medical Center and Brad E. Waddell's Motion to Dismiss All Claims Against Dr. Waddell and Counts VI and VII Against Eastern Maine Medical Center (ECF No. 5).  Specifically, the Court DISMISSES Dr. Michailidou's breach of contract claim against Dr. Waddell.  The Court DISMISSES Dr. Waddell's Motion to Dismiss Dr. Michailidou's intentional infliction of emotional distress claim and Northern Light Eastern Maine Medical Center's Motion to Dismiss the breach of contract and intentional infliction of emotional distress claims.

36

For the sake of clarity, all Counts remain as to Northern Light and only the intentional infliction of emotional distress claim, Count VII, remains as to Dr. Waddell.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 26th day of July, 2024

37