UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| MARIA MICHAILIDOU, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:23-cv-00352-JAW |
| | ) | |
| EASTERN MAINE MEDICAL | ) | |
| CENTER, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON MOTION FOR SUMMARY JUDGMENT**

Defendants, a medical center and one of its doctors, move for summary judgment on claims of discrimination in violation of federal and state law, retaliation, breach of contract, and intentional infliction of emotional distress brought by a former employee. The court grants the defendants' motion for summary judgment on each claim, concluding the defendants have shown there is no genuine dispute as to any material fact and that they are entitled to judgment as a matter of law.

## I.    PROCEDURAL HISTORY

On August 14, 2023, Maria Michailidou, M.D. filed a complaint against Brad Waddell, M.D. and the Eastern Maine Medical Center (EMMC)[1] (collectively, the Defendants) in the Penobscot County Superior Court, alleging sex discrimination in

---

[1] Eastern Maine Medical Center (EMMC) is also known as Northern Light Eastern Maine Medical Center (NLEMMC or Northern Light). *State Ct. R.*, Attach. 9, *Compl.* ¶ 2 (ECF No. 2). The original contract was between EMMC and Dr. Michailidou and the later separation agreement between NLEMMC and Dr. Michailidou. *Compare Rule 56(h) Joint Stipulated Rec.*, Attach. 1, *Physician Employment Agreement* (ECF No. 40) *with Decl. of Megan Randlett, Esq.*, Attach. 10, *Confidential Separation Agreement* (ECF No. 45) (*Separation Agreement*). For sake of clarity, the Court refers to the corporate Defendant as Eastern Maine Medical Center and EMMC in this order.

violation of the Maine Human Rights Act (MHRA), codified at 5 M.R.S. § 4572(1)(a) (Count I), ancestry and national origin discrimination in violation of the MHRA (Count II), sex discrimination in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e *et seq.* (Count III), ancestry and national origin discrimination in violation of Title VII (Count IV), retaliation in violation of the Maine Whistleblower Protection Act (MWPA), 26 M.R.S. § 833 *et seq.* (Count V), breach of contract (Count VI), and intentional infliction of emotional distress (IIED) (Count VII). *State Ct. R.*, Attach. 9, *Compl.* (ECF No. 2). On September 19, 2023, the Defendants jointly filed a notice of removal to this Court. *Notice of Removal* (ECF No. 1).

The Defendants moved to dismiss Counts VI and VII against Dr. Waddell and EMMC on September 27, 2023.[2] *Mot. to Dismiss* (ECF No. 5). On July 26, 2024, the Court granted in part and dismissed in part the Defendants' motion, dismissing Count VI as to Dr. Waddell but allowing the Plaintiff to proceed on Count VI against EMCC and Count VII against both Defendants. *Order on Mot. to Dismiss* at 1-37 (ECF No. 24).

---

[2]    The Complaint contains seven counts. *Compl.* ¶¶ 64-89. In the Complaint, Dr. Michailidou specifies that Counts I, II, and V are against only EMMC and Counts VI and VII are against both Dr. Waddell and EMMC. *Id.* Although phrased against defendant, not defendants, Counts III and IV do not specify whether they are against Dr. Waddell, EMMC, or both. *Id.* ¶¶ 71-76. Uncertain whether Counts III and IV were against Dr. Waddell, the Defendants moved to dismiss all claims against him. *Defs.' Mot.* at 1. In her response, however, Dr. Michailidou clarified that "Counts III and IV are asserted solely against EMMC. Only Counts VI and VII apply to Dr. Wad[d]ell." *Pl.'s Opp'n* at 13. In its order on the Defendants' motion to dismiss, the Court accepted Dr. Michailidou's clarification and treats the Complaint as alleging all Counts against EMMC and only Counts VI and VII against Dr. Waddell. *Order on Mot. to Dismiss* at 2 n.2 (ECF No. 24).

The parties prepared for summary judgment and, on February 27, 2025, filed a Rule 56(h) joint stipulated record. *Rule 56(h) Joint Stipulated Rec.* (ECF No. 40) (JSR). On March 14, 2025, the Defendants filed a motion for summary judgment and an accompanying statement of undisputed material facts. *Defs.' Mot. for Summ. J.* (ECF No. 43) (*Defs.' Mot.*); *Defs.' Statement of Material Facts* (ECF No. 44) (DSMF). On June 6, 2025, Dr. Michailidou filed her response to the Defendants' statement of material facts, *Pl.'s Opposing Statement of Material Facts* (ECF No. 59) (PRDSMF), and, on June 9, 2025, filed her opposition to the motion as well as her own statement of additional facts. *Pl.'s Additional Statement of Material Facts* (ECF No. 61) (PSAMF); *Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J.* (ECF No. 62) (*Pl.'s Opp'n*). The Defendants filed their reply to the Plaintiff's opposition and their response to the Plaintiff's statement of additional material facts on July 7, 2025. *Defs.' Reply Mem. in Support of Mot. for Summ. J.* (ECF No. 73) (*Defs.' Reply*); *Consolidated Set of Parties' Statement of Material Facts, Together with Respective Objs. and Resps.* at 65-106 (ECF No. 74) (DRPSAMF).

## II.   STATEMENT OF FACTS

### A.   The Parties

Maria Michailidou, M.D. is a female born in Athens, Greece and is of Greek national origin and ancestry. JSR. ¶ 1; DSMF ¶ 6; PRDSMF ¶ 6; PSAMF ¶ 1; DRPSAMF ¶ 1. She completed medical school at the University of Patras in Greece, after which she came to the United States on a J-1 visa for a research position at Massachusetts General Hospital. JSR ¶ 2; PSAMF ¶ 2; DRPSAMF ¶ 2. Dr.

Michailidou subsequently completed a general surgery residence at the University of Arizona, which assumed sponsorship of her visa. JSR ¶ 3; PSAMF ¶ 2; DRPSAMF ¶ 2. After completing a one-year fellowship in colorectal surgery at Pennsylvania State University, Dr. Michailidou came to EMMC on a J-1 visa waiver with the understanding that EMMC would sponsor her H1-B visa application upon the expiration of her waiver. JSR ¶ 4; PSAMF ¶ 2; DRPSAMF ¶ 2.

Eastern Maine Medical Center, doing business as Northern Light Eastern Maine Medical Center, is a Maine nonprofit corporation with a principal place of business in Bangor, Maine.[3] *Compl.* ¶ 2.

Brad Waddell, M.D. is the Chief of General Surgery at EMMC. JSR ¶ 10; DSMF ¶ 7; PRDSMF ¶ 7. Dr. Waddell also practices clinically within a medical group called Northern Light Surgical Specialists, a multi-specialty group including colorectal, surgical oncology, minimally invasive, and bariatric surgery.[4] JSR ¶ 10; DSMF ¶ 7; PRDSMF ¶ 7; PSAMF ¶ 8; DRPSAMF ¶ 8.

**B.  Dr. Michailidou's Immigration Status and the Conrad 30 Program**

After Dr. Michailidou completed her colorectal fellowship at Pennsylvania State University, her J-1 visa required her to return to Greece to practice medicine

---

[3]     "Ordinarily, statements in a complaint are not part of the summary judgment record." *Doherty v. Donahoe*, 985 F. Supp. 2d 190, 195 (D. Mass. 2013) (citing *Sheinkopf v. Stone*, 927 F.2d 1259, 1262-63 (1st Cir. 1991)). Here, however, the parties' respective statements of fact do not introduce EMMC or provide background information regarding this Defendant's principal place of business, place of incorporation, or corporate status. The Court thus refers to the Plaintiff's complaint only to ensure that crucial background—such as who the Defendants are—is provided. If the Court is wrong in its description of EMMC, the parties are free to correct the record.

[4]     DSMF ¶ 7 states: "Dr. Brad Waddell is Chief of the Surgery Service at NLEMMC . . .. Dr. Waddell also practices clinically within a medical group called Northern Light Surgical Specialists,

for two years before she was eligible to work in the United States, unless she obtained a J-1 visa waiver.  JSR ¶ 5.  Such a waiver is available under the Conrad 30 Program, which allows international medical graduates who secure employment to provide medical services in an underserved area of the United States for a minimum of three years to waive the J-1 visa requirement that would otherwise require them to return to their foreign residence.  *Id.*; DSMF ¶ 1; PRDSMF ¶ 1.  Following completion of the waiver's three-year term, the physician may seek lawful permanent residency (LPR) status in the United States.  JSR ¶ 5.

EMCC has relied heavily on the Conrad 30 Program because it is challenging to recruit skilled physicians to Bangor, Maine.[5]  DSMF ¶ 2; PRDSMF ¶ 2.  For most

which is a multi-specialty group that includes colorectal, surgical oncology, minimally invasive and bariatric surgery."  DSMF ¶ 7.  The Plaintiff seeks to qualify this statement on the ground that "[t]he separation of responsibilities that Dr. Waddell implies to exist between his role as Chief of Surgery and his equal partnership status does not exist.  He never stops being the Chief of Surgery even within his practice group."  PRDSMF ¶ 7.

The Court is skeptical of the Plaintiff's distinction.  It seems apparent that the role of Chief of Surgery is distinct from the role of general surgeon.  When Dr. Waddell performs surgery, he is not acting in as chief, and when he performs duties as Chief, he is not practicing general surgery, particularly as Dr. Waddell is employed by a separate entity for purpose of his clinical practice.

Moreover, the parties stipulated that "[i]n addition to his clinical practice, Dr. Waddell held the Medical Staff role of Chief of General Surgery."  JSR ¶ 10.  This stipulation confirms that Dr. Waddell's clinical practice was "in addition to," i.e., distinct from, his role as Chief of General Surgery and the Court thus does not accept the Plaintiff's qualification, as it is inconsistent with JSR ¶ 10.  *See Doe v. Austin*, No. 2:22-cv-00368-NT, 2024 U.S. Dist. LEXIS 199423, at *7 (D. Me. Nov. 1, 2024) ("The Local Rules provide that if the parties opt to file jointly stipulated facts, those stipulated facts 'shall control and take precedence over any conflicting statement of fact filed by any party to the stipulation'") (quoting D. ME. LOC. R. 56(b)); *accord Handler v. Mayhew*, No. 1:11-cv-00308-JAW, 2013 U.S. Dist. LEXIS 181227, at *7 n.40 (D. Me. Dec. 30, 2013) ("Once a party agrees to a stipulated fact, he may not contradict that fact in his own statement of facts").

This same disagreement reappears in PSAMF ¶ 8 and DRPSAMF ¶ 8 and the Court concludes it resolved by the above.

[5]    The Plaintiff seeks to qualify DSMF ¶ 2, asserting "[w]hile [EMMC] has relied on the Conrad program, hiring and retaining Doctors on a J-1 visa is not EMMC's preference.  EMMC considers its J-1 visa physicians to be 'risks' for workforce planning purposes. . . [and] believes it is appropriate to look at immigration status to make decisions when it affects business needs."  PRDSMF ¶ 2.  This

of the physicians who come to EMMC with a J-1 waiver, EMMC goes on to support

their application for LPR status, including by retaining immigration counsel and

paying all associated fees and costs.[6]  DSMF ¶ 3; PRDSMF ¶ 3.  EMMC considers

immigration status in hiring decisions when a candidate's status bears upon or is

relevant to business need.[7]  PSAMF ¶ 4; DRPSAMF ¶ 4.  Between 2019 and 2024,

---

qualification is beyond the scope of DSMF ¶ 2, which does not address EMMC's preference for the Conrad 30 Program, whether EMMC considers J-1 visa physicians to be "risks," or whether it is appropriate to look at immigration status in hiring decisions.  *See* DSMF ¶ 2; *see also Martínez-Suárez v. Mansiones De Garden Hills Apartments*, 556 F. Supp. 3d 1, 7 (D.P.R. 2021) (quoting *Acevedo-Padilla v. Novartis Ex Lax, Inc.*, 740 F. Supp. 2d 293, 298 (D.P.R. 2010) ("When evaluating a proper qualification or denial and additional facts, the Court must decide whether 'a party's denial or qualification of a proposed fact [is] strictly limited to the issue therein raised,'" *rev'd and remanded on other grounds*, 696 F.3d 128, 137 (1st Cir. 2012)) ("district court, in an appropriate exercise of its discretion, ruled that it would disregard any additional facts provided by [plaintiff] when denying or qualifying [defendant's] statement of uncontested facts").

Plaintiff alleges this same fact in PSAMF ¶ 3, and Defendants oppose it on the ground that the evidence Dr. Michailidou cites in support, an email chain attached to Attorney Adam Lee's declaration, *Aff. of Adam R. Lee, Esq.* (*Lee Decl.*), Attach. 30, *Ex. 30* (ECF No. 57), does not support her allegation.  DRPSAMF ¶ 3.  The Court agrees with the Defendants.  Exhibit 30 includes an email from Marc Edelman, Senior Vice President, Operations at EMMC to Michael Reid, the Vice President for Provider Services at EMMC and to Dr. James Clarke, Senior Physician Executive.  (Dr. Clarke's position at EMMC is not revealed in this email exchange but is elsewhere confirmed.  *See* PSMF ¶ 7).  The Edelman email states "Mike: Yes, awesome, thoughts on other category, at Risk for a number of reasons, J 1, spouse, etc. provider specific.  Marc."  *Ex. 30* at 1.

The Court cannot reasonably extrapolate from this single email the Plaintiff's general allegation that "[w]hile it has relied on the Conrad program, hiring and retaining Doctors on a J-1 visa is not EMMC's preference [and] EMMC considers its J-1 visa physicians to be 'risks' for workforce planning purposes.'"  PSAMF ¶ 3.  The Marc Edelman email of September 21, 2020 addresses recruitment to the Medical Oncology, Cardiology, and Cardiac Surgery practices, not General Surgery, and notes that the considerations are "provider specific."  *Ex. 30* at 1.  The Court declines to infer a general attitude at EMMC regarding J-1 visa physicians from this one email, which discusses "provider specific" issues.

[6]    The Plaintiff seeks to qualify DSMF ¶ 3 on the ground that "EMMC considers its J-1 visa physicians to be 'risks' for workforce planning purposes . . . [and] believes it is appropriate to look at immigration status to make decisions when it affects business need . . ..  When Dr. Waddell became chief, two other foreign-born surgeons lost their contracts."  PRDSMF ¶ 3.  The Court does not credit this qualification because it is beyond the scope of DSMF ¶ 3.  *See Martínez-Suárez*, 556 F. Supp. 3d at 7.

[7]    PSAMF ¶ 4 alleges "EMMC believes it is appropriate to look at immigration status to make decisions when it affects by business need," PSAMF ¶ 4 (citing JSR, Attach. 12, *Ali Worster Dep.* at 37:5-40:15 (*Worster Dep.*), and Defendants object and seek to qualify on the ground that "[t]he phrase 'affects by business need' is unclear" and "should be modified to conform to the evidence Plaintiff has

EMMC successfully obtained J-1 waivers and sponsored H-1B visas for approximately eighty-eight physicians, including Dr. Michailidou, at a cost to EMMC of approximately $4,550 to $5,780 per physician. DSMF ¶ 4; PRDSMF ¶ 4. In addition, between 2019 and 2022, EMMC sponsored approximately sixty-two physicians' J-1 waivers and H-1B visas; of these sixty-two physicians, EMMC sponsored LPR applications for fifty-six individuals at a cost to EMMC of between $9,995 and $10,320 per physician. DSMF ¶ 5; PRDSMF ¶ 5.

Two foreign-born physicians left EMMC after Dr. Waddell became Chief of Surgery, although Dr. Sophia Villanueva, a colorectal surgeon at EMMC, does not know under what circumstances.[8] PSAMF ¶ 10; DRPSAMF ¶ 10.

### C.    Dr. Michailidou's Employment at EMMC

In 2018, EMMC hired Dr. Michailidou as a colorectal surgeon for a three-year term. JSR ¶ 8; DSMF ¶ 6; PRDSMF ¶ 6. As part of their employment agreement,

---

cited," which "reflects that [EMMC] considers immigration status in hiring when a candidate's immigration status bears upon or is relevant to business need." DRPSAMF ¶ 4. The Court agrees with the Defendants and amends PSAMF ¶ 4 for clarification and to reflect Ms. Worster's deposition testimony.

[8]    PSAMF ¶ 10 says "When Dr. Waddell became chief, two other foreign-born surgeons lost their contracts." PSAMF ¶ 10 (citing JSR, Attach. 9, *Cont. Zoom Dep. of Sophia S. Villanueva, M.D., FACS* at 22:9-23:19 (*Villanueva Dep. Cont.*)). Defendants object on Rule 602 grounds, asserting a "reasonable trier of fact could [not] believe that [Dr. Villanueva] had personal knowledge' concerning the circumstances under which these physicians left [EMMC]," DRPSAMF ¶ 10 (quoting *United States v. Doe*, 960 F.2d 221, 223 (1st Cir. 1992), directing the Court to Dr. Villanueva's testimony that she did not "know what happened" with one of the surgeons but heard "through the grapevine that he – his contract was not renewed," and, regarding the second, testified "we also didn't know what happened. Did he leave? Did he resign? Did – was he forced to resign? No one knows. Nobody can ask . . .. And I don't really know . . . what happened." *Villanueva Dept. Cont.* at 22:12-23:16. Defendants thus seek to qualify PSAMF ¶ 10 to say: "Two surgeons left [EMMC] at some point after Dr. Waddell became Chief of Surgery and Dr. Villanueva does not know the circumstances under which they did so." DRPSAMF ¶ 10.    The Court amended PSAMF ¶ 10 slightly to clarify that the circumstances surrounding the departure of these two foreign-born physicians are not known to Dr Villanueva.

EMMC sponsored Dr. Michailidou for a J-1 visa waiver and H-1B visa and paid all costs associated with the same.[9]  JSR ¶ 8; DSMF ¶ 6; PRDSMF ¶ 6; PSAMF ¶ 2; DRPSAMF ¶ 2.

Dr. Michailidou began work at EMMC on August 31, 2018.  JSR ¶¶ 6, 8-9; DSMF ¶ 8; PRDSMF ¶ 8; PSAMF ¶ 5; DRPSAMF ¶ 5.

### D.    Dr. Michailidou's Colleagues

During her tenure at EMMC, Dr. Michailidou practiced within the Northern Light Surgical Specialists medical group alongside Dr. Peter Huang, the Lead Physician in the group, Dr. Michelle Toder, Dr. Villanueva, and Dr. Waddell.  JSR ¶¶ 6, 8-9; DSMF ¶ 8; PRDSMF ¶ 8; PSAMF ¶ 5; DRPSAMF ¶ 5. Dr. Waddell was hierarchical, PSAMF ¶ 9; DRPSAMF ¶ 9, and, although there is not a formal distinction between senior and junior partners at EMMC, Dr. Waddell regarded himself, Dr. Toder, and Dr. Huang as senior to Dr. Villanueva and Dr. Michailidou.[10]

---

[9]    The parties agree that, at all times relevant to Dr. Michailidou's complaint, EMMC has secured the payment of workers' compensation benefits to its employees by maintaining the Eastern Maine Group Workers' Compensation Trust Fund, which has at all relevant times been authorized to self-insure workers' compensation benefits.  DSMF ¶ 94; PRDSMF ¶ 94.  Although the parties agree  to this factual allegation, the Court excludes it from the statement of facts because Plaintiff in her opposition to summary judgment clarifies that she "does not pursue claims for IIED regarding actions prior to [her] forced resignation, [and] accordingly no response to Workers' Compensation Exclusivity is necessary, as it does not apply to claims subsequent to employment," *Pl.'s Opp'n* at 16 n.2, and, thus, EMMC's involvement with Maine Group Workers' Compensation Trust Fund is not relevant to their dispute.

[10]    PSAMF ¶ 6 alleges "Even though there is not supposed to be a distinction between senior partners and junior partners, Dr. Waddell thinks of himself, Toder and Huang as Senior partners." PSAMF ¶ 6.  Defendants object and qualify on the ground that "[t]he cited testimony does not state or suggest 'there is not supposed to be a distinction between senior and junior partners,' but rather that these labels are not formally defined or recognized. . .. otherwise, admitted."  DRPSAMF ¶ 6.  The Court agrees with the Defendants' interpretation of the Plaintiff's citation in support of PSAMF ¶ 6 and amends the statement of fact accordingly.

PSAMF ¶ 9 similarly alleges "Dr. Waddell was very hierarchical and sat atop the hierarchy," and Defendants qualify that "Dr. Waddell was hierarchical and held the position [of] Chief of Surgery."

PSAMF ¶ 6; DRPSAMF ¶ 6.  Dr. Waddell, Dr. Clarke, Dr. Toder, and Dr. Huang shared decision-making power at EMMC in their respective leadership roles as Chief of Surgery, Senior Physician Executive, Robotics Chair, and Practice Lead Physician.[11]  PSAMF ¶ 7; DRPSAMF ¶ 7.  As Chief of Surgery, Dr. Waddell determines which cases with complications are presented in the context of Mortality and Morbidity reviews.[12]  PSAMF ¶ 24; DRPSAMF ¶ 24.  In Dr. Waddell's construction of the way the partnership works, partners are supposed to figure out their role in the partnership in the same way they figure out where the bathroom is, the more senior partners are supposed to show them.  PSAMF ¶ 20; DRPSAMF ¶ 20.  If someone is not included in a hiring process for instance, and the decision has been

---

DRPSAMF ¶ 9.  The Court amends PSAMF ¶ 9 to reflect the Defendants' recitation of fact, which the Court agrees is reflected by the citation both parties provide in support.  *See* JSR, Attach. 8, *Dep. via Zoom of Sophia Villanueva, M.D., FACS* at 60:2-10 (*Villanueva Dep.*).

[11]    PSAMF ¶ 7 says "Dr. Waddell, Dr. Clarke, Dr. Toder, and Dr. Huang had all of the decision-making power in the practice," PSAMF ¶ 7, and DRPSAMF ¶ 7 qualifies "[t]he evidence supports that these individuals had decision-making authority because they held the leadership roles of Chief of Surgery, Senior Physician Executive, Robotics Chair, and Practice Lead Physician, respectively." DRPSAMF ¶ 7.  Both parties cite Dr. Villanueva's deposition transcript at 15:12-25 in support of their respective statements of material fact, in which Dr. Villanueva responds to the question "Who was, from your perspective[,] in the position to make decisions [at EMMC]?" by answering "[i]t's Dr. Waddell, it's Dr. Clark, Toder, Huang.  Everybody had some sort of position.  Huang was the practice lead physician.  Dr. Toder was the robotics chair.  Dr. Waddell was . . . the chair of the department of surgery, then Clark was the . . . department of surgery initially . . . and then . . . was the physician. So they . . . pretty much had ahold of every, you know, leadership position." *Villanueva Dep. Cont.* at 15:12-24.  The Court agrees with Dr. Michailidou's representation of this fact, but amends PSAMF ¶ 7 slightly to include the respective leadership roles of these four doctors.

[12]    Plaintiff alleges "Dr. Waddell greatly affected the attitude of other individuals in the practice towards a physician, because he is the filter of all of a physician's complications, including deciding which cases get presented to the Mortality and Morbidity." PSAMF ¶ 24.  Defendants object and qualify on the ground that PSAMF ¶ 24 is overly broad and unsupported by the evidence, which they insist "supports only that Dr. Waddell, as Chief of Surgeon, determined which cases with complications were presented in the context of Mortality and Morbidity reviews." DRPSAMF ¶ 24.  The Court, upon reviewing the evidence cited by both parties, agrees with the Defendants and amends the factual statement accordingly.

made, it's too bad, because the decision has been made.  PSAMF ¶ 20; DRPSAMF ¶ 20.

Dr. Villanueva is a female colorectal surgeon originally from Venezuela. DSMF ¶ 9; PRDSMF ¶ 9.  Another Maine healthcare entity sponsored Dr. Villanueva's J-1 visa waiver, after which EMMC hired her and sponsored her LPR application.  DSMF ¶ 9; PRDSMF ¶ 9.  During her tenure at EMMC, Dr. Villanueva was never disciplined concerning her employment or privileges, and she left EMMC in 2022 for the stated reason of moving to Virginia to be closer to family following the birth of her second child.[13]  DMSF ¶ 9; PRDSMF ¶ 9.

During her time at EMMC, Dr. Villanueva felt "junior physicians or new physicians are [not] really treated like equal partners," and while she could share her opinion in meetings, she "didn't really make decisions" because she was the "junior

---

[13]    Dr. Michailidou seeks to qualify DSMF ¶ 9:

> Dr. Villanueva hated the environment at EMMC.  It was a hostile environment, and it's not a safe place for individuals to share contrary opinions.  If you share a contrary opinion you'll get in trouble.  It was a traumatic part of her life . . . .  Dr. Villanueva was never treated like an equal partner.  She felt that as a physician on a visa, she was never in a position to question anything, because she may lose her job, and losing her job[] meant leaving the country . . ..  Dr. Villanueva felt that Junior attendings with visa waivers did not have decision making power or much of a say in the practice . . ..  Dr. Villanueva was only considered a senior partner when they needed her to do something or take on more responsibility . . ..  Dr. Waddell would take credit and compensation for work that Dr. Villanueva did.  She was the only immigrant on a visa waiver who worked on the ERAs protocol and was the only one who wasn't compensated for her participation in the ERAs protocol process. . ..  Dr. Waddell did not treat Dr. Villanueva like a peer[;] he was condescending and belittling, treating her like a child.

PRDSMF ¶ 9.  The Court does not include this qualification because it is outside the scope of DSMF ¶ 9., *Martínez-Suárez*, 556 F. Supp. 3d at 7, and violates Local Rule 56(b)(1)'s requirement that statements of material fact be "short and concise."  D. ME. LOC. R. 56(b)(1).

attending."[14]  PSAMF ¶ 15; DRPSAMF ¶ 15; PSAMF ¶ 19; DRPSAMF ¶ 19.  She believed Dr. Waddell, Dr. Clark, Dr. Toder, and Dr. Huang only referred to her as a "senior surgeon" when they needed her to take on a particular responsibility.[15] PSAMF ¶ 18; DRPSAMF ¶ 18.

At one point, when she sought information about Dr. Michailidou's departure from EMMC, Dr. Villanueva perceived Dr. Waddell to speak to her dismissively and "like a child."[16]  PSAMF ¶ 16; DRPSAMF ¶ 16.  Dr. Villanueva believed Dr. Waddell would take credit and receive compensation for her work, including the Enhanced

---

[14]    Dr. Michailidou alleges that "[she] and Dr. Villanueva were never treated like equal partners. As physicians on a visa, they were never in a position to do anything about it because they were fully beholden to EMMC, and losing their jobs meant leaving the country.  That was the hierarchy."  PSAMF ¶ 15 (citing *Villanueva Dep. Cont.* at 12:13-14:15).  Defendants object and qualify and instead point to Dr. Villanueva's specific comments on the issue of her visa and her status at the hospital.  DRPSAMF ¶ 15.  The Court agrees with Defendants that Dr. Villanueva's own testimony is a more accurate description of her position on these points, and amends PSAMF ¶ 15 accordingly.

The Court determines PSAMF ¶ 19 and DRPSAMF ¶ 19 are resolved by the above discussion.

[15]    Defendants seek to qualify Plaintiff's statement in PSAMF ¶ 18 that "Dr. Villanueva was only considered a senior partner when they needed her to do something or take more responsibility" by instead asserting that, "[a]ccording to Dr. Villanueva, Dr. Waddell, Dr. Clark, Dr. Toder, and Dr. Huang referred to her as 'the senior surgeon' only in the context of asking her to 'do . . . stuff' with Plaintiff or giving her direction in connection with the ERAs protocol; but she otherwise perceived that she did not have 'much say.'"  DRPSAMF ¶ 18.  The Court considers the parties' dispute mostly semantic but amends slightly PSAMF ¶ 18 to indicate Dr. Villanueva had this perception specifically regarding Dr. Waddell, Dr. Clark, Dr. Toder, and Dr. Huang.

The Court overrules Defendants' alternative objection to PSAMF ¶ 18 pursuant to Rule 602 and disagrees with the Defendants that a "reasonable trier of fact could [not] believe [Dr. Villanueva] had personal knowledge" concerning how her partners viewed or "considered" her.  DRPSAMF ¶ 18 (quoting *Doe*, 960 F.2d at 223).

[16]    PSAMF ¶ 16 says "Dr. Waddell did not treat Dr. Villanueva as a peer[;] he was condescending and belittling, treating her like a child."  PSAMF ¶ 16 (citing *Villanueva Dep. Cont.* at 21:14-22:8). Defendants qualify that the testimony Plaintiff cites in support of its statement establishes only that Dr. Villanueva felt as if Dr. Waddell spoke to her in a condescending manner on one occasion. DRPSAMF ¶ 16.  The Court reviewed Dr. Villanueva's testimony at the section provided by Plaintiff and Defendants and agree it supports the Defendants' qualification.

Recovery After Surgery (ERAS) protocol, which Dr. Villanueva started at EMMC.[17] PSAMF ¶ 17; DRPSAMF ¶ 17.  Dr. Villanueva was the only person involved in the ERAS proposal to EMMC's administration who did not receive funding or get paid for her work, and additionally the only person within the same group who was on a waiver and is not white; she believes Dr. Waddell, in contrast, received at least $20,000 a year for his involvement.  PSAMF ¶ 17; DRPSAMF ¶ 17.  Throughout her time at EMMC, Dr. Villanueva was "very careful" because she was "beholden to [EMMC] for [her] job because [she] had a visa waiver" and would need to leave the United States if she lost her employment.  PSAMF ¶ 15; DRPSAMF ¶ 15.

### E.    Initial Complaints Regarding Dr. Michailidou's Practice and Professionalism

In 2018 and 2019, Dr. Waddell received feedback from two highly skilled and experienced Physician Assistants (PA), Jude Tardy and Rochelle Loeb, who had both spent a significant amount of time supporting Dr. Michailidou in the operating room, expressing concern regarding her surgical techniques and specifically reporting to Dr. Waddell that Dr. Michailidou's techniques were unsafe and that she was dismissive of their input.  DSMF ¶ 16; PRDSMF ¶ 16.  Dr. Michailidou questions the motivation behind PA Tardy and PA Loeb's report, pointing to testimony of Dr. Villanueva that

---

[17]    Because the Court concludes PSAMF ¶ 17 is fully supported by Dr. Villanueva's testimony, *see Villanueva Dep. Cont.* at 19:1-21:3, it does not accept the Defendants' objection or qualification that the evidence Plaintiff cites does not support PSAMF ¶ 17.  DRPSAMF ¶ 17.

PAs and others in the workplace were scared of Dr. Waddell and preferred to be on his good side.[18]  DSMF ¶ 16; PRDSMF ¶ 16; PSAMF ¶¶ 25, 66; DRPSAMF ¶¶ 25, 66.

Dr. Michailidou believes this is particularly true of women and, during her time at EMMC, recalls that Dr. Waddell treated men differently than women and spoke to her in a degrading manner, including in front of her colleagues.[19]  PSAMF ¶

---

[18]    Plaintiff objects to DSMF ¶ 16 on the ground that it is hearsay.  PRDSMF ¶ 16.  She also seeks to qualify DSMF ¶ 16 on the ground that "Dr. Waddell is at the top of the hierarchy [and] PAs, like Jude Tardy and Rochelle Loeb, nurses, and other surgeons were best served to be on his good side and not question his decisions. . .."  PRDSMF ¶ 16.

The Court addresses Plaintiff's objection first.  "'It is black-letter law that hearsay evidence cannot be considered on summary judgement' for the truth of the matter asserted."  *Hannon v. Beard*, 645 F.3d 45,49 (1st Cir. 2011) (quoting *Dávila v. Corporación de P.R. para la Difusión Pública*, 498 F.3d 9, 17 (1st Cir. 2007)).  However, "[o]ut-of-court statements offered not to prove the truth of the matter asserted but merely to show context—such as a statement offered for the limited purpose of showing what effect the statement had on the listener—are not hearsay."  *Stark v. Hartt Tasp. Sys.*, 37 F. Supp. 3d 445, 462 n.47 (D. Me. 2014) (quoting *United Staes v. Cabrera-Rivera*, 583 F.3d 26, 33 n.4 (1st Cir. 2009)).  Here, the Court amends DSMF ¶ 16 slightly to reflect the effect of PA Tardy and PA Loeb's statements on Dr. Waddell, an amendment consistent with the portion of Dr. Waddell's declaration Defendants cite in support.  *See Decl. of Brad E. Waddell, M.D.* ¶ 16 (ECF No. 46) (*Waddell Decl.*).

Turning to the Plaintiff's qualification, the Court reviewed the authorities Plaintiff provides in support and, in the following sentence, adds the qualification that Dr. Michailidou believes the PAs shared this information with Dr. Waddell because "people are scared of him," *Villanueva Decl.* at 45:24, and agree they "are best served by being on his good side."  *Id.* at 45:21-24.  Plaintiff raises this same factual allegation in PSAMF ¶ 25 ("Dr. Waddell is at the top of the hierarchy.  PA's, nurses, and other surgeons were best served to be on his good side and not question his decisions.  People were scared of him"), and Defendants object and also qualify, DRPSAMF ¶ 25, and the Court determines the disagreement resolved by the above.  The Court reaches the same conclusion regarding PSAMF ¶ 66, which specifically asserts PA Tardy sided with Dr. Waddell in disputes because they had a longstanding professional relationship and Dr. Waddell is the Chief of Surgery.  Again, this is resolved by the above.

[19]    Plaintiff alleges "Dr. Waddell treated men differently from women," and "treated Dr. Michailidou so poorly in front of other physicians, they would contact her later to apologize."  PSAMF ¶ 12 (citing JSR, Attach. 6, *Dep. of Maria Michailidou* at 26:14-27:19) (*Michailidou Dep.*).  Defendants object and qualify, alleging the first part of Dr. Michailidou's statement is a conclusory legal allegation and the second part of her statement is over-stated because the evidence Plaintiff cites in support only states that one female colleagues called her in the way she describes.  DRPSAMF ¶ 12.  The Court amends PSAMF ¶ 12 to reflect Dr. Michailidou's deposition testimony, which states that one female oncologist called her to apologize and, further, that Dr. Michailidou believed Dr. Waddell treated men differently than women.  *See Michailidou Dep.* at 26:14-27:19.

12; DRPSAMF ¶ 12.  After an oncology meeting, a female senior oncologist called Dr. Michailidou to apologize for the way Dr. Waddell had treated her.  PSAMF ¶ 12; DRPSAMF ¶ 12.  The parties agree Dr. Waddell would frequently raise his voice when he got angry and when he gave commands.  PSAMF ¶ 26; DRPSAMF ¶ 26.  He would also make people cry.  PSAMF ¶ 26; DRPSAMF ¶ 26.

In December of 2018, Dr. Michailidou left a sponge inside a patient's abdomen during surgery.  DSMF ¶ 17; PRDSMF ¶ 17.  During a surgical procedure at EMMC, the operating room staff perform a sponge count at the beginning of an operation and a second count before the physician closes the patient; if there is a discrepancy between the sponge counts, medical staff perform an x-ray intraoperatively.  DSMF ¶ 17; PRDSMF ¶ 17.  When there was a discrepancy in the sponge count in Dr. Michailidou's surgery in 2018, she first looked inside the patient's abdomen and, when she did not observe a sponge, ordered an x-ray, and then reviewed it with the radiologist, who reported that he observed a foreign object but did not see something that resembled a sponge.[20]  DSMF ¶ 17; PRDSMF ¶ 17.  Because a penrose can look

---

[20]    DSMF ¶ 17 says:

> In December of 2018, Dr. Michailidou left a sponge inside a patient's abdomen during surgery, notwithstanding a discrepancy in the sponge count at the conclusion of the procedure and an x-ray that showed a foreign object in the patient's abdomen. The patient experienced complications and underwent a second surgery to remove the sponge.

DSMF ¶ 17 (citing *Michailidou Dep.* at 48:10-50:18; *Waddell Decl.* ¶ 19).  Dr. Michailidou qualifies the Defendant's statement, adding:

> With regard to the sponge incident, Dr. Michailidou relied on the radiologist's reading of the abdomen to determine that there was not a sponge inside the patient.  Dr. Michailidou ultimately corrected the issue.  Taking the x-ray was the appropriate and correct thing to do.  It is a relatively common thing that has happened [to] numerous surgeons, including Dr. Villanueva, who was not disciplined for it.  It is understandable

like the string on a sponge, Dr. Michailidou mistook the foreign object on the x-ray for a properly placed penrose and proceeded to close the patient. DSMF ¶ 17; PRDSMF ¶ 17. However, the patient later experienced complications and underwent a second surgery to remove the sponge. DSMF ¶ 17; PRDSMF ¶ 17. A retained surgical sponge is a sentinel event, also referred to as a "never event," which is extremely uncommon and largely preventable.[21] DSMF ¶ 18; PRDSMF ¶ 18.

On September 16, 2019, Dr. Michailidou mistakenly injured her patient's ureter during a surgical procedure; upon discovering her error, she properly reported

---

that the sponge was mistaken for a penrose. Hindsight is 20/20, but it did not constitute a gross deviation from the applicable standard of care.

PRDSMF ¶ 17 (citing *Michailidou Dep.* at 48:10-54:11; *Villanueva Dep. Cont.* at 26:15-33:4).

The Court reviewed the authorities both parties provided in support of their respective versions of the 2018 sponge incident. First, both parties agree that, in December of 2018, Dr. Michailidou accidentally left a sponge inside a patient's abdomen during surgery, and, further, that there was a discrepancy in the sponge count between the beginning and end of surgery. They also appear to agree that a sponge count followed proper procedure, and, when the error was discovered, it was corrected through the removal of the sponge. The Court has rewritten DSMF ¶ 17 and PRDSMF ¶ 18 to reflect these points of agreement.

The Court also accepts Dr. Michailidou's qualification that the sponge was mistaken for a penrose, a mistake Dr. Villanueva agreed was understandable because "[t]he Penrose can look like that little string on the sponge." *Villanueva Dep. Cont.* at 29:18-19. However, the Court does not accept Dr. Michailidou's additional qualification that "[i]t is a relatively common thing that has happened [to] numerous surgeons, including Dr. Villanueva, who was not disciplined for it," PRDSMF ¶ 17, because Plaintiff provides no support for this portion of the qualification and the Court does not observe it within the portion of Dr. Villanueva's deposition transcript Plaintiff cites elsewhere in PRDSMF ¶ 17.

[21] Plaintiff seeks to qualify DSMF ¶ 18 for "[the] [s]ame qualification as [PRDSMF] 17." PRDSMF ¶ 18. The Court reviewed the citations Defendants provide in support of DSMF ¶ 18 and agree they support the Defendants' statement of material fact. *See* DSMF ¶ 18 (citing *Michailidou Dep.* at 80:5-16; *Waddell Decl.* ¶ 20). Both Dr. Waddell's declaration and Dr. Michailidou's deposition transcript agree, in the latter's words, "the surgical sponge, it's a – it should be a no event, like a never event." *Michailidou Dep.* at 80:10-11.

the event and has not made the same mistake again.[22]  DSMF ¶ 19; PRDSMF ¶ 19; PSAMF ¶ 37; DRPSAMF ¶ 37.  However, as a result of the surgical error in 2019, the patient underwent at least four additional operations.  DSMF ¶ 19; PRDSMF ¶ 19.  Dr. Michailidou concedes the ureteral injury is a serious health event but asserts it is a known complication of the kind of procedure this patient underwent in September of 2019.  DSMF ¶ 20; PRDSMF ¶ 20.  Both before and after September of 2019, Dr. Michailidou followed the same standards in surgery to check for and avoid ureteral injuries.[23]  DSMF ¶ 20; PRDSMF ¶ 20.

In another instance, Dr. Michailidou expressed her preference for using TAP blocks[24] on a patient; the ERAS protocol instead instructed the use of an epidural and Dr. Villanueva, who developed the ERAS protocol, told the Plaintiff to follow the protocol.[25]  PSAMF ¶ 38; DRPSAMF ¶ 38.

On January 10, 2019, Dr. Waddell received a written complaint from a nurse who described Dr. Michailidou as unacceptably rude to staff and reported that she

---

[22]    The Court accepts Plaintiff's qualification that "[s]he properly reported the event [and] [s]he's never had a repeat of the ureter injury," agreeing it properly qualifies DSMF ¶ 19 and is supported by the authorities Plaintiff provides in support.

[23]    DSMF ¶ 20 says Dr. Michailidou "asserts there is nothing she could have done differently to avoid the injury and maintains she changed nothing about her practices following the injury to minimize the risk of it happening again."  DSMF ¶ 20.  PRDSMF ¶ 20 qualifies that "Dr. Michailidou learned from the ureter injury.  She would consult urology intraoperatively for help.  She has not had a repeat of the ureter injury."  PRDSMF ¶ 20.  The Court confirmed Dr. Michailidou's deposition transcript, at the location cited by each party in support of their respective statements of material fact, and rewrote DSMF ¶ 20 slightly to acknowledge that the reason Dr. Michailidou has not deviated her standard of care regarding ureter injuries is because, at the time of the September 2019 injury, she also followed the appropriate standards of care.  *See Michailidou Dep.* at 81:1-10.

[24]    The parties do not define this term.

[25]    The Court amends PSAMF ¶ 38 slightly to include the context provided by DRPSAMF ¶ 38.

removed a specimen from a patient and left it unlabeled and underneath trash on a tray and without an order. DSMF ¶ 21; PRDSMF ¶ 21. Dr. Michailidou believes she was not rude in this encounter, and that people sometimes find her personality and tone different from what they expect; she believes this perception owes in part to her gender.[26]  DSMF ¶ 21; PRDSMF ¶ 21; PSAMF ¶ 21; DRPSAMF ¶ 21.  In addition, having been born in Greece and educated partly in Germany, Dr. Michailidou has found through experience that her tone and directness are often perceived in the United States as rude or aggressive. PSAMF ¶ 22; DRPSAMF ¶ 22.  She has spent a significant amount of time working on this and believes emotional intelligence training she received at EMMC is working; a large part of this issue, however, is cultural. PSAMF ¶ 22; DRPSAMF ¶ 22.  After the reported incident, Dr. Waddell and Dr. Huang met with Dr. Michailidou to discuss the nurse's report and why her

---

[26]    Dr. Michailidou objects to DSMF ¶ 21 on hearsay grounds and qualifies "Dr. Michailidou and the patient were familiar with one another, and so there was no need for an introduction. Dr. Michailidou was not rude. Dr. Michailidou understands that some people find her personality and tone different from what they expect . . . . She was born in Greece and spent a significant portion of her educational years in Germany . . . . Maria's brash demeanor was perceived as a problem because she was a woman, when in actuality it is confidence which is a valued trait for surgeons." PRDSMF ¶ 21 (citing *Michailidou Dep.* at 19:17-21:20, 81:11-82:1, 6:11-20; *Villanueva Dep. Cont.* at 33:21-34-12, 35:7-36:6).

First, the Court overrules the Plaintiff's hearsay objection, on the ground that Defendants offer the nurse's complaint not for the truth of the matter asserted but for its effect on the listener. Second, the Court concludes the Plaintiff's qualification that "[she] and the patient were familiar with one another, and so there was no need for an introduction," PRDSMF ¶ 21, is beyond the scope of DSMF ¶ 21, which only refers to Dr. Michailidou's disposition and interaction with staff, not a patient. DSMF ¶ 21. However, the Court amends DSMF ¶ 21 slightly to add Dr. Michailidou's qualification that "some people find her personality and tone different from what they expect," which she attributes in part to her gender. PRDSMF ¶ 21.

Plaintiff similarly alleges "[her] brash demeanor was perceived as a problem because she was a woman, when in actuality it is confidence which is a valued trait for surgeons," PSAMF ¶ 21, and Defendants object. DRPSAMF ¶ 21. The Court determines this disagreement resolved by the above.

reported demeanor and handling of the specimen were of concern.[27]  DSMF ¶ 22; PRDSMF ¶ 22.

On May 31, 2019, Dr. Michailidou sent what she acknowledges was an unprofessional email communication to the Director of Clinical Documentation. DSMF ¶ 23; PRDSMF ¶ 23.  Specifically, in response to a request that Dr. Michailidou add to a patient's medical record information about the patient's diagnosis upon presentation to the Emergency Department, Dr. Michailidou replied: "Unfortunately my time is too precious to make addendums all day for appropriate documentation… I'm sorry."[28]  DSMF ¶ 23; PRDSMF ¶ 23.  Dr. Waddell emailed Dr. Michailidou about her May 31, 2019 email communication and explained that her communication was unacceptable; Dr. Michailidou replied and apologized.  DSMF ¶ 24; PRDSMF ¶ 24.

On August 11, 2019, Dr. Michailidou reviewed a patient's medical chart "out of curiosity," which she quickly acknowledged was in violation of EMMC's policy and

---

[27]    The Court rejects Dr. Michailidou's denial that "[she] does not recall having a conversation with them, she recalls receiving an email from Dr. Waddell," PRDSMF ¶ 22, because the authority Defendants cite in support of DSMF ¶ 22 supports their version of events, namely, that this meeting occurred in person.  DSMF ¶ 22 (citing *Waddell Decl.* ¶ 23) (in turn citing *id.*, Attach. 2, *Ex. B* at 1).

[28]    Dr. Michailidou "acknowledged that the email was not professional and apologized for sending it," but qualified that she "understands that some people find her personality and tone different from what they expect," and restating that she was born in Greece, educated in Germany, and that her brash demeanor "was perceived as a problem because she was a woman."  PRDSMF ¶ 23.  The Court does not credit this qualification, for the reason that it is beyond the scope of DSMF ¶ 23, which Plaintiff herself acknowledged was accurate.  *See* PRDSMF ¶ 23 ("Maria acknowledged that the email was not professional and apologized for sending it.").

HIPAA.[29]  DSMF ¶ 25; PRDSMF ¶ 25.  Dr. Waddell addressed this policy violation

with Dr. Michailidou in person and in writing.  DSMF ¶ 25; PRDSMF ¶ 25.

On multiple occasions prior to September 2019, Dr. Michailidou placed orders

or otherwise took action with respect to an inpatient after hours, without

communicating to the on-call physician, who is charged with the inpatients' care after

hours; Dr. Waddell discussed this issue with Dr. Michailidou, explaining why

communication is critical in this context.[30]  DSMF ¶ 26; PRDSMF ¶ 26.

On or about September 26, 2019, Dr. Michailidou placed evening orders for an

inpatient about whose condition she had concerns and failed to tell the on-call

---

[29]    Dr. Michailidou "acknowledged very quickly that she shouldn't have done the chart review,"
and adds that "[she] understands that some people find her personality and tone different from what
they expect," she was born in Greece and educated in Germany, and her "brash demeanor was
perceived as a problem because she was a woman."  PRDSMF ¶ 25.  The Court amends DSMF ¶ 25
slightly to indicate the Plaintiff acknowledged her error "quickly," but does not credit the remainder
of the Plaintiff's qualification for the reason that it is beyond the scope of the Defendant's statement
of material fact.

[30]    The Plaintiff raises a hearsay objection to DSMF ¶ 26 but does not explain on what grounds.
Dr. Waddell, at the portion of his declaration cited by Defendants, says, in relevant part:

> On more than one occasion prior to September of 2019, Dr. Michailidou placed orders
> or otherwise took action with respect to an inpatient after hours, without
> communicating what she was doing and why to the on-call physician. Communication
> is critical in this context because the on-call physician is the individual charged with
> the patient's care after hours and s/he cannot appropriately and effectively care for the
> patient without all relevant information. Each time it came to my attention that Dr.
> Michailidou failed to communicate with the on-call physician, I addressed the issue
> with her directly and explained the importance of communication with her partners.

*Waddell Decl.* ¶ 26.  By the Court's read, Dr. Waddell is stating what he learned from other doctors
regarding Dr. Michailidou's behavior and is offering their statements for their effect on the listener.
*See id.* ("Each time it came to my attention that Dr. Michailidou failed to communicate with the on-
call physician, I addressed the issue with her directly and explained the importance of communication
with her partners").

Plaintiff also seeks to qualify DSMF ¶ 26: "During the Dr. Heatherman event, Dr. Michailidou
had called EMIC – and the CAT scan in question was normal, so at that point there were no findings
and therefore no need for communication."  PRDSMF ¶ 26.  Dr. Waddell's declaration discusses a
communication with Dr. Heatherman which occurred on September 27, 2019; this date is beyond the

physician she had done so.[31]  DSMF ¶ 27; PRDSMF ¶ 27.  On September 27, 2019, Dr. Waddell emailed Dr. Michailidou about this and informed her that patient-care-related communication among partners was an "unequivocal expectation;" she responded that she had forgotten to share this information and should have done so. DSMF ¶ 27; PRDSMF ¶ 27.

On October 3, 2019, Dr. Waddell received a report from a nurse concerning an interaction with Dr. Michailidou that the nurse characterized as consistent with an observed pattern of behavior.[32]  DSMF ¶ 28; PRDSMF ¶ 28.  Specifically, the nurse reported that Dr. Michailidou spoke to her in an aggressive fashion, talked over her, and was generally rude, writing in her report: "Unfortunately, this has not been the

---

scope of DSMF ¶ 26, which addresses "multiple occasions *prior to* September 2019."  DSMF ¶ 26 (emphasis supplied).

[31]  Plaintiff qualifies "Dr. Michailidou wouldn't ever order a CAT scan and not follow up on it, had there been an issue, she would have called Dr. Heatherman or the on-call doctor directly."  PRDSMF ¶ 27.  In support of DSMF ¶ 27, Defendants cite Dr. Waddell's declaration, which provides:

> On September 27, 2019, Dr. Heatherman (who had been on call the night before) reached out to me, complaining that Dr. Michailidou had ordered a CT scan and an EMIC consult on an inpatient the evening prior without alerting Dr. Heatherman to the orders or to whatever concerns prompted her to place the orders between 8-9 p.m. I emailed Dr. Michailidou, asking whether she communicated with the on-call partner about her orders and the EMIC consult, and Dr. Michailidou replied that she "forgot" but "should have." I replied, reminding Dr. Michailidou of our previous conversations about this subject and reiterating that communication with our partners was "an unequivocal expectation in our group." A true and accurate copy of this email exchange is attached hereto as Exhibit F.

*Waddell Decl.* ¶ 26.  The Court reviewed Exhibit F, *see Waddell Decl.*, Attach 6, *Ex. F*, an email exchange between Dr. Waddell and Dr. Michailidou, and agrees with Defendants that it confirms the version of events as recounted by Dr. Waddell's declaration, namely, that Dr. Michailidou acknowledged, "No I didn't [communicate with her on-call partner regarding her order of a CAT scan for a patient].[ ]I forgot.[ ]I should have[.]"  *Ex. F*.

[32]  The Court overrules Plaintiff's objection on hearsay grounds, again observing DSMF ¶ 28 is admissible because it is offered not for the truth of the matter asserted but its effect on the listener and, further, that Defendants in support cite the report filed by the complaining nurse and, thus, it is not hearsay.  *See Waddell Decl.*, Attach. 7, *Ex. G* at 5-6.

only time that this doctor has been abrupt and not exhibited caring behaviors toward staff.  She is frequently abrasive with nursing staff both at the nurse's station and at the bedside in front of patients.  Dr. Michailidou's demeanor makes it difficult for staff to feel as though they can communicate concerns to her."  DSMF ¶ 28; PRDSMF ¶ 28.  Dr. Michailidou believes the circumstances warranted her demeanor because the young patient had been covered in stool the entire evening while waiting for care at EMMC.[33]  DSMF ¶ 28; PRDSMF ¶ 28.

When Dr. Jim Jarvis, Senior VP and Senior Physician Executive, shared the nurse's report with Dr. Waddell and asked if he was previously aware of the incident, Dr. Waddell responded he was unaware of the incident but not surprised because his practice group had heard of "similar issues in the OR" and also had "some clinical concerns" arise in the past several weeks.[34]  PSAMF ¶ 23; DRPSAMF ¶ 23.

## F.    EMCC's Disciplinary Policy

At all times relevant to Plaintiff's complaint, EMCC maintained a policy and procedure covering steps to be taken when a member of the Medical Staff fails to meet

---

[33]    Plaintiff also denies DSMF ¶ 28: "The incident dealt with a young patient, whose mother was present.  They voiced to Dr. Michailidou their concern that the patient had been covered in stool the entire evening.  Given the circumstances, Dr. Michailidou was not rude or disrespectful."  PRDSMF ¶ 28.  The Court interprets this as a request to qualify, not deny, and accepts it as such, adding a sentence providing the context requested by the Plaintiff and supported by her citation in support.

[34]    PSAMF ¶ 23 alleges "[e]ven prior to the FPPE, Dr. Waddell was undermining Dr. Michailidou's credibility by vaguely referencing clinical concerns to the C-Suite."  PSAMF ¶ 23 (citing JSR, Attach. 10, *Dep. of Brad E. Waddell, M.D.* at 89:9-94:4 (*Waddell Dep.*); *Lee Decl.*, Attach. 2, Ex. 2).  Defendants object that Plaintiff's statement is unsupported by the evidence and respond on the same grounds.  DRPSAMF ¶ 23 (citing *Waddell Dep.* 89:9-4; *Ex. 2*).  The Court reviewed the evidence provided by both parties and amends PSAMF ¶ 23 to reflect this.

the standards for clinical performance or professional behavior (Policy 11-022).[35]  JSR

¶ 11; DSMF ¶ 10; PRDSMF ¶ 10.  Policy 11-022 directs the Service Chief to determine

the appropriate level of response to the performance concern, as between coaching

and counseling, a Chief-directed Focused Performance Practice Evaluation (FPPE),

or disciplinary action.[36]  JSR ¶ 11; DSMF ¶ 11; PRDSMF ¶ 11.  Disciplinary action

or restriction of a practitioner's privileges can have lasting negative effects on a

practitioner, insofar as the practitioner must report these actions to the Maine Board

of Licensure in Medicine (BOLIM) when renewing their license, and EMMC is

sometimes required to report adverse actions to BOLIM or the National Practitioner

Databank.[37]  DSMF ¶ 12; PRDSMF ¶ 12.  FPPE is a process by which medical staff

---

[35]    DSMF ¶ 10 restates JSR ¶ 11, and Plaintiff seeks to qualify on the ground that "[w]hile EMMC has a written policy, the partners did not effectively or thoughtfully plan and schedule to support Dr. Michailidou's development or her improvement on an FPPE. . . ."  PRDSMF ¶ 10.  The Court does not credit this qualification for two reasons: first, it is beyond the scope of DSMF ¶ 10; second, it contradicts a stipulation to which the Plaintiff has agreed.

[36]    The parties stipulate "[a]t all times relevant to Plaintiff's complaint [EMMC] has maintained a policy and procedure covering steps to be taken when a member of the Medical Staff is failing to meet the standards for clinical performance and/or professional behavior.  <u>True and accurate copies of the policies in effect in 2019 and 2020 are attached hereto as Exhibit B</u>."  JSR ¶ 11 (emphasis supplied).  DSMF ¶ 11 says "[t]he policy (11-022) directs the Service Chief to determine the appropriate level of response to the performance concern, as between coaching/counseling, a Chief-directed Focused Professional Practice Evaluation ('FPPE'), or disciplinary action."  DSMF ¶ 11 (citing JSR ¶ 11; *Waddell Decl.* ¶ 11).  Plaintiff seeks to qualify DSMF ¶ 11, explaining "[s]ame qualification as [PRDSMF ¶] 10."  PRDSMF ¶ 11.

    The Court does not credit the qualification in PRDSMF ¶ 11 for the same reasons it did not credit PRDSMF ¶ 10: PRDSMF ¶ 11 is beyond the scope of DSMF ¶ 11 and, further, because DSMF ¶ 11 simply reports what is contained in Exhibit B, a document Plaintiff agreed reflected a "[t]rue and accurate cop[y] of the policies in effect in 2019 and 2020," *see* JSR ¶ 11, PRDSMF ¶ 11 also contradicts a stipulated fact.

[37]    Plaintiff seeks to qualify DSMF ¶ 12, raising allegations regarding Dr. Waddell's disciplinary treatment of her and its effect on her visa, EMMC's discipline of her specifically, and the harm Dr. Waddell had on her reputation.  PRDSMF ¶ 12.  The Court does not credit these qualifications for the reason that they exceed the scope of DSMF ¶ 12, which concerns only EMMC policy and the impact disciplinary practice can have on any doctor, and makes no statement regarding Dr. Michailidou or Dr. Waddell's application of the hospital's disciplinary policy.  Furthermore, the Court confirms DSMF

evaluate a physician's competence or behavior over time, and Policy 11-0022 states that a Chief-directed FPPE is not considered disciplinary action.[38]  DSMF ¶ 13; PRDSMF ¶ 13.

## G.    EMMC Places Dr. Michailidou on a FPPE

Dr. Waddell, Dr. Villanueva, Dr. Huang, and Dr. Toder conferred about the events and reports received from staff concerning Dr. Michailidou and agreed with Dr. Waddell's decision that he should place Dr. Michailidou on a Chief-directed FPPE.[39]  DSMF ¶ 29; PRDSMF ¶ 29.  In a September 26, 2019 email to Dr. Waddell concerning placing Dr. Michailidou on a FPPE, Dr. Villanueva wrote: "All these problems [Dr. Michailidou] is causing is making me furious.  It also upsets me that there is an attitude problem that [I] feel is a bad reflection to our group.  I think she should be reviewed on both management of patients but also professionalism."[40]  DSMF ¶ 30; PRDSMF ¶ 30.  Dr. Michailidou believes Dr. Villanueva felt compelled

---

¶ 12 is supported by Dr. Waddell's declaration, the authority Defendants provide in support.  *See Waddell Decl.* ¶ 14, 45.

[38]    PRDSMF ¶ 13 seeks to qualify DSMF ¶ 13, explaining "[s]ame qualifications as Paragraphs 10, 11 and 12."  PRDSMF ¶ 13.  PRDSMF ¶¶ 10, 11, and 12 discuss only Dr. Michailidou's FPPE, not EMMC's policy regarding FPPEs, and the Court is thus unsure on what ground the Plaintiff seeks to qualify DSMF ¶ 13, which only addresses EMMC policy, and also concludes Plaintiff's qualification is beyond the scope and will not be credited.  In addition, the Court confirms DSMF ¶ 13 is supported by the citation they provide in support.  *See Waddell Decl.* ¶ 14.

[39]    Plaintiff denies ¶ 29 for the reason that "[i]t was Dr. Wad[d]ell's decision, Dr. Waddell was very hierarchical and sat atop the hierarchy . . .."  PRDSMF ¶ 29.  The Court again interprets this as a request for qualification, not denial, and amends DSMF ¶ 29 slightly to reflect that Dr. Waddell conferred with other physicians, but it was ultimately his physician, as Chief of Surgery, to place Dr. Michailidou on an FPPE.

[40]    Dr. Michailidou qualifies Dr. Villanueva's email to Dr. Waddell, explaining "Dr. Villanueva hated the environment at EMMC.  It was a hostile environment, and it's not a safe place for individuals to share contrary opinions . . .."  PRDSMF ¶ 30.  The Court adds language reflecting that Dr. Villanueva did testify at her deposition that EMMC employees were best served by being on Dr. Waddell's "good side."  *Id.* (citing *Villanueva Dep. Cont.* at 23:17-24:24).

23

to make this statement to remain on Dr. Waddell's good side.  DSMF ¶ 30; PRDSMF ¶ 30.

On October 17, 2019, consistent with EMMC policy, Dr. Waddell provided the Plaintiff with a letter summarizing his concerns with her performance, and later met with Dr. Michailidou in person to review the contents of the letter.[41]  DSMF ¶ 31; PRDSMF ¶ 31.  The October 17, 2019 letter identified and discussed three areas of concern relating to Dr. Michailidou's performance: (1) her patient care and technical skills; (2) her interpersonal skills and communication; and (3) her lack of appreciation for the importance of working in interprofessional teams to enhance patient safety and improve patient care quality.  DSMF ¶ 32; PRDSMF ¶ 32.  The letter provided, and Dr. Waddell explained to Dr. Michailidou, that she could submit a written response.  DSMF ¶ 33; PRDSMF ¶ 33.  Dr. Michailidou explains her decision not to file a written response as owing to her fear that acting contrary to authority might jeopardize her employment and her legal status in the United States.[42]  DSMF ¶ 33; PRDSMF ¶ 33.

On or about October 30, 2019, Dr. Waddell placed Dr. Michailidou on a FPPE.  JSR ¶ 12.  When Dr. Michailidou received the FPPE, she was immediately in fear and felt the need to obey everything or else risk losing her job and jeopardizing her

---

[41]    Dr. Michailidou qualifies that "Dr. Waddell wanted to make Dr. Michailidou's FPPE as onerous as possible and to put pressure on the partners to put Dr. Michailidou out of the practice."  PRDSMF ¶ 31.  The Court does not accept Plaintiff's qualification for the reason that it is beyond the scope of DSMF ¶ 31.

[42]    The Court amended DSMF ¶ 33 slightly to reflect that the reason Dr. Michailidou did not file a response is out of concern for her job and legal status.  *See* PRDSMF ¶ 33.

stay in the United States.  PSAMF ¶ 29; DRPSAMF ¶ 29.  Dr. Waddell provided Dr. Michailidou a copy of the FPPE on the same day, which addressed the same three areas of concern and identified specific steps Dr. Michailidou must take to improve her performance.  DSMF ¶ 34; PRDSMF ¶ 34.  Dr. Michailidou acknowledges that Dr. Waddell provided her with a copy of the FPPE but contends EMMC did not provide her with specific details regarding her deficiencies.[43]  DSMF ¶ 34; PRDSMF ¶ 34; PSAMF ¶ 41; DRPSAMF ¶ 41.

The parties agree that the monitor of an FPPE is supposed to assist the physician subject to it and, in Dr. Michailidou's case, it was Dr. Waddell's job to monitor her FPPE progress.  PSAMF ¶¶ 31-32; DRPSAMF ¶¶ 31-32.  Dr. Huang was also supposed to mentor Dr. Michailidou, both in his role as Lead Physician and as a surgeon involved in case observations.  PSAMF ¶ 40; DRPSAMF ¶ 40.  As part of the FPPE, Dr. Michailidou met regularly with Dr. Huang and consulted regularly with Dr. Villanueva about case selection and patient care strategies.  DSMF ¶ 36; PRDSMF ¶ 36; PSAMF ¶ 30, 33; DRPSAMF ¶ 30, 33.  Consistent with the terms of the FPPE, Dr. Michailidou underwent emotional intelligence training, which she found helpful.  DSMF ¶ 35; PRDSMF ¶ 35.  Dr. Waddell does not recall receiving any

---

[43]    Plaintiff provides numerous qualifications to DSMF ¶ 34, many of which the Court concludes are beyond its scope.  *See* PRDSMF ¶ 34.  However, the Court incorporates Plaintiff's qualification that she was not provided with specifics or details on her deficiencies, which is supported by her testimony and within the scope of DSMF ¶ 34.  *See id.*  This resolves PSAMF ¶ 41 and DRPSAMF ¶ 41, which address the same issue.

further reports about Dr. Michailidou being short with or rude to others.  DSMF ¶ 35; PRDSMF ¶ 35.

The FPPE's requirement that one of her partners observe Dr. Michailidou perform ten major colon resections was never completed, DSMF ¶ 37; PRDSMF ¶ 37; PSAMF ¶ 44; DRPSAMF ¶ 44, and she was also unable to finish the FPPE's robotic training requirement due to the COVID-19 pandemic.[44]  DSMF ¶ 38; PRDSMF ¶ 38. Dr. Michailidou contends it was Dr. Waddell's job to monitor her progress on the FPPE and asserts that the partners did not effectively support her in completing the FPPE.[45]  DSMF ¶¶ 36-37; PRDSMF ¶¶ 36-37; PSAMF ¶¶ 30, 33, 44; DRPSAMF ¶¶ 30, 33, 44.  Dr. Huang testified to logistical difficulties with scheduling these observations and also expressed reluctance to discuss Dr. Michailidou's future plans with her, believing these would be better suited coming from someone who was not in a leadership position.[46]  PSAMF ¶ 40; DRPSAMF ¶ 40.  Dr. Villanueva, as a

---

[44]    Plaintiff includes the same qualification to DSMF ¶ 38 as for DSMF ¶¶ 34 and 36.  Regarding DSMF ¶ 38, the Court concludes Plaintiff's qualifications regarding partner scheduling and commitment to her improvement is beyond the scope of DSMF ¶ 38 because her qualification does not specifically address the robotic training, which is the subject of DSMF ¶ 38.

Both parties again address Dr. Michailidou's noncompletion of the observed robotics cases in DSMF ¶ 45 and PRDSMF ¶ 45.  The Court determines this resolved by the Court's treatment of DSMF ¶ 38 and PRDSMF ¶ 38.

[45]    DSMF ¶ 37 states "[t]he FPPE's requirement that one of her partners observe Dr. Michailidou perform 10 major colon resections was never completed."  DSMF ¶ 37.  Plaintiff does not contest that she did in fact complete the ten surgeries but qualifies that this owed to improper planning and scheduling on the part of her partners, and the Court includes her qualification as context above. PRDSMF ¶ 37.  The same dispute arises in PSAMF ¶ 44 and DRPSAMF ¶ 44 and is resolved by the above.

In PRDSMF ¶ 36 and PSAMF ¶¶ 30, 33, Dr. Michailidou similarly challenges the partners' monitoring of her FPPE progress; the Court concludes this qualification and the additional statements of fact resolved by the above.

[46]    PSAMF ¶ 40 says that Dr. Huang "wasn't comfortable talking with [Dr. Michailidou] about her progress or her plans, and thought that should come from someone who wasn't in a leadership

surgeon senior to Dr. Michailidou, addressed specific complex and first-time cases with Dr. Michailidou as part of her FPPE but could not remember at the time of her deposition which cases these were.[47]  PSAMF ¶ 42; DRPSAMF ¶ 42.

Dr. Villanueva recalled that Dr. Waddell "got fed up" with Dr. Michailidou and expressed to her that he "want[ed] [the FPPE] to be onerous to Maria" to induce her to leave EMMC, which he believed would be the best decision for her.[48]  PSAMF ¶ 43;

---

position."  PSAMF ¶ 40 (citing JSR, Attach. 12, *Dep. of Peter Huang, M.D.* at 28:17-37:25 (*Huang Dep.*)).  Defendants object that the evidence cited does not support that Dr. Huang was uncomfortable talking with Dr. Michailidou about her FPPE progress and qualify that the cited testimony supports that Dr. Huang felt that someone who was not in a leadership position would be a more appropriate person to have an informal dialogue with her about her future at EMMC.  DRPSAMF ¶ 40.  The Court reviewed the portion of Dr. Huang's deposition cited by both parties and amended PSAMF ¶ 40 to reflect his testimony on this issue, which the Court concludes generally supports the Defendants' interpretation.

[47]    Addressing the issue of partners' mentorship of Dr. Michailidou's FPPE progress, PSAMF ¶ 42 alleges "[e]ven though the notes of Dr. Michailidou's FPPE say that specific cases were discussed, they weren't."  PSAMF ¶ 42 (citing *Villanueva Dep.* at 77:3-23).  Defendants object and also qualify.  DRPSAMF ¶ 42.  The Court reviewed the section of Dr. Villanueva's transcript cited by the Plaintiff.  Dr. Villanueva was shown a note in which Dr. Michailidou had written she was having difficulties with "complex cases, first-time cases," and Dr. Villanueva recalled discussing specific cases with Dr. Michailidou but could not remember their specific medical record number or patient names.  *Villanueva Dep.* at 77:3-22.  The Court corrects PSAMF ¶ 42 to reflect Dr. Villanueva's testimony that while she did discuss specific cases with Dr. Michailidou, she could not recall their particulars at the time of her deposition.

[48]    PSAMF ¶ 43 says "Dr. Waddell wanted to make Dr. Michailidou's FPPE as onerous as possible and to put pressure on the partners to push Dr. Michailidou out of the practice."  PSAMF ¶ 43 (citing *Villanueva Dep.* at 73:8-74:3; *Villanueva Dep. Cont.* at 23:17-24:24).  Defendants object that the evidence does not indicate that Dr. Waddell wanted to put pressure on the partners to push Dr. Michailidou out of the practice and qualify that the evidence in fact supports that there was pressure "from the partners" to push the Plaintiff out, and further supports that Dr. Villanueva perceived that Dr. Waddell "got fed up" and said, "I don't want the FPPE to be onerous to us, but I want it to be onerous to Maria" to induce her to make the best decision, which would be for her to leave EMMC.  DRPSAMF ¶ 43 (quoting *Villanueva Dep.* at 73:8-74:3).  The Court agrees that the Defendants' recitation is a more accurate reflection of Dr. Villanueva's testimony and amends PSAFM ¶ 43 to include Dr. Villanueva's own words.

DRPSAMF ¶ 43.  Dr. Villanueva also testified that there was pressure "from the partners" to push Dr. Michailidou out.  PSAMF ¶ 43; DRPSAMF ¶ 43.

Dr. Waddell has placed six physicians on a FPPE based on concerns about their clinical decision-making or behavior and professionalism since 2018.  DSMF ¶ 14; PRDSMF ¶ 14.  Four of those physicians were male and two, including Dr. Michailidou, were female.  DSMF ¶ 14; PRDSMF ¶ 14.  Two of these physicians, Dr. Michailidou and a male doctor, were born outside of the United States and worked at EMMC on a J-1 waiver.  DSMF ¶ 14; PRDSMF ¶ 14.  Four of the six physicians successfully completed their FPPE; three of them remain employed at EMMC today and the fourth physician left EMMC when his or her position was eliminated in 2024.[49]  DSMF ¶ 15; PRDSMF ¶ 15.

## H.    Partners Discuss Dr. Michailidou's FPPE Progress

On November 12, 2019, Dr. Waddell emailed Dr. Villanueva and Dr. Huang, inquiring whether Dr. Michailidou had discussed with them her plan to place a chemotherapy port in a patient shortly after the patient underwent another procedure.  DSMF ¶ 39; PRDSMF ¶ 39.  Dr. Villanueva replied that Dr. Michailidou

---

[49]    PRDSMF ¶ 15 seeks to qualify DSMF ¶ 15, adding "[n]either of the physicians born outside of the United States [that] Dr. Waddell placed on FPPEs successfully completed their FPPEs or were retained."  PRDSMF ¶ 15 (citing *Villanueva Dep. Cont.* at 22:9-23:19).  The Court reviewed Dr. Villanueva's deposition transcript at the lines indicated by the Plaintiff and determines it does not support the statement for which Plaintiff offers it.  Dr. Villanueva, at 22:9-23:19, discussed "when [Dr. Waddell] started becoming the chair of the department, there was some surgeons who all of a sudden didn't get their . . . contracts renewed."  *Villanueva Dep. Cont.* at 22:13-17.  She proceeds to list the names of two visa holders, Mike Grant and Rafael Grossmann, whose contracts were not renewed.  *Id.* at 22:18-23:16.  However, in the section of her transcript cited by Plaintiff, Dr. Villanueva does not address the FPPE, or any other kind of administrative disciplinary process, and also does not clarify that either of these foreign-born physicians were among the six Dr. Waddell placed on an FPPE for clinical or behavioral issues after 2018.  Because the citation Plaintiff provides for its qualification does not support the same, the Court does not accept PRDSMF ¶ 15.

had not consulted with her and that there was "no way [Dr. Michailidou] should be doing a port" as Dr. Michailidou "gave [a] patient a pneumo [i.e. collapsed lung]" the "last time," and went on to describe an argument she had with Dr. Michailidou about a care decision and concluded her email as follows: "There is a considerable time investment in all of this meetings that we have for her but if she is not teachable then there is no point." DSMF ¶ 39; PRDSMF ¶ 39. Dr. Michailidou believes Dr. Villanueva expressed this perspective to Dr. Waddell out of concern for reprisal.[50] DSMF ¶ 39; PRDSMF ¶ 39. Dr. Michailidou acknowledges having punctured a patient's lung in the course of inserting a port but maintains that she has only done this once and this is a common difficulty surgeons experience at the beginning of their careers.[51] DSMF ¶ 40; PRDSMF ¶ 40. According to Dr. Villanueva, it is not particularly unusual for a new surgeon to experience minor difficulties at the beginning of their career and, particularly with colorectal surgeries, it can be

---

[50]    Dr. Michailidou provides the same qualification to DSMF ¶ 39 as DSMF ¶¶ 9 and 30, regarding Dr. Villanueva's concern for the environment at EMMC and particular concern for getting on Dr. Waddell's bad side. PRDSMF ¶ 39. The Court accepts Dr. Michailidou's qualification that she believes Dr. Villanueva agreed with Dr. Waddell to stay on his good side.

[51]    DSMF ¶ 40 says "Plaintiff acknowledges having punctured a patient's lung in the course of inserting a port," and PRDSMF ¶ 40 qualifies that "[a] pneumothorax is a known complication of a port procedure, and this is the first and last time it happened for Dr. Michailidou . . .. Dr. Michailidou's difficulties were the expected difficulties that surgeons experience at the beginning of their careers, particularly in a hospital system." PRDSMF ¶ 40. The Court amends DSMF ¶ 40 slightly.

challenging for a colorectal surgeon to know that a surgery is complicated before they participate in one themselves.[52]  PSAMF ¶¶ 34-35; DRPSAMF ¶ 34-35.

On November 18, 2019, Dr. Villanueva emailed Dr. Waddell, Dr. Toder, and Dr. Huang after she observed an operation performed by Dr. Michailidou:

> It was honestly like watching a plane that can crash at any time. Some concerning techniques I saw were – Cauterizing something that was not in her visual field, allowing blood to pool and not seeing her operative field and just ligating without defining anatomy hence getting into the wrong plane. . .. These were some of the unsafe practices that was concerning for me. It really bothers me that she may get away with these things but ultimately patients can get hurt.  I understand now what the PA's position is because it is a very difficult position to be in when a surgeon is doing things that are out of standard of what we do.

DSMF ¶ 41; PRDSMF ¶ 41.  Dr. Michailidou believes Dr. Villanueva feared sharing an opinion contrary to Dr. Waddell's at EMMC.[53]  DSMF ¶ 41; PRDSMF ¶ 41.

On December 6, 2019, Dr. Waddell emailed Dr. Michailidou that the requirement in her FPPE that she discuss elective cases with a partner would be extended for at least a month after he learned that Dr. Michailidou was considering operating on a 14-year-old patient with Crohn's disease and had not discussed the case with any of her colleagues:

> With or without an FPPE in place, [the partners] should be able to reasonably expect that you exercise good judgment in terms of case selection.  If, as in this case, the situation was unusual enough for you

---

[52]    The Court amends PSAMF ¶ 34 slightly to indicate this is Dr. Villanueva's perspective and, further, to reflect that Dr. Villanueva's testimony was not directed solely to "Dr. Michailidou's difficulties," as indicated by the Plaintiff.  The Court similarly amends PSAMF ¶ 35 ("It's difficult as a colorectal surgeon to know what the difficult surgeries are, because you don't know they're complicated until you get to the complication") to clarify this is Dr. Villanueva's testimony.  DRPSAMF ¶ 35.

[53]    Dr. Michailidou provides the same qualification to DSMF ¶ 41 as DSMF ¶¶ 9, 30, and 39, and the Court amends DSMF ¶ 41 slightly to reflect this.

> to call [the Practice manager] inquiring about your privileges to take care of pediatric patients, then it was unusual enough for you to discuss with peers in your group before agreeing to perform the elective surgery – whether required as part of an FPPE or not.[54]

DSMF ¶ 42; PRDSMF ¶ 42. Dr. Michailidou alleges that she had no reason to know that she would need to directly inquire with Dr. Waddell about her privileges.[55] PSAMF ¶ 39; DRPSAMF ¶ 39.

In late December 2019, Dr. Waddell attended a procedure performed by Dr. Michailidou and, when he observed that she made no attempt to locate the patient's ureter before beginning to divide the patient's sigmoid mesentery, directed her to stop what she was doing and locate the ureter so she would not mistakenly injure it.[56] DSMF ¶ 43; PRDSMF ¶ 43. In response to an email from Dr. Waddell describing

---

[54]    PRDSMF ¶ 42 qualifies:

> The monitor of an FPPE is supposed to assist the physician subject to it. . .. It was Dr. Wad[d]ell's job to monitor Maria's progress on the FPPE. . .. Dr. Waddell wanted to make Dr. Michailidou's FPPE as onerous as possible and to put pressure on the partners to push Dr. Michailidou out of the practice . . .. With regard to the pretextual reason for sending this email, Dr. Michailidou has no reason to know that she would need to directly inquire with Dr. Waddell about her privileges.

PRDSMF ¶ 42. The Court does not read PRDSMF ¶ 42 as directly responding to DSMF ¶ 42 and, thus, does not incorporate Plaintiff's qualification.

[55]    Defendants object to PSAMF ¶ 39, alleging that Plaintiff's statement is "vague, ambiguous, and untethered to any factual mooring, which renders it impossible to respond to," and additionally qualifies on the ground that the testimony cited by Plaintiff in support concerns a pediatric case Dr. Michailidou was considering accepting. DRPSAMF ¶ 39. The Court overrules the Defendants' objection, and accepts Plaintiff's qualification, which the Court agrees provides context explaining why she did not reach out to Dr. Waddell to inquire about her privileges—namely, that she did not believe she needed to. PSAMF ¶ 39.

[56]    Dr. Michailidou seeks to qualify the Defendants' statement on the ground that "[t]he monitor of an FPPE is supposed to assist the physician subject to it," and, as such, "[i]t was Dr. Wad[d]ell's job to monitor Maria's progress on the FPPE." PRDSMF ¶ 43. On the Court's read, DSMF ¶ 43 offers an example of Dr. Waddell "monitor[ing]" Dr. Michailidou's "progress on the FPPE," specifically here, her progress on a surgery. Thus, the Court does not credit the Plaintiff's attempt at qualification.

what he had observed, Dr. Villanueva shared, "[w]hen [Dr. Villanueva] observed [Dr. Michailidou's] last robotic case for colovaginal fistula, it was the same thing—she never made an effort to look for the ureter," although Dr. Villanueva later added that, while she believes it is safest to look for the ureter, it may be a matter of personal practice.[57]  DSMF ¶ 44; PRDSMF ¶ 44.

Dr. Michailidou was not included on the partners' email communications regarding her FPPE progress, including emails critical of her clinical skills.  PSAMF ¶ 48; DRPSAMF ¶ 48.  As explanation for this decision, Dr. Waddell explained, "I can't fathom how I would be able to do my job if I felt like I could write things like that in an email and then expect people to believe me when I tell them that I'm generally trying to help them."[58]  PSAMF ¶ 48; DRPSAMF ¶ 48.

## I.    EMMC Hires Dr. Tyler Bernaiche

In February of 2020, while Dr. Michailidou was on her FPPE, EMMC became aware of Tyler Bernaiche, a junior colorectal surgeon born and raised in Aroostook

---

[57]    The Plaintiff qualifies Dr. Villanueva's email to Dr. Waddell on the ground that "Dr. Villanueva chalks up the concerns about Dr. Michailidou's location of the ureter as a matter of personal practice and preference." PRDSMF ¶ 44 (citing *Villanueva Dep.* at 54:7-55:23).  The Court reviewed the portion of Dr. Villanueva's deposition cited by the Plaintiff: addressing this surgery, Dr. Villanueva explained that while she believes "it's best practice" and the safest approach to "identify the anatomy if you can," she additionally acknowledged this approach "it's more of . . . for me personal practice.  I always look for the ureter before I . . . resect the mesentery." *Villanueva Dep.* at 54:2-56:6.  The Court amends DSMF ¶ 44 slightly to incorporate Dr. Villanueva's additional comments on her observations.

[58]    Parties agree Dr. Michailidou was not included on the partners' critical email communications but disagree as to why.  PSAMF ¶ 48 says Dr. Waddell decided to have these communications without Dr. Michailidou "because he didn't know how he'd make it look like he was trying to help her if she saw the insulting things he was saying about her," while DRPSAMF ¶ 48 quotes Dr. Waddell's deposition testimony as stating "I can't fathom how I would be able to do my job if I felt like I could write things like that in an email and then expect people to believe me when I tell them that I'm generally trying to help them."  DRPSAMF ¶ 48 (quoting *Waddell Dep.* at 106:10-107:19).  The Court agrees with the Defendants that it is preferable to use Dr. Waddell's own language to express how he viewed this decision.

County, Maine, who was completing his fellowship and planning to join another Northern Light Health member organization, AR Gould, where he would be the only colorectal surgeon. DSMF ¶ 88; PRDSMF ¶ 88; PSAMF ¶ 49; DRPSAMF ¶ 49. Dr. Clarke asked Dr. Waddell and Dr. Huang to evaluate whether EMMC ought to hire Dr. Bernaiche part time, such that Dr. Bernaiche could share his time between EMMC and AR Gould. DSMF ¶ 89; PRDSMF ¶ 89; PSAMF ¶ 49; DRPSAMF ¶ 49.

Dr. Waddell explains his advocacy for Dr. Bernaiche as owing in part to succession planning reasons, because he questioned whether Dr. Michailidou would remain at EMMC after her J-1 waiver expired in the summer of 2021.[59] DSMF ¶¶ 90-91; PRDSMF ¶¶ 90-91; PSAMF ¶¶ 11, 56; DRPSAMF ¶¶ 11, 56. Although Dr. Michailidou, in January of 2020, did contemplate leaving EMMC after her waiver expired, she believes Dr. Waddell preferred Dr. Bernaiche to her because he was born in northern Maine and, unlike the Plaintiff, is neither an immigrant nor a woman.

---

[59]    Defendants explain Dr. Waddell's interest in Dr. Bernaiche as owing to "succession planning reasons," DSMF ¶ 90, while Dr. Michailidou believes he was biased in favor of Dr. Bernaiche because he is from northern Maine and not an immigrant, unlike the Plaintiff. PRDSMF ¶ 90. The Court incorporates both parties' positions on this point, as each are supported by their respective citations, and it reflects a fundamental factual disagreement of this case.

The Court does not accept Plaintiff's denial to DSMF ¶ 91 ("In fact, in January of 2020, Dr. Michailidou's intentions were to leave [EMMC] . . . after completion of her J-1 waiver") (citing JSR, Attach. 7, *Maria Michailidou Dep. Cont.* at 33:22-34:8 (*Michailidou Dep. Cont.*)), in which she asserts "[e]ven in the end, Dr. Michailidou was open to learning and changing in response to the FPPE and wanted to stay at EMMC and keep her job." PRDSMF ¶ 91. Upon the Court's review, Dr. Michailidou's qualification is beyond the scope, in that it addresses her desire to stay at EMMC at a different period in time than January 2020, the subject of DSMF ¶ 91, and, further, that the Defendants' statement is fully supported by Dr. Michailidou's deposition testimony. *See Michailidou Dep. Cont.* at 33:22-34:8 (when asked, "And at this point in time [January of 2020], you were expressing that you were eager to leave EMMC?," she responded, "Yes, after my waiver, yes," explaining, "I was having a very bad experience during my FPPE, so again, my intention was to stay until I finished my waiver").

The parties raise the same or similar disagreements in PSAMF ¶¶ 11, 51, 56 and DRPSAMF ¶¶ 11, 51, 56 and the Court determines they are resolved by the above.

33

DSMF ¶¶ 90-91; PRDSMF ¶¶ 90-91; PSAMF ¶ 51; DRPSAMF ¶ 51.  Dr. Waddell maintains that he supported EMMC hiring Dr. Bernaiche part time even if Dr. Michailidou remained at EMMC long-term.[60]  DSMF ¶ 92; PRDSMF ¶ 92.

The partnership did not unanimously support Dr. Waddell's preference for Dr. Bernaiche or agree that the practice could support a third colorectal surgeon.  PSAMF ¶¶ 52-54; DRPSAMF ¶¶ 52-54.  Dr. Clarke did not think it was "a must" for EMMC to hire Dr. Bernaiche.  PSAMF ¶ 55; DRPSAMF ¶ 55.  Dr. Huang had concerns about hiring Dr. Bernaiche and cannot say whether he was ever on the same page as Dr. Waddell regarding this matter.  PSAMF ¶ 53; DRPSAMF ¶ 53.  Dr. Villanueva was opposed to hiring Dr. Bernaiche for several reasons, including that EMMC did not have sufficient volume to support a third colorectal surgeon.   PSAMF ¶ 52; DRPSAMF ¶ 52.  She voiced these concerns but did not have much say in the decision-making process.  PSAMF ¶ 52; DRPSAMF ¶ 52.  Dr. Michailidou, for her part, was excluded from emails concerning the potential hire of Dr. Bernaiche, Dr. Waddell did not discuss the matter with her, and Dr. Waddell believed Dr. Villanueva had discussed Dr. Bernaiche's candidacy with Dr. Michailidou and could adequately represent her opinions on the matter to the partners.[61]  PSAMF ¶ 50; DRPSAMF ¶

---

[60]    Plaintiff seeks to qualify DSMF ¶ 92, asserting the same qualification raised previously regarding Dr. Waddell's alleged bias in favor of Dr. Bernaiche on account of his upbringing in northern Maine. PRDSMF ¶ 92.  The Court has addressed and incorporated this qualification previously and does not do so again regarding DSMF ¶ 92.

[61]    Defendants allege a disagreement with PSAMF ¶ 50; however, by the Court's comparison of PSAMF ¶ 50 and DRPSAMF ¶ 50, the parties' dispute is semantic and they in fact agree (1) Dr. Michailidou was excluded from emails concerning Dr. Bernaiche's hiring, (2) Dr. Waddell did not discuss Dr. Bernaiche with Plaintiff, and (3) Dr. Waddell believed Dr. Villanueva could adequately represent Plaintiff's opinions regarding the matter.  *Compare* PSAMF ¶ 50 *with* DRPSAMF ¶ 50.

50.  Dr. Waddell understood there was disagreement within the group regarding Dr. Bernaiche's hire but represented to Michael Reid, Medical Group Administrator, that Dr. Huang, Dr. Villanueva, Dr. Toder, and himself were "on the same page" regarding to the terms of his hire.[62]  PSAMF ¶¶ 57-59; DRPSAMF ¶¶ 57-59.

In May of 2020, EMMC extended an offer of employment to Dr. Bernaiche which contemplated his hire after the completion of his fellowship; Dr. Bernaiche accepted the offer and joined EMMC and AR Gould, respectively, in October of 2020.[63] DSMF ¶ 93; PRDSMF ¶ 93.

## J.    Rounding During the COVID-19 Pandemic

On March 30, 2020, Dr. Huang emailed the surgeons and PAs, suggesting that the on-call physician and PA communicate with each other and avoid duplicative

---

[62]    PSAMF ¶ 57 claims "[e]ven though [Dr. Waddell] was well aware that Dr. Villanueva disagreed with hiring Dr. Bernaiche, Dr. Waddell falsely represented that she did and conveyed that they were all on the same page . . .," (citing *Waddell Dep.* at 115:9-127:24), and Defendants object that while "Dr. Villanueva did not support the hire of Dr. Bernaiche, and Dr. Waddell knew this when he recommended Dr. Bernaiche's hire[,] [t]he evidence does not support that Dr. Waddell misrepresented Dr. Villanueva's position" because he reported everyone was "on the same page" not regarding the fact of his hire but the terms of such hire, particularly in regards to his part-time employment at EMMC. DRPSAMF ¶ 57.  The Court, upon reviewing the cited portion of Dr. Waddell's deposition, agrees with Defendants' qualification and amends PSAMF ¶ 57 to provide this context.

The parties raise a similar disagreement in PSAMF ¶¶ 58-59 and DRPSAMF ¶¶ 58-59.  The Court determines it has been resolved by the above.

[63]    The Court concludes Plaintiff's qualification in PRDSMF ¶ 93 that "Dr. Huang's concerns about Dr. Bernaiche never came to fruition, because after Dr. Michailidou left, Dr. Bernaiche only works at EMMC as one of two colorectal surgeons," is beyond the scope and declines to incorporate it. In addition, Defendants admit to PSAMF ¶ 90, which says: "Dr. Huang's concerns about Dr. Bernaiche never came to fruition, because after Dr. Michailidou left, Dr. Bernaiche only works at EMMC as one of two colorectal surgeons."  PSAMF ¶ 90.

Plaintiff later asserts "Dr. Waddell demonstrated his bias in the contrasting ways he handled Dr. Bernaiche's medical complications as compared to the way he handled Dr. Michailidou, and with respect to the decision to hire him."  PSAMF ¶ 88.  The Court agrees with the Defendants' objection that PSAMF ¶ 88 is conclusory and, further, unsupported by the evidence in the record, which does not address Dr. Bernaiche's medical complications.  DRPSAMF ¶ 77.

examinations of inpatients, in order to limit the spread of COVID-19, specifically instructing: "If there are uncomplicated or straightforward patients, I don't think the MD making rounds necessarily has to see every patient if the PA has already seen them." DSMF ¶ 83; PRDSMF ¶ 83; PSAMF ¶ 27; DRPSAMF ¶ 27. Dr. Michailidou disagreed and responded, "I believe that an attending surgeon needs to see all patients in the morning. I'm planning on seeing patients in the morning when I'm on call, unless the primary surgeon wants to see them. As long as there is communication with the team it should work ok." DSMF ¶ 84; PRDSMF ¶ 84; PSAMF ¶ 27; DRPSAMF ¶ 27. Next, Dr. Waddell addressed the group, writing: "Only 1 person from our group needs to be within 6 feet of the patient on rounds conducting an exam, etc.—unless there is a specific reason otherwise—for our protection and patient protection. That's our new reality. That's how Rochelle and I made rounds last week." DSMF ¶ 85; PRDSMF ¶ 85.

Dr. Michailidou believes she received pushback and resistance from the PAs after this disagreement over EMMC's COVID-19 policy, and PAs at times would not see a patient if Dr. Michailidou asked them to and she had already visited the patient herself.[64] DSMF ¶ 86; PRDSMF ¶ 86; PSAMF ¶ 28; DRPSAMF ¶ 28. However, after

---

[64]    DSMF ¶ 86 alleges "Dr. Michailidou did not perceive anyone to express frustration or hostility toward her for stating her belief that a surgeon needed to see all patients in the morning or for indicating that she would continue to see the patients," *id.*, and Plaintiff qualifies that, "[a]s a result of Dr. Michailidou's complaint [to Dr. Huang] . . . Dr. Michailidou received pushback and resistance from the PAs, who would say that because she was seeing all of her patients there was no need for them to see the patients." PRDSMF ¶ 86 (citing *Michailidou Dep.* at 95:10-96:11). The Court reviewed the portion of the Plaintiff's deposition transcript cited in support of PRDSMF ¶ 86 and, agreeing it supports the Plaintiff's recitation of events, amends the statement of fact accordingly.

The parties revisit this disagreement in PSAMF ¶ 28 and DRPSAMF ¶ 28; the Court concludes it resolved by the above.

this email exchange, she followed Dr. Huang's instruction and did not visit each patient while she was on-call, instead splitting the list with the PA.[65]  DSMF ¶ 87; PRDSMF ¶ 87.

### K.  Partners Continue to Observe Dr. Michailidou's FPPE Progress

Meanwhile, the partners continued to observe Dr. Michailidou's progress on the FPPE.  On April 8, 2020, Dr. Michailidou emailed Dr. Huang, Dr. Villanueva, and Dr. Waddell, inquiring about the status of her FPPE and suggesting a "debrief" meeting; Dr. Huang replied to Dr. Michailidou the following day, asking whether everything in the FPPE had been completed, and Dr. Michailidou responded she had not yet completed the required number of observed robotics cases.[66]  DSMF ¶ 45; PRDSMF ¶ 45.

In June of 2020, Dr. Michailidou perforated a patient's colon when performing a colonoscopy.[67]  DSMF ¶ 46; PRDSMF ¶ 46.

---

[65]    The Plaintiff qualifies DSMF ¶ 86 slightly to explain that she did not visit every patient after this email exchange pursuant to the new policy articulated by Dr. Huang.  PRDSMF ¶ 86.  The Court amends DSMF ¶ 86 to incorporate this context.

[66]    Dr. Michailidou seeks to qualify DSMF ¶ 45 on the same or similar grounds as DSMF ¶¶ 10, 29, 34, and 36-38, in which she alleges "[t]he partners did not effectively or thoughtfully support Dr. Michailidou's development or her improvement on an FFPE."  PRDSMF ¶ 45.  The Court has already incorporated this qualification alongside DSMF ¶ 36 and PRDSMF ¶ 36 and does not do so again here.

[67]    The Plaintiff seeks to qualify this statement on the ground that "Dr. Michailidou's difficulties were the expected difficulties that surgeons experience at the beginning of their careers, particularly in a hospital setting. . .."  PRDSMF ¶ 46 (citing, *Villanueva Dep.* at 12:3-13:1, 40:14-44:20, 54:7-55:23; *Villanueva Dep. Cont.* at 9:19-12:12, 31:6-33:14).  The Court reviewed the portions of Dr. Villanueva's deposition transcript cited by the Plaintiff and does not incorporate them because while Dr. Villanueva does address the challenges young colorectal surgeons face generally, she does not speak to the particular colon perforation addressed within DSMF ¶ 46 and PRDSMF ¶ 46 is thus beyond the scope of the Defendant's statement of material fact.

In late June of 2020, Nurse Manager Endoscopy Lisa Dorr reported to Dr. Waddell that several endoscopy staff had expressed concerns to her about Dr. Michailidou's clinical practices, including that she was not careful, had difficulty identifying anatomy, held the scope in a way that increased the risk of perforation, and routinely asked for assistance from gastrointestinal practitioners, but then did not pay attention to their actions or expressly disregarded their guidance.[68] DSMF ¶ 47; PRDSMF ¶ 47.

On July 6, 2020, PA Tardy submitted a 360 evaluation of Dr. Michailidou, which Dr. Waddell reviewed. DSMF ¶ 48; PRDSMF ¶ 48. In this evaluation, PA Tardy indicated that Dr. Michailidou "almost never" "encourages others to share their opinions" and "almost never" listens and considers what other team members say about relevant issues; PA Tardy represented that he would "never" "feel comfortable referring friends and family to [Dr. Michailidou]."[69] DSMF ¶ 48; PRDSMF ¶ 48. On or about July 20, 2020, PA Tardy told Dr. Waddell that she and the other PAs continued to be concerned about the quality and safety of Dr. Michailidou's patient care.[70] DSMF ¶ 49; PRDSMF ¶ 49. Dr. Waddell encouraged PA Tardy to continue working with Dr. Michailidou, but to have a low threshold for directing Operating

---

[68]     Dr. Michailidou raises the same or similar qualification regarding DSMF ¶ 47 as for DSMF ¶¶ 40, 44, and 46. The Court has addressed this qualification before and, here, concludes it is beyond the scope of DSMF ¶ 47.

[69]     Dr. Michailidou raises the same or similar qualification regarding DSMF ¶ 48 as for DSMF ¶¶ 40, 44, 46, and 47. The concludes this qualification is beyond the scope of DSMF ¶ 48.

[70]     Dr. Michailidou raises the same or similar qualification regarding DSMF ¶ 49 as for DSMF ¶¶ 40, 44, 46, 47, and 48. The concludes this qualification is beyond the scope of DSMF ¶ 49.

Room staff to call in another surgeon if they developed concerns during a procedure. DSMF ¶ 49; PRDSMF ¶ 49.

On July 22, 2020, Dr. Villanueva informed Dr. Waddell and Dr. Huang that Dr. Michailidou had booked a robotic case without a proctor, notwithstanding the fact that she had not yet completed the ten observed robotics cases required by the FPPE.[71]   DSMF ¶ 50; PRDSMF ¶ 50.   Dr. Villanueva additionally informed Dr. Waddell that the PAs had expressed to her that they did not feel safe supporting Dr. Michailidou in the operating room.[72]   DSMF ¶ 51; PRDSMF ¶ 51.

In response to Dr. Villanueva's report, Dr. Huang emailed Dr. Michailidou that she could not do this robotic case without a proctor; Dr. Waddell subsequently replied, telling Dr. Michailidou that the FPPE was "not optional" and was "not something [she] could unilaterally modify, ignore or amend."[73]   DSMF ¶ 52; PRDSMF ¶ 52.

On August 10, 2020, Dr. Toder emailed Dr. Huang and Dr. Waddell about an interaction she had with Dr. Michailidou over the previous weekend, where Dr.

---

[71]    Plaintiff seeks to qualify the Defendant's statement of material fact, alleging "Dr. Waddell wanted to make Dr. Michailidou's FPPE as onerous as possible and to put pressure on the partners to push Dr. Michailidou out of the practice. . .. Dr. Waddell is at the top of the hierarchy. PA's, nurses, and other surgeons were best served to be on his good side and not question his decisions. People were scared of him."   PRDSMF ¶ 50.  Dr. Michailidou raises the same or similar qualification or objection to DSMF ¶¶ 16, 29, 31, 34, 36-39, 42-43, 45, 47-49 and, having addressed it already, the Court does not do so again.

[72]    Dr. Michailidou raises the same or similar qualification to DSMF ¶ 51 as to DSMF ¶¶ 40, 44, 46-49.  The Court has addressed this qualification previously and determines it would be repetitive to do so again here.

[73]    The Plaintiff seeks to qualify DSMF ¶ 52 on the ground that "[t]he monitor of an FPPE is supposed to assist the physician subject to it," and, as such, "[i]t was Dr. Wad[d]ell's job to monitor Maria's progress on the FPPE."   PRDSMF ¶ 52.  The Court reaches the same conclusion regarding PRDSMF ¶ 52 as it did with PRDSMF ¶ 43, namely that this is an inapposite qualification where DSMF ¶ 52 offers an example of Dr. Waddell and Dr. Huang "monitor[ing]" Dr. Michailidou's "progress on the FPPE."

Michailidou reportedly asked for Dr. Toder's input and then disregarded Dr. Toder's response:

> Do not call for help before seeing a patient, examining them, reviewing the chart for info past and present and reviewing all available data. Determine their level of acuity, develop a differential diagnosis and then call to discuss.  Don't then just ignore the recommendations provided and if you do, please document your reasoning and follow up on your intervention.

DSMF ¶ 53; PRDSMF ¶ 53.[74]  According to Dr. Toder, Dr. Michailidou responded, "Fine, I won't call you again."  DSMF ¶ 53; PRDSMF ¶ 53.

Dr. Waddell discussed these mounting concerns about Dr. Michailidou with Dr. Huang, Dr. Toder, and Dr. Villanueva, who collectively agreed that it was important Dr. Michailidou understand both that it was increasingly likely these concerns would need to be presented to the Medical Executive Committee and also what the potential consequences or negative implications of this path could be for her.[75]  DSMF ¶ 54; PRDSMF ¶ 54.

On August 25, 2020, Dr. Huang met with Dr. Michailidou, with Practice Manager Lori Hazlerig in attendance, and reviewed a number of clinical and similar

---

[74]    Dr. Michailidou objects on hearsay grounds and alternatively seeks to qualify, alleging "Dr. Toder told Dr. Michailidou not to call her before seeing a patient[;] Dr. Michailidou confirmed she wouldn't."  PRDSMF ¶ 53.  First, the Court overrules the Plaintiff's hearsay objection because the statement is not offered for the truth of the matter asserted but to illustrate that the information was communicated to Dr. Huang and Dr. Waddell.  Second, the Court reads the Plaintiff's qualification as restating rather than qualifying the Defendants' statement of material fact which the Court additionally notes is supported by both Dr. Waddell's declaration and the described email communication, which Defendants attached to Dr. Waddell's declaration.  *See Waddell Decl.* ¶ 44; *id.*, Attach. 18, *Ex. R.*

[75]    Dr. Michailidou raises the same or similar qualification to DSMF ¶ 54 as she raised for DSMF ¶¶ 10, 34, 36-38, 42-43, 45, and 52.  The Court has addressed this qualification before and now determines it is beyond the scope of DSMF ¶ 54.

40

concerns before explaining that, while Dr. Michailidou's job was not in jeopardy, she would likely be subjected to additional oversight, which could result in referral to the Medical Staff and restricted privileges or disciplinary action.[76]  DSMF ¶ 55; PRDSMF ¶ 55.

In September 2020, Dr. Villanueva met with Dr. Michailidou to impress upon her the need to limit herself to straightforward procedures and to ask whether she intended to remain at EMMC beyond her J-1 waiver period.[77]  DSMF ¶ 56; PRDSMF ¶ 56; PSAMF ¶ 36; DRPSAMF ¶ 36.  Dr. Villanueva reported to Dr. Waddell and the

---

[76]    The Plaintiff restates her qualification to DSMF ¶¶ 10, 29, 34, 36-38, 45, 52, and 54 to DSMF ¶ 55, namely, that "Dr. Huang was supposed to be Maria's mentor," and "[t]he partners did not effectively or thoughtfully plan and schedule to support Dr. Michailidou's development or her improvement on an FPPE."  PRDSMF ¶ 55.  For reasons similar to those already explained, the Court determines this qualification is beyond the scope of DSMF ¶ 55.

[77]    Dr. Michailidou denies DSMF ¶ 56:

> Dr. Villanueva never suggested that Maria take less complicated cases, nor did anyone else . . ..  Even in the end, Dr. Michailidou was open to learning and changing in response to the FPPE and wanted to stay at EMMC and keep her job. . ..  Dr. Huang was supposed to be Maria's mentor for purposes of the FPPE, but he wasn't comfortable talking with her about her progress or her plans, and thought that should come from someone who wasn't in a leadership position.

PRDSMF ¶ 56.

First, the Court overrules Plaintiff's denial regarding Dr. Huang, as it is beyond the scope of DSMF ¶ 56, which solely concerns Dr. Villanueva.  Second, the Court reviewed the citations provided by the Plaintiff and Defendants in support of their respective allegations concerning Dr. Villanueva's conversation with Dr. Michailidou.  In support of DSMF ¶ 56, Defendants cite Dr. Waddell's declaration ¶ 48 and Dr. Villanueva's deposition transcript at 68:3-69:1.  Although Dr. Villanueva's deposition transcript at the location provided by the Defendants does not provide direct support for DSMF ¶ 56, Dr. Waddell's declaration at the paragraph cited by the Defendants does.  The Plaintiff, for her part, cites Dr. Villanueva's deposition transcript at 40:14-44:20 and 75:20-76:1.  The Court reviewed these portions of Dr. Villanueva's deposition and concludes they do not support the Plaintiff's response.  While Dr. Villanueva testified that "[she] cannot recall a specific conversation as such," *Villanueva Dep.* at 41:7-11, when asked if they could recall speaking to Dr. Villanueva about suggesting that she stick with simpler surgeries, she also said, "I mean, she can still do other laparoscopic procedures.  I just think that there is some difficult cases that may be harder for her to take on as a starting physician – a starting surgeon."  *Id.* at 40:19-22.  The parties revisit this disagreement in PSAMF ¶ 36 and DRPSAMF ¶ 36; it is resolved by the above discussion.

other partners that Dr. Michailidou represented she planned to leave EMMC at the end of J-1 waiver period, the following summer.  DSMF ¶ 56; PRDSMF ¶ 56.

Dr. Waddell drafted a revised FPPE for Dr. Michailidou, which he shared with Senior Physician Executive Dr. Jim Clarke.  DSMF ¶ 57; PRDSMF ¶ 57.  Prior to revising her FPPE, Dr. Waddell had at this point already determined Dr. Michailidou was not a good long term fit at EMMC.  PSAMF ¶ 46; DRPSAMF ¶ 46.

On October 7, 2020, Dr. Waddell was at home in the evening when he received a call from operating room staff who were assisting Dr. Michailidou with a procedure that typically takes approximately six hours but was still underway after more than ten hours.  DSMF ¶ 58; PRDSMF ¶ 58.  Dr. Michailidou explains that, in this procedure, Dr. Villanueva was assisting her in retrieving a needle tip that had broken off in a patient's perineum, and Dr. Michailidou requested that operating room staff call Dr. Waddell, as the Chief of Surgery, to request his assistance, which is not unusual in difficult cases.[78]  DSMF ¶ 58; PRDSMF ¶ 58.  As explained by Dr. Villanueva, after Dr. Michailidou closed the patient, operating room staff realized that a two-centimeter tip of needle had broken off in a patient's perineum; when this was discovered, Dr. Michailidou and Dr. Villanueva requested an x-ray and simultaneously searched through the tissue of the perineum for the needle tip, which

---

[78]    The Court incorporates Plaintiff's qualification, which contextualizes DSMF ¶ 58 by explaining that Dr. Waddell was called at home because Dr. Michailidou, in a surgery in which she was operating alongside Dr. Villanueva, requested his assistance.  *See* PRDSMF ¶ 58.  The Court also adds the qualification, provided by Dr. Villanueva's deposition testimony, that it is not unusual to call the Chief of Surgery during a difficult procedure.  *Villanueva Dep.* at 82:1-23.

they eventually found, with Dr. Waddell's assistance.[79]  DSMF ¶¶ 59-60; PRDSMF ¶¶ 59-60; PSAMF ¶ 64; DRPSAMF ¶ 64.  Dr. Villanueva explains that the needle tip likely broke off because the patient was morbidly obese and the tissue was fragile and

---

[79]    The Court overrules the Plaintiff's hearsay objection because the Defendants offer the statement not for the truth of the matter asserted but to show its effect on the listener, here, Dr. Waddell.  The Court does, however, amend DSMF ¶ 59 to incorporate the Plaintiff's qualification, which provides context regarding the procedure, the needle tip, Dr. Waddell's requested assistance, and the timing of events.  Most importantly, DSMF ¶ 59 alleges that "[o]perating room staff reported to Dr. Waddell that Dr. Michailidou had lost the tip of a needle in the patient's perineum, had searched for it unsuccessfully for some time, and now intended to finish the case and leave the needle tip in the patient; staff asked Dr. Waddell to come to the hospital immediately to assist in the procedure."  DSMF ¶ 59.  Dr. Villanueva's deposition transcript, however, explains that, in fact, while operating staff had reported the lost needle tip to Dr. Waddell, Dr. Michailidou and Dr. Villanueva asked operating staff to call Dr. Waddell to request assistance, as addressed regarding DSMF ¶ 58 and, further, that Dr. Michailidou "had closed the wound" because "she wasn't aware that the tip of the needle had already got broken."  *Villanueva Dep.* at 78:21-23.  Dr. Villanueva explained that, once operating staff observed that a "very, very small tip of the needle" had broken off in the patient's tissue, Dr. Villanueva and Dr. Michailidou ordered an x-ray to try to find the needle, a procedure which was challenging because the needle "was deep into the perineum" and "the patient was morbidly obese."  *Id.* at 80:7-8.  Dr. Villanueva explained further, "And then the issue was just so fragile, and so it broke off.  But [Dr. Michailidou] didn't know that it broke off until . . . the nurses . . . figured out later on that the piece of that needle [had broken off] – and honestly, it would be really difficult because you're talking about maybe 2 millimeters of a tip of the needle."  *Id.* at 80:8-14.  Dr. Villanueva added, "I don't think she intended to leave the needle there because when I came in she was struggling to find the needle."  *Id.* at 82:24-83:1.  Dr. Villanueva testified that she and Dr. Michailidou, later with Dr. Waddell's assistance, successfully removed the needle tip, but added, "I think in hindsight we could have left it because that's not really technically a foreign body by JCAHO standards."  *Id.* at 78:25-79:3.

    DSMF ¶ 60 states "Dr. Waddell went to the hospital and helped Dr. Michailidou retrieve the needle tip from the patient's perineum."  *Id.*  Plaintiff seeks to qualify this statement for the same reasons as DSMF ¶¶ 58 and 59.  *See* PRDSMF ¶ 60.  The Court has resolved this factual disagreement, as explained above.  PSAMF ¶ 64 and DRPSAMF ¶ 64 similarly discuss whether Dr. Michailidou intended to remove the needle tip; the Court has resolved this issue above.

    PSAMF ¶ 64 additionally claims "[t]here was no basis to terminate [Dr. Michailidou]."  PSAMF ¶ 64 (citing *Villanueva Dep. Cont.* at 63:22-65:9).  Although posited as a statement of fact, this is an ultimate issue of dispute in this case.

    Even though the Defendants respond a "reasonable trier of fact could [not] believe [Dr. Villanueva] had personal knowledge" concerning EMMC's reasons for her termination, DRPSAMF ¶ 64 (citing *Doe*, 960 F.2d at 223), and PSAMF ¶ 65 cites Dr. Villanueva's testimony for the proposition that "[n]one of Dr. Michailidou's issues for which she was terminated deviated from the applicable standard of care or merited termination or forced resignation[;] she's a good doctor."  PSAMF ¶ 65 (citing *Villanueva Dep. Cont.* at 31:6-33:14), these are factual issues for resolution by a jury.  The Court is obligated to view contested factual issues in the light most favorable to Dr. Michailidou but not Dr. Michailidou's legal assertions.

adds that Dr. Michailidou did not know the tip had broken because "it was a very, very small tip of the needle" and was lodged "deep in the perineum." DSMF ¶ 59; PRDSMF ¶ 59.

The next day, October 8, 2020, PA Tardy informed Dr. Waddell that he and the other PAs were no longer comfortable supporting Dr. Michailidou in the OR and would not do so any longer, as they were not seeing improvement, were afraid for patient safety, and feared implications for their own licensure.[80]  DSMF ¶ 61; PRDSMF ¶ 61. Shortly after meeting with PA Tardy, Dr. Waddell received an email from Dr. Huang, forwarding a communication from PA Loeb, who similarly stated that she would no longer agree to support Dr. Michailidou in the operating room due to concerns about patient safety.[81] DSMF ¶ 62; PRDSMF ¶ 62. Dr. Waddell went immediately to Dr. Clarke and reported the PAs' refusal to continue supporting Dr. Michailidou in the operating room.[82] DSMF ¶ 63; PRDSMF ¶ 63. Dr. Waddell also directed PA Tardy to be in touch with Dr. Clarke regarding this matter, and, around

---

[80]    The Court overrules Dr. Michailidou's objection to DSMF ¶ 61 on hearsay grounds because the statement is offered not for its truth but for the fact that the information was communicated to Dr. Waddell. The Court also does not incorporate the Plaintiff's qualification to DSMF ¶ 61, which alleges "Dr. Waddell wanted to make Dr. Michailidou's FPPE as onerous as possible," "Dr. Waddell is at the top of the hierarchy," and additional qualifications regarding the needle procedure. PRDSMF ¶ 61. Regarding the allegations as to the needle operation, the Court has addressed these before, and does not do so again now, and, as to the allegations regarding Dr. Waddell's intentions regarding Dr. Michailidou, and his role in the EMMC hierarchy, the Court concludes these are beyond the scope of DSMF ¶ 61.

[81]    Dr. Michailidou raises the same hearsay objection and qualification to DSMF ¶ 62 as for DSMF ¶ 61. The Court overrules the hearsay and determines the qualification is beyond the scope of DSMF ¶ 62, for the same reasons described above.

[82]    The Court does not incorporate Dr. Michailidou's qualification, which she has raised previously, that, in essence, "Dr. Waddell wanted to make Dr. Michailidou's FPPE as onerous as possible and put pressure on the partners to push Dr. Michailidou out of the practice," PRDSMF PRDSMF ¶ 63, for the reason that it is beyond the scope of DSMF ¶ 63.

the same time, which corresponded to one week after Dr. Bernaiche was hired, Dr. Waddell observed that Dr. Bernaiche would eventually take Dr. Michailidou's office; Dr. Waddell qualifies that when he made this statement about Dr. Bernaiche taking Dr. Michailidou's office, he was aware of her declared intention to leave the EMMC after the expiration of her J-1 visa waiver period.[83]  PSAMF ¶ 67; DRPSAMF ¶ 67. Dr. Waddell would frequently communicate with Dr. Michailidou and the PAs by text message but routinely deleted his text messages and produced none in response to Dr. Michailidou's discovery requests.[84]  PSAMF ¶ 68; DRPSAMF ¶ 68.

Dr. Clarke met with PA Tardy, who explained to Dr. Clarke his long standing and serious concerns about Dr. Michailidou's clinical skills, including that she routinely appeared to be "lost" in the operative field, proceeding without a firm grasp of anatomy, and rejecting PA Tardy's attempts to orient and help her.[85]  DSMF ¶ 64;

---

[83]    The parties dispute whether Dr. Waddell intended his statement to mean that Dr. Bernaiche would assume Dr. Michailidou's office immediately, or upon the expiration of her visa.  PSAMF ¶ 67; DRPSAMF ¶ 67.  The Court provides the qualification requested by Defendants as it is consistent with Dr. Waddell's statement in his deposition that he believed Dr. Michailidou intended to leave EMMC following the expiration of her visa.  *Waddell Dep.* at 162:6-19.

[84]    In PSAMF ¶ 68, Dr. Michailidou asserts "Dr. Waddell communicates with medical staff by text messages, but routinely deletes his text messages and produced none responsive to discovery requests in this case. In fact, Dr. Waddell would communicate frequently with Dr. Michailidou by text message, as well as with PAs and other medical staff."  PSAMF ¶ 68 (citing *Waddell Dep.* at 182:11-25; *Michailidou Decl.* ¶ 13).  Defendants object regarding relevance and lack of foundation as to Dr. Michailidou's personal knowledge of how Dr. Waddell communicated with other medical staff. DRPSAMF ¶ 68.  Defendants alternatively admit the statement.  The Court reviewed the portion of Dr. Waddell's testimony cited by Plaintiff and observes that it indicates that Dr. Waddell did not recall being asked to produce text messages and, further, that he routinely deletes text messages.  *Waddell Dep.* at 182:11-14.  Dr. Michailidou also cites her own sworn declaration in support.  *Michailidou Decl.* ¶ 13.  Dr. Waddell's deposition and Dr. Michailidou's declaration support in part PSAMF ¶ 68.  They support the assertion that Dr. Waddell communicated with Dr. Michailidou and the PAs by text and that he routinely deleted his text messages.  They also support the assertion that Dr. Waddell did not produce any text messages in response to Dr. Michailidou's discovery requests.  They do not support the assertion that Dr. Waddell commonly texted other physicians.

[85]    Dr. Michailidou seeks to qualify DSMF ¶ 64 on the ground that "[t]he things Jude Tardy describes as deficiencies in Dr. Michailidou's patient care are just differences in methods," PRDSMF

45

PRDSMF ¶ 64; PSAMF ¶ 63; DRPSAMF ¶ 63.  Dr. Clarke had worked with PA Tardy for more than ten years and found PA Tardy to be a quiet, careful, and extremely skilled PA and, to Dr. Clarke's knowledge, PA Tardy previously had never refused to work with a surgeon or expressed such serious concerns about patient safety.[86] DSMF ¶ 65; PRDSMF ¶ 65.

## L.  Dr. Michailidou's Suspension

On October 8, 2020, after speaking with PA Tardy, Dr. Clarke conferred with Human Resources and, collectively, they decided to place Dr. Michailidou on paid administrative suspension, pending investigation, to ensure patient safety.[87]  DSMF ¶ 66; PRDSMF ¶ 66; PSAMF ¶ 62; DRPSAMF ¶ 62.  EMMC does not have a policy to determine the circumstances in which a physician should be administratively

---

¶ 64 (citing *Villanueva Dep.* at 54:7-55:23), and "Dr. Waddell wanted to make Dr. Michailidou's FPPE as onerous as possible." *Id.* (citing *Villanueva Dep.* at 73:8-74:3; *Villanueva Dep. Cont.* at 23:17-24:24). The Court concludes the Plaintiff's qualifications regarding Dr. Waddell are beyond the scope of DSMF ¶ 64 and does not incorporate them.  As to the Plaintiff's qualifications regarding PA Tardy's personal preference, the Court concludes Dr. Michailidou's citation to the portion of Dr. Villanueva's deposition transcript does not directly address the issue for which the Plaintiff cites it and, as such, does not incorporate it.  The Plaintiff alleges this same fact in PSAMF ¶ 63 ("The things that Dr. Waddell or Jude Tardy described as deficiencies in Dr. Michailidou's patient care are just differences in methods") and cites Dr. Villanueva's deposition in support.  Having already reviewed Dr. Villanueva's deposition and determined it does not support this proposition, the Court does not accept PSAMF ¶ 63 and determines it resolved by the above.

[86]    Dr. Michailidou raises the same qualification to DSMF ¶ 65 as to DSMF ¶ 64 and the Court again concludes it does not warrant incorporation because it is beyond the scope.

[87]    Plaintiff seeks to qualify the Defendant's statement on the ground that "EMMC has no policy to determine the circumstances in which a physician should be administratively suspended," "EMMC believes it is appropriate to look at immigration status to make decisions when it affects by business need," "Dr. Villanueva was completely excluded from the decision to suspend Dr. Michailidou," and "[t]he way EMMC dealt with Dr. Michailidou was very punitive and not professional."  PRDSMF ¶ 66. The Court concludes these qualifications are beyond the scope of DSMF ¶ 66.

The Court determines the disagreement as to phrasing in PSAMF ¶ 62 and DRPSAMF ¶ 62 resolved by the Court's handling of DSMF ¶ 66 and PRDSMF ¶ 66 above.

suspended. PSAMF ¶ 60; DRPSAMF ¶ 60. EMMC also does not have a policy for handling a physician's patients during a term of administrative suspension. PSAMF ¶ 61; DRPSAMF ¶ 61.

Dr. Clarke provided Dr. Michailidou with a letter, indicating that effective October 9, 2020, she was administratively suspended, pending investigation, and would be given an opportunity share her perspective. Although Dr. Clarke stated that he had no preconceived notions about whether and under what conditions Dr. Michailidou would return to practice at EMMC at this time, Ali Worster removed language from Dr. Clarke's notes in preparation for his investigatory meeting with Dr. Michailidou that stated "I think you should be preparing for the possibility that

you will not return to work here."[88]  DSMF ¶ 67; PRDSMF ¶ 67; PSAMF ¶¶ 69-70; DRPSAMF ¶¶ 69-70.

Dr. Clarke's administrative assistant subsequently scheduled an investigatory meeting between Dr. Clarke and Dr. Michailidou on October 23, 2020.[89]  DSMF ¶ 68; PRDSMF ¶ 68.  Dr. Michailidou's Employment Agreement obligated her to "[p]articipate in meetings/committees/investigations as appropriate, requested, and/or required by the Lead Physician of the Practice . . ., Vice President of Provider Services and the President, EMMC Medical Group."  DSMF ¶ 69; PRDSMF ¶ 69.  On October 22, 2020, Dr. Michailidou's counsel, Attorney Lipzen, contacted EMMC's legal department to communicate that Dr. Michailidou was "out of town" and would

---

[88]    Dr. Michailidou denies this statement, asserting:

> HR edited Dr. Clarke's notes for his meeting with Dr. Michailidou to conceal that Dr. Clarke had already determined that Dr. Waddell's concerns were legitimate.  HR deleted a sentence in Dr. Clarke's notes for his meeting with Dr. Michailidou that stated "I think you should be preparing for the possibility that you will not return to work here," because they didn't want it to be read as the way it's being read in this case.

PRDSMF ¶ 67 (citing *Worster Dep.* at 26:3-27:2, 29:19-20:11).  First, the Court reviewed Dr. Clarke's declaration, at the section cited by the Defendants in support of their own statement, *Decl. of James Clarke, MD* ¶¶ 6-7 (ECF No. 49) (*Clarke Decl.*), and confirm it supports DSMF ¶ 67.  The Court also reviewed Ms. Worster's deposition transcript at the sections cited by the Plaintiff; at this portion of her deposition, Ms. Worster discussed edits she made to Dr. Clarke's notes in anticipation of his conversation with Dr. Michailidou, including an edit to remove Dr. Clarke's language, "I think you should be preparing for the possibility that you will not return to work here," *Worster Dep.* at 29:19-21, because, as she explained, "we . . . didn't know that to be true," and, further, Ms. Worster "d[idn't] think that's what Dr. Clarke thought it to be" because "Dr. Clarke was trying to find a way for her to continue her career, and he saw that as an option for her to continue to do things if she did them voluntarily," but Ms. Worster "was concerned that it would be read [to imply a conclusion regarding her suspension" and, thus, removed it.  *Id.* at 29:22-30:8.  The Court amends DSMF ¶ 67 to add that Ms. Worster edited Dr. Clarke's notes to reflect this message.

The Court's discussion above resolves PSAMF ¶¶ 69-70 and DRPSAMF ¶¶ 69-70.

[89]    The Court concludes the Plaintiff's denial that "Dr. Michailidou was absolutely willing to meet with EMMC about their investigation and . . .. absolutely wanted to return to continue working there," PRDSMF ¶ 68 is beyond the scope of DSMF ¶ 68.

not appear for the scheduled meeting with Dr. Clarke the following day.[90] DSMF ¶ 70; PRDSMF ¶ 70. Dr. Michailidou acknowledges that she was out of town on October 23, 2020, but does not recall telling her lawyers that she had been asked to meet with Dr. Clarke on this date and was unaware her lawyers told EMMC's counsel that she would not be meeting with him. DSMF ¶ 70; PRDSMF ¶ 70. She asserts that EMMC did not contact her directly regarding his meeting with Dr. Clarke, only through her lawyer, and, furthermore, that her attorney did not report her priorities, which was to complete her waiver at EMMC.[91] PSAMF ¶¶ 79-81; DRPSAMF ¶ 79-81.

On October 29, 2020, Attorney Lipzen represented to EMMC's counsel that Dr. Michailidou did not intend to meet with Dr. Clarke or return to EMMC.[92] DSMF ¶ 71; PRDSMF ¶ 71. Dr. Michailidou asserts she was unaware her lawyer made this

---

[90]    In support of her qualification that "[she] was absolutely willing to meet with EMMC about their investigation and very much wanted to have access to and discuss their clinical concerns," PRDSMF ¶ 70, Dr. Michailidou cites a portion of her deposition transcript at which she acknowledges she was out of town at the time of this meeting, but insists she does not recall telling her lawyers that she had been asked to come to a meeting on October 23, 2020 with Dr. Clarke, and, further, was unaware that her lawyers told EMMC's counsel that she would not be meeting with Dr. Clarke. *Michailidou Dep. Cont.* at 13:6-23. She further states she was "absolutely" willing at this point to meet with someone from the hospital. The Court amends DSMF ¶ 70 to incorporate Dr. Michailidou's qualifications.

[91]    The disputes that appear in PSAMF ¶¶ 79, 81 and DRPSAMF ¶¶ 79, 81 are resolved by the Court's handling of DSMF ¶ 70 and PRDSMF ¶ 70.

PSAMF ¶ 80 asserts "EMMC is unsure what it did to reach Maria directly to conduct its investigation." PSAMF ¶ 80. Defendants qualify that EMMC communicated with Dr. Michailidou on this subject through her attorney. DRPSAMF ¶ 80. The Court agrees with Defendants' qualification, that EMMC did communicate through Dr. Michailidou through her counsel, even though it did not additionally contact her directly regarding the meeting with Dr. Clarke.

[92]    Dr. Michailidou raises the same qualification, including the same citation in support, regarding DSMF ¶ 71 as for DSMF ¶ 70 and the Court amends DSMF ¶ 71 to address the Plaintiff's additions, which are supported by her deposition transcript at the sections supplied by Dr. Michailidou. *See* PRDSMF ¶ 71 (citing *Michailidou Dep. Cont.* at 13:24-16:2, 17:3-16).

representation and, during the time of her suspension, she was fully willing to meet with someone from the hospital. DSMF ¶ 71; PRDSMF ¶ 71; PSAMF ¶ 78; DRPASMF ¶ 78. Attorney Lipzen asked whether or how EMMC could support Dr. Michailidou in transitioning away from EMMC on terms that would allow her to transfer her J-1 waiver to another employer. DSMF ¶ 71; PRDSMF ¶ 71. EMMC's counsel represented to Dr. Michailidou's counsel on more than one occasion and in writing that, while EMMC would permit Dr. Michailidou to resign in lieu of termination, EMMC was required to report Dr. Michailidou's resignation to the BOLIM.[93] DSMF ¶ 72; PRDSMF ¶ 72.

EMMC's Medical Staff did not take any action concerning Dr. Michailidou's privileges prior to her separation from employment.[94] PSAMF ¶ 47; DRPSAMF ¶ 47.

When Dr. Villanueva subsequently inquired of Dr. Waddell why Dr. Michailidou had been suspended and whether she needed to assume care of one of Dr. Michailidou's patients, Dr. Waddell responded, "Sophia, Sophia, Sophia, just stop talking—there is no Maria."[95] PSAMF ¶ 71; DRPSAMF ¶ 71. Dr. Villanueva believes

---

[93]    Plaintiff raises the same qualification to DSMF ¶ 72 as to DSMF ¶¶ 70-71 and the Court concludes it is beyond the scope of the Defendants' statement of material fact.

[94]    The parties have a minor disagreement over the testimony reflected in PSAMF ¶ 47 and DRPSAMF ¶ 47. The Court reviewed the testimony and agrees with the Defendants' interpretation, and revises the statement of fact accordingly. *See Worster Dep.* at 12:22-14:15.

[95]    The parties dispute whether Dr. Villanueva "questioned the decision" to suspend Dr. Michailidou, PSAMF ¶ 71, or asked what happened regarding the suspension, DRPSAMF ¶ 71, and the Court, upon reviewing the portion of Dr. Villanueva's deposition cited by the parties, agrees with Defendants' statement that she questioned why Dr. Michailidou had been suspended, *Villanueva Dep.* at 86:5-21, but observes for the Plaintiff that, by the Court's read, the fact that Dr. Villanueva subsequently questioned the suspension implies she had not been heavily involved in the decision-making process.

EMMC treated Dr. Michailidou in the context of her suspension as "a criminal" and in a "very vindictive" and unprofessional manner.[96]  PSAMF ¶ 72; DRPSAMF ¶ 72. More broadly, Dr. Villanueva expressed at this time that she perceived the environment at EMMC as hostile, and felt it was not a safe place for individuals to share contrary opinions.[97]  PSAMF ¶ 73; DRPSAMF ¶ 73.

### M.    Dr. Michailidou's Resignation from EMMC

On November 13, 2020, EMMC stopped paying Dr. Michailidou's salary, DSMF ¶ 73; PRDSMF ¶ 73, and, on November 17, 2020, Dr. Michailidou provided EMMC with written notice of her resignation.  DSMF ¶ 74; PRDSMF ¶ 74.  Dr. Michailidou's decision to resign was influenced by her understanding that involuntary termination could negatively impact her immigration status and her counsel's recommendation that she resign.  DSMF ¶ 75; PRDSMF ¶ 75.  Specifically, prior to Plaintiff's resignation, Dr. Waddell communicated to Dr. Michailidou his mistaken belief that her J-1 waiver would not be impacted by her resignation.[98]  DSMF ¶ 75; PRDSMF ¶

---

[96]    The Court agrees with Plaintiff that Dr. Villanueva's deposition, at the portion cited by Plaintiff, *Villanueva Dep. Cont.* at 53:21-54:23, supports their factual statement and accepts it over the Defendants' objection for relevance and denial that Dr. Villanueva's perceptions are inaccurate because "Dr. Michailidou was allowed to resign in lieu of being terminated."  DRPSAMF ¶ 72.  The Court clarifies that this is Dr. Villanueva's perception but overrules Defendants' objection and denial.

[97]    The Court reaches the same conclusion regarding PSAMF ¶ 73 as with PSAMF ¶ 72, and the Court agrees with Plaintiff that Dr. Villanueva's deposition, at the portion cited by Plaintiff, *Villanueva Dep. Cont.* at 53:21-54:23, supports their factual statement and accepts it over the Defendants' objection for relevance and denial that Dr. Villanueva's perceptions are inaccurate. DRPSAMF ¶ 73.  The Court clarifies that this is Dr. Villanueva's perception but overrules Defendants' objection and denial.

[98]    Dr. Michailidou qualifies this statement on the ground that "Dr. Waddell inaccurately assured his colleagues that no matter what happened with Maria's FPPE she would complete her waiver," and "Dr. Michailidou went back to Greece because she had no other choice."  PRDSMF ¶ 75 (citing, e.g., *Worster Dep.* at 53:3-54:15).  The Court reviewed Ms. Worster's deposition transcript at the section provided by the Plaintiff: Ms. Worster stated it was Dr. Waddell's "belief at the time" that "completion of [Dr. Michailidou's] waiver is not in jeopardy" on account of resignation; Ms. Worster also stated Dr.

75.  He expressed the same mistaken belief to partners and also communicated internally that he hoped Dr. Michailidou would leave of her own accord after the completion of her waiver period.[99]  PSAMF ¶ 46; DRPSAMF ¶ 46.

On December 10, 2020, Dr. Michailidou's counsel emailed EMMC's counsel the Separation Agreement, which had been executed by Dr. Michailidou.  DSMF ¶ 76; PRDSMF ¶ 76.  The Separation Agreement expressly captured the parties' understanding that EMMC would report Dr. Michailidou's resignation to BOLIM, and Dr. Michailidou understood at the time she signed the Separation Agreement that EMMC would be making this report; Dr. Michailidou qualifies that she did not understand at the time whether the report would be submitted to BOLIM by EMMC or herself, and EMMC has no policy as to who should make a report to BOLIM or what that report should include.[100]  DSMF ¶ 77; PRDSMF ¶ 77; PSAMF ¶ 82; DRPSAMF ¶ 82.  The Separation Agreement also included a covenant not to sue EMMC for breach of her Employment Agreement.  DSMF ¶ 77; PRDSMF ¶ 77.

On or about December 9, 2020, EMMC sent a letter to BOLIM, reporting that Dr. Michailidou resigned her employment while on administrative suspension for reasons related to patient safety concerns.  JSR ¶ 13; DSMF ¶ 78; PRDSMF ¶ 78.  On

---

Waddell was incorrect.  *Worster Dep.* at 53:16-54:12.  The Court incorporates this portion of Plaintiff's qualification.

[99]    PSAMF ¶ 46 and DRPSAMF ¶ 46 similarly address Dr. Waddell's mistaken belief regarding the impact of a Medical Executive Committee report on Dr. Michailidou's visa waiver.  The Court resolves the disputed portion of PSAMF ¶ 46 and DRPSAMF ¶ 46 in line with the Court's prior resolution of DSMF ¶ 75 and PRDSMF ¶ 75.

[100]    The Court amends DSMF ¶ 77 slightly to incorporate the Plaintiff's qualification that she did not know whether the report would be submitted to BOLIM by herself or EMMC.  PRDSMF ¶ 77.

December 22, 2020, the BOLIM sent EMCC a letter requesting additional information, including the names of any patients whose care gave rise to the adverse action, medical records relating to the event or events giving rise to the adverse action, written statements signed or prepared by witnesses, and any correspondence between Dr. Michailidou and EMCC relating to the adverse action. JSR ¶ 14; DSMF ¶ 79; PRDSMF ¶ 79. On December 28, 2022, EMMC responded to BOLIM's request, providing all the items BOLIM requested, including witness statements. DSMF ¶ 80; PRDSMF ¶ 80.

Dr. Michailidou believes Dr. Waddell provided more narrative than BOLIM required, which harmed her in the context of BOLIM's investigation. PSAMF ¶ 84; DRPSAMF ¶ 84.[101] Dr. Michailidou notes further that Dr. Waddell has been on the BOLIM for over a decade, and he is frequently the Board Member the BOLIM relies on for investigations and case presentations regarding surgical cases, and, as such, believes his opinion carries significant weight in this tribunal. PSAMF ¶ 83; DRPSAMF ¶ 82. BOLIM ultimately issued a complaint against Dr. Michailidou, and

---

[101]    PSAMF ¶ 84 states: "Even though he was only asked to identify cases giving rise to the FPPE, he wrote extensively a narrative arguing Dr. Michailidou's incompetence as a physician knowing that the Board would know it was his decision to put her on an FPPE." PSAMF ¶ 84. In support, Dr. Michailidou cites "ECF Doc. 40-10 at 514 (177:9-182:10); Lee Affidavit, Exhibits 23, 25 and 26)." *Id.* The Defendants object to PSAMF ¶ 84 as "an argumentative and conclusory characterization of Dr. Waddell's communication" and "largely unsupported by the record material cited." DRPSAMF ¶ 84.

The Court agrees for the most part with the Defendants. The first record citation is to Dr. Waddell's deposition transcript and does not confirm the characterization in paragraph 84. The second record citation is to several email exchanges leading to the FPPEs. Neither supports the assertions in PSAMF ¶ 84 that Dr. Waddell's witness statement was extensive or that Dr. Waddell intended to signal to BOLIM that he was the physician who recommended the FPPE and thereby influence BOLIM. The Court has therefore amended PSAMF ¶ 84 to clarify that it is Dr. Michailidou's view that Dr. Waddell went beyond what was necessary in reporting to the BOLIM to influence its decision.

the matter was dismissed with a Letter of Guidance, which is not a disciplinary action.[102]   DSMF ¶ 81; PRDSMF ¶ 81; PSAMF ¶ 92; DRPSAMF ¶ 92.   When she received the complaint, Dr. Michailidou provided a comprehensive response to EMMC's allegations to the BOLIM.   PSAMF ¶ 91; DRPSAMF ¶ 91.

Dr. Michailidou moved back to Greece in December of 2020 when she was unable to secure additional employment in the United States within the sixty-day grace period before her visa waiver expired; because she was unable to maintain or secure employment pursuant to the terms of the J-1 waiver, immigration law requires her to stay in Greece for three years before she may then return to the United States.[103]   DSMF ¶ 82; PRDSMF ¶ 82; PSAMF ¶ 87; DRPSAMF ¶ 87.   Dr. Michailidou returned to Greece in December of 2020 because she had no other choice.   PSAMF ¶ 86; DRPSAMF ¶ 86.

After Dr. Michaildou left EMMC, EMMC did not hire a third colorectal surgeon and, thus, Dr. Huang's concerns about Dr. Bernaiche's hiring and patient volume

---

[102]   Dr. Michailidou qualifies "[a]fter BOLIM's investigation, which included an expert review of the numerous cases that form the basis for EMMC's decision to force her resignation, the matter was dismissed."   PRDSMF ¶ 81 (citing *Michailidou Decl.* ¶ 10) (citation amended) ("The matter was ultimately dismissed with a letter of guidance, which is not a disciplinary action").   The Court amends DSMF ¶ 81 slightly to reflect that the matter was dismissed with a letter of guidance, which is not a disciplinary action.   The Court notes further that Defendants admit to this statement, which appears in PSAMF ¶ 92, in DRPSAMF ¶ 92.

[103]   Plaintiff denies Defendants' statement that "Dr. Michailidou moved back to Greece in December of 2020 and has taken no steps to pursue employment in the United States since" and "[t]he BOLIM proceedings did not interfere with her ability to earn a living in Greece or otherwise caused her economic harm," DSMF ¶ 82, contending "[w]hen Dr. Waddell expanded on the issues presented to [BOLIM] with his letter, it harmed Dr. Michailidou's reputation and made it very difficult to find another job, especially since she only had 60 days in the United States to find a new job to preserve her immigration status" and "Dr. Michailidou went back to Greece because she had no other choice, she had to leave the country."   PRDSMF ¶ 82.   The Court amends DSMF ¶ 82 to provide this context on the Plaintiff's immigration status.

never came to fruition; due to shifting volume, EMMC instead chose to hire a third surgical oncologist.[104]  PSAMF ¶¶ 54, 90; DRPSAMF ¶¶ 54, 90.

### N.    EMMC Staff's Communications with Dr. Michailidou Following Her Resignation

After Dr. Michailidou's resignation from EMMC, she asked Dr. Villanueva to write a recommendation letter or serve as a reference.  PSAMF ¶ 74; DRPSAMF ¶ 74.  Dr. Villanueva texted her in response, "I want to help you but I am still working for them and I don't want to get in trouble.  I'm keeping my head down until I leave.  These people are so vindictive who knows what they can do."[105]  PSAMF ¶ 74; DRPSAMF ¶ 74.  Another senior physician indicated that she wanted to help Dr. Michailidou, but "it's just that I'm scared if I do that I will lose my job on some kind of trumped up charges."[106]  PSAMF ¶ 75; DRPSAMF ¶ 75.

Several months after she left, Dr. Michailidou received a message from one of the junior physician assistants stating, "well I now know what it is like to have Dr. Waddell against me.  They are trying to build a case against me that doesn't exist

---

[104]    Plaintiff alleges "[EMMC] didn't need a third colorectal surgeon[;] they didn't hire one after Michailidou left and are not recruiting one now." PSAMF ¶ 54 (citing *Waddell Dep.* at 134:12-135:16). Defendants qualify "[t]he cited testimony is more nuanced that PSAMF ¶ 54 suggests . . .. [and] supports that, after Dr. Michailidou's departure, [EMMC] chose to hire a third surgical oncologist o cover increases in volume, rather than another colorectal surgeon." DRPSAMF ¶ 54 (citing *Waddell Dep.* at 134:12-136:16). The Court agrees with Defendants that their qualification adds helpful context to EMMC's staffing decisions and amends PSAMF ¶ 54 accordingly.

[105]    Defendants narrowly object and qualify PSAMF ¶ 74 which additionally alleged Dr. Villanueva "was scared that if she spoke out . . . she would be retaliated against," alleging it is unsupported by the evidence. DRPSAMF ¶ 74. The Court agrees that this specific portion of PSAMF ¶ 74 is unsupported and amends the Plaintiff's statement accordingly.

[106]    Defendants object on hearsay grounds and, alternatively, admit PSAMF ¶ 75. The Court overrules the statement, because Plaintiff offers it not for the truth of the matter but its effect on the listener and the fact that the communication was made, and, having overruled the objection, admits the statement.

and discriminating against me through my whole pregnancy. I am sorry what they did to you, it's just not right."[107]  PSAMF ¶ 13; DRPSAMF ¶ 13.

She received a text message from a second female employee stating "the history of retaliation against women healthcare workers at Northern Light is strong."[108] PSAMF ¶ 14; DRPSAMF ¶ 14.

A senior gastroenterologist at EMMC, Dr. Jean Larson, texted Dr. Michailidou that "Brad [Waddell] was out to get you out of [EMMC] and make it as onerous as possible to practice," and "your lawyer here needs to realize he is dealing with 1970's [N]ew [Y]ork with a southern bias."[109]  PSAMF ¶ 77; DRPSAMF ¶ 77.

Dr. Waddell regrets nothing about his interactions with either Dr. Villanueva or Dr. Michailidou.  PSAMF ¶ 76; DRPASMF ¶ 76.

## III.    THE PARTIES' POSITIONS

### A.    The Defendants' Motion for Summary Judgment

Defendants move for summary judgment on all counts in Plaintiff's complaint.

---

[107]    Defendants simultaneously object to PSAMF ¶ 13 on hearsay grounds and admit PSAMF ¶ 13.  DRPSAMF ¶ 13.  The Court concludes PSAMF ¶ 13 is admissible for the non-hearsay purpose to show that the communication was made and its effect on the listener.

[108]    Defendants simultaneously object to PSAMF ¶ 14 on hearsay grounds and admit PSAMF ¶ 14.  DRPSAMF ¶ 14.  The Court concludes PSAMF ¶ 14 is admissible for the non-hearsay purpose to show that the communication was made and its effect on the listener.

[109]    Defendants object on hearsay grounds and alternatively qualify, accepting that Dr. Larson sent this text message but denying that Dr. Waddell's concerns about Dr. Michailidou were driven by bias.  DRPSAMF ¶ 77.  The Court overrules the hearsay objection, observing this statement is admitted not for the truth of the matter asserted but its effect on the listener, and denies the Defendants' requested qualification, for the reason that PSAMF ¶ 77 provides the context that this is Dr. Larson's perception of Dr. Waddell's rationale.

### 1.   Counts I – IV: Federal and State Discrimination

Defendants first argue they are entitled to summary judgment on Plaintiff's federal and state discrimination claims brought pursuant to the MHRA and Title VII and raised in Counts I through IV of the complaint. *Defs.' Mot.* at 6. Observing the Plaintiff asserts Defendants subjected her to disparate treatment based on her sex and national origin and additionally alleges that Dr. Waddell subjected her to a hostile work environment, Defendants argue they are entitled to summary judgment on either theory of liability. *Id.*

### a.   Disparate Treatment

Relying upon the familiar *McDonnell Douglas* burden-shifting framework to evaluate claims of workplace discrimination under federal and state law, *id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)), Defendants concede for purposes of the summary judgment stage that Dr. Michailidou has satisfied the first step, which requires the Plaintiff to "make out a prima facie showing of discrimination" by showing (1) she is a member of one or more protected classes, (2) she performed her job satisfactorily, (3) she suffered an adverse employment action, and (4) there is some evidence of a causal connection between her protected characteristic or characteristics and the adverse employment action. *Id.* at 6-7 (citing *Garmon v. Nat'l Railroad Passenger Corp.*, 844 F.3d 307, 313 (1st Cir. 2016)).

Because Defendants admit Plaintiff has made out a prima facie showing of discrimination, they turn, under *McDonnell Douglas*, to the second stage, where the burden shifts to Defendants to produce evidence of a legitimate, non-discriminatory

reason for the challenged employment action. *Id.* Here, Defendants argue EMMC's concerns about Plaintiff's performance, quality of care, and patient safety provide "not only legitimate, but compelling" reasons explaining Dr. Michailidou's FPPE, suspension, and subsequent steps culminating in her resignation. *Id.* They assert, furthermore, that EMMC's concerns were based on multiple complaints and written reports from trusted and experienced hospital staff. *Id.*

They assert, furthermore, that these reasons were not pretext "to cover up unlawful discrimination," arguing "[w]hile concededly sufficient to satisfy Dr. Michailidou's light prima facie burden, evidence relating to [EMMC's] hire of Dr. Bernaiche—the male, 'U.S. born,' colorectal surgeon—is of limited probative value, given the 'larger picture,'" adding that Dr. Waddell placed Dr. Michailidou on an FPPE "several months <u>before</u> [EMMC] began contemplating his hire." *Id.* at 8 (quoting *Ponte v. Steelcase Inc.*, 741 F.3d 310, 322 (1st Cir. 2014)) (citing DSMF ¶¶ 34, 88) (emphasis in *Def.'s Mot.*). Defendants argue the First Circuit has determined "it is not enough for a plaintiff merely to impugn the veracity of the employer's justification; [the plaintiff] must elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real and unlawful motive of discrimination." *Id.* (quoting *Theidon v. Harvard Univ.*, 948 F.3d 477, 497 (1st Cir. 2020) (in turn quoting *Velez v. Thermo King de P.R., Inc.*, 585 F.3d 441, 452 (1st Cir. 2009))).

Here, Defendants say, while there may be a genuine dispute as to Dr. Michailidou's clinical skills and whether patients were in fact at imminent risk of

harm when EMMC suspended her, "[t]here is no dispute . . . about the unprofessional content of certain of Dr. Michailidou's e-mail communications, the  fact that her patients experienced avoidable complications, or the fact that Dr. Waddell fielded complaints and concerns from a significant number of [EMMC] employees at different levels and in different departments—from nurses to PAs to Dr. Michailidou's surgical colleagues—about Dr. Michailidou's clinical skills, judgment, communications, and/or receptivity to feedback or input." *Id.* at 8-9 (citing DSMF ¶¶ 16-21, 23, 25-28, 39-44, 46-51, 53, 58-62).  "Dr. Michailidou may question the accuracy or reasonableness of these inputs," Defendants say, "but the sheer volume of them makes it impossible for her to establish pretext without evidence of a giant conspiracy to oust her." *Id.* at 9.

Defendants assert that because they have produced evidence of a legitimate, non-discriminatory reason for the challenged employment action, under *McDonnell Douglas*, the burden shifts back to Dr. Michailidou to show that the employer's articulated reason is a pretext for unlawful discrimination. *Id.* at 6.  Defendants argue they are entitled to summary judgment on Plaintiff's disparate treatment claim because "[t]here is no evidence any decision-making or 'influencer' harbored discriminatory bias, such as statements, jokes, or other conduct indicative of prejudice against female and/or foreign physicians." *Id.* at 9.

### b.    Hostile Work Environment

Defendants also argue they are entitled to summary judgment on Plaintiff's hostile work environment claim. *Id.* at 10.  To prevail on a hostile work environment theory, Defendants report, Dr. Michailidou must show (1) she was subjected to

59

unwelcome harassment based on sex or national origin, (2) the harassment was sufficiently severe or pervasive to alter the conditions of her employment, and (3) the conduct was objectively and subjectively offensive. *Id.* (citing *Garmon*, 844 F.3d at 318). Whether alleged conduct meets the high bar for hostile work environment depends on "the totality of the circumstances, including factors such as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with [the] employee's work performance." *Id.* (quoting *Johnson v. Whole Foods Market Group, Inc.*, 657 F. Supp. 3d 158, 179 (D. Me. 2023) (in turn quoting *Brader v. Biogen Inc.*, 983 F.3d 39, 59 (1st Cir. 2020) (citation corrected)).

Defendants argue they are entitled to summary judgment on Plaintiff's hostile work environment claim because Plaintiff has not established the first and third elements of this inquiry. *Id.* (alleging Dr. Waddell's communications to Dr. Michailidou, while "direct," cannot be characterized as objectively offensive and, furthermore, "there is no admissible evidence that any alleged mistreatment was motivated by her sex or national origin") (citing *Garmon*, 844 F.3d at 318).

### 2. Count V: The Maine Whistleblower Protection Act

Turning to Count V of Plaintiff's complaint, which raises a claim against EMMC pursuant to the Maine Whistleblower Protection Act, Defendants argue that, to survive summary judgment on this count, Plaintiff must identify evidence that (1) she made a protected report under the MWPA, (2) she thereafter experienced an adverse employment action, and (3) "the record as a whole would allow a jury to

reasonably conclude that the adverse employment action was motivated at least in part by retaliatory intent." *Id.* at 11 (quoting *Brady v. Cumberland Cnty.*, 2105 ME 143, ¶ 37, 126 A.3d 1145). Here, Defendants assert Dr. Michailidou cannot establish the first or final element of her MWPA claim. *Id.*

Addressing the first element, Defendants assert that the MWPA prohibits retaliation against an employee who, "acting in good faith . . . reports to the employer . . . what the employee has reasonable cause to believe is an act or omission that constitutes a deviation from the applicable standard of care for a patient by an employer shared with the care of that patient." *Id.* (quoting 26 M.R.S. §833(1)(E)). Dr. Michailidou contends she made such a report in the context of a March of 2020 email exchange about ways to minimize duplicative inpatient visits and, therefore, the spread of COVID-19, *id.* (citing DSMF ¶ 83; *Compl.* ¶¶ 34, 36), and Defendants contend "the facts do not bear this out" because "[n]owhere in th[e] [March 30, 2020] email exchange [concerning rounding during the pandemic] does Dr. Michailidou assert that the standard of care, patient safety, or any law requires patients to be examined daily by a surgeon." *Id.* at 11-12 (citing DSMF ¶¶ 83-84; *Compl.* ¶ 35). Defendants note further that, following this email exchange, Dr. Michailidou "did not in fact see every patient each morning when she was on-call." *Id.* at 12 (citing DSMF ¶ 87).

Next, Defendants argue Dr. Michailidou additionally has not satisfied the third element of this inquiry because "[t]here is no evidence of a causal connection between Dr. Michailidou's March 30, 2020[] email and any adverse employment action." *Id.*

(emphasis removed). They note that the record indicates Dr. Waddell began the performance management process and placed Dr. Michailidou on an FPPE in 2019, which predates her March 30, 2020 email and the onset of the pandemic, and, further, that her suspension followed the allegedly protected activity by nearly seven months; thus, "the most common method of proving causation—temporal proximity—is notably absent in this case." *Id.* (citing *Calero-Cerezo v. U.S. Dept. of Justice*, 355 F.3d 6, 25-26 (1st Cir. 2004) (noting that a three- or four-month temporal lag between protected activity and adverse action "have been held insufficient" to establish causation); *Moron-Barradas v. Dep't of Educ. of P.R.*, 588 F.3d 472, 481 (1st Cir. 2007) (eight-month delay between protected activity and adverse action held insufficient) (citation amended)). Defendants argue further "there is no evidence that Dr. Michailidou's alleged protected activity led to even 'some consternation,' . . . much less that Dr. Waddell was angry or concerned about Dr. Michailidou's fleeting stance on this issue of patient rounding during a pandemic." *Id.* at 12-13.

### 3. Count VI: Breach of Contract

Under Maine Law, Defendants report, the elements of a breach of contract claim are (1) breach of a material contract term, (2) causation, and (3) damages. *Id.* at 13 (citing *Maine Woods Pellet Co., LLC v. Western World Ins. Co.*, 401 F.Supp.3d 194, 199-200 (D. Me. 2019)). Observing that Plaintiff's complaint asserts a breach of contract claim based on her Employment Agreement and the Separation Agreement's non-disparagement provision, Defendants argue Dr. Michailidou cannot establish

these elements with respect to either of the two contracts she contends EMMC breached.[110]  *Id.*

Concerning the Employment Agreement, Defendants say Dr. Michailidou claims EMMC forced her to resign and thereby "failed to honor [her] employment contract." *Id.* (quoting *Compl.* ¶¶ 57, 83). Defendants argue "[t]his claim fails for the simple reason that she cannot establish a breach" because EMMC "plainly had a contractual right to issue Dr. Michailidou a notice of default once her counsel represented she had no intention to participate in an investigation or return to work at NLEMMC; and Dr. Michailidou undisputedly chose to resign in lieu of being fired." *Id.*

"Moreover," Defendants add, "Dr. Michailidou's assertion of this claim is itself a breach of the Separation Agreement's covenant not to sue." *Id.*  Defendants recall that Dr. Michailidou contested this affirmative defense in her opposition to the Defendants' motion to dismiss, arguing the covenant not to sue was unenforceable because she had not received the benefits of resignation. *Id.* at 14. Defendants argue "the record does not bear this out" because, prior to Plaintiff's November 17, 2020 resignation, EMMC's counsel informed her counsel, in writing and on multiple occasions, that whether she was terminated or chose to resign, "[EMMC] would be reporting her separation to BOLIM, as required by law." *Id.* (citing DSMF ¶ 72). Defendants report further that, prior to Dr. Michailidou's execution of the Separation

---

[110]    As noted, Plaintiff's complaint initially brought Count Six against both EMMC and Dr. Waddell.  The Court dismissed Count Six against Dr. Waddell on September 27, 2023.  *See Order on Mot. to Dismiss.*

Agreement, which contained the covenant not to sue, EMMC's counsel sent Plaintiff's counsel a draft of EMMC's initial report to BOLIM, and the Separation Agreement itself, as well as each draft exchanged prior to its execution, "unambiguously and expressly stated: 'Physician acknowledges that [EMMC] is required by law to report . . . to [BOLIM].'" *Id.* (citing and quoting DSMF ¶ 77). Defendants contend that EMMC's communications with BOLIM are the only actions that Dr. Michailidou relies upon to excuse her compliance with the Separation Agreement's covenant not to sue, and:

> given the facts set forth above, a rational jury could not find that [EMMC] promised to forgo reporting to BOLIM in exchange for Dr. Michailidou's promise not to sue [EMMC] for breach of the Employment Agreement. Consequently, Dr. Michailidou cannot establish that [EMMC] deprived her of the benefit of or materially breached the Separation Agreement. The covenant not to sue is enforceable and bars Dr. Michailidou's claim for breach of the Employment Agreement.

*Id.*

Next, Defendants say, insofar as Count VI rests on EMMC's alleged breach of the Separation Agreement's non-disparagement provision, based on the Defendants' submitted report to BOLIM, EMMC is entitled to summary judgment because "[g]iven that the Separation Agreement expressly contemplates [EMMC's] report to BOLIM, a jury could not rationally find that [EMMC's] response to BOLIM's written request for additional information was a breach." *Id.* at 15. To the extent the Court disagrees, Defendants continue, EMMC is still entitled to summary judgment because (1) any agreement by EMMC to withhold information it is statutorily required to report to BOLIM would be contrary to public policy and, therefore, unenforceable, and (2) the record does not contain any evidence that EMMC's

provision of information about Plaintiff to BOLIM caused her to incur recoverable damages. *Id.* at 15-16 (citing, e.g., 25 M.R.S. § 2501 *et seq.*; 32 M.R.S. § 3269).

On the issue of damages, Defendants report that Maine law requires actual injury or damage, and emotional distress damages are unavailable. *Id.* at 16 (citing *In re Hannaford Bros. Co. Customer Data Security Breach Litigation*, 2010 ME 93, ¶¶ 8, 14, 4 A.3d 492). Here, Defendants assert, the factual record indicates that Dr. Michailidou stopped pursuing employment in the United States and moved back to Greece in December of 2020, before EMMC responded to BOLIM's request for additional information, and, further, that Dr. Michailidou concedes BOLIM's proceedings did not interfere with her ability to earn a living in Greece or otherwise cause her economic harm. *Id.* at 16-17 (citing DSMF ¶ 82). Given the absence of recoverable damages, Defendants argue they are entitled to summary judgment on Count Six.

### 4.    Count VII: Intentional Infliction of Emotional Distress

Plaintiff brings Count VII for intentional infliction of emotional distress (IIED) against both Dr. Waddell and EMMC; Defendants report that, to prevail on her claim of IIED, Plaintiff must show that Defendants' "conduct was so 'extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized community.'" *Id.* at 17 (quoting *Curtis v. Porter*, 2001 ME 158, ¶ 10, 784 A.2d 18, 22-23 (Me. 2001)). Defendants argue Dr. Michailidou cannot meet this high bar and point to cases in which the Maine Law Court has affirmed summary judgment for defendants "in cases involving allegedly

intentional conduct very similar to the pre-resignation conduct that Dr. Michailidou's attributes to Dr. Waddell in this case." *Id.* (citing, *e.g.*, *Botka v. S.C. Noyes & Co.*, 2003 ME 128, ¶¶ 10, 19, 834 A.2d 947 (holding evidence that the defendant "frequently interrupted, berated, insulted, and harassed the [plaintiffs] alone or in front of clients or others" was insufficient to support a finding of "extreme and outrageous" conduct)); *Staples v. Bangor Hydro-Elec. Co.*, 561 A.2d 499, 501 (Me. 1989) (finding jury could not rationally find for plaintiff who argued his boss "humiliated him at staff meetings and demoted him without cause"). Defendants allege that the Law Court has also recognized that a defendant's assertion of its legal rights cannot be characterized as "extreme and outrageous," even if it causes the plaintiff extreme emotional distress, and contend "[i]f asserting one's legal rights cannot ground an IIED claim, then [EMMC's] report to the BOLIM in accordance with its legal obligation certainly cannot do so." *Id.* at 18 (citing *Chiapetta v. Lumberman's Mut. Ins. Co.*, 583 A.3d 198, 201 (Me. 1990)).

Further, Defendants assert that Dr. Michailidou's claim for pre-resignation emotional distress is barred by the Maine Workers' Compensation Act (MWCA) because "an employer who has secured the payment of compensation in conformity with the [MWCA] is exempt from civil actions . . . at common law . . . involving personal injuries sustained by an employee arising out of an in the course of employment," *id.* (quoting 39-A M.R.S. § 104), and the exemption from liability extends to intentional torts and to the employer's agents. *Id.* (citing 39-A M.R.S. § 104; *Frank v. L.L. Bean, Inc.*, 352 F.Supp.2d 8, 11 (D. Me. 2005)). "Under the

circumstances and given the evidence that [EMMC] had, at all relevant times, secured payment of compensation under the MWCA," *id.* at 19 (citing DSMF ¶ 94), and, thus, "Defendants are entitled to summary judgment on Dr. Michailidou's pre-resignation IIED claim." *Id.*

Defendants argue Dr. Michailidou's claim for post-employment emotional distress is barred by the Maine Health Security Act (MHSA), codified at 24 M.R.S. § 2501 *et seq.*, which confers broad immunity upon health care entities and providers reporting to BOLIM, assisting in investigation conducted by BOLIM, or otherwise helping BOLIM carry out its legally prescribed duties, in order to encourage compliance with reporting and disclosure obligations. *Id.* (citing 24 M.R.S. § 2511; *Argereow v Weisberg*, 2018 ME 140, 195 A.3d 1210). Defendants argue this immunity extends to them and move the Court to issue summary judgment on Count VII.

## B.   Dr. Michailidou's Opposition

### 1.   Counts I – IV: Federal and State Discrimination

Like the Defendants, Dr. Michailidou addresses Counts I – IV together. However, she only addresses Defendants' arguments as to her disparate treatment theory of discrimination and does not additionally respond to what Defendants construed as her hostile work environment claim. *Pl.'s Opp'n* at 10-13.

#### a.   Disparate Treatment

Observing that Defendants concede she has established a prima facie case of discrimination, Dr. Michailidou argues Defendants have not met their burden under *McDonnell Douglas* to demonstrate a legitimate non-discriminatory reason for their

actions. *Id.* at 10. Dr. Michailidou contends that summary judgment is unwarranted on Counts I, II, III, and IV because the factual record contains genuine disputes of material facts regarding whether her patient care fell below an acceptable standard. *Id.* at 10-11 (citing *Ripoli v. R.I. Dep't of Hum. Servs.*, 123 F.4th 565, 572 (1st Cir. 2024) (citation corrected) ("Generally—though by no means always—'a plaintiff's prima facie case, combined with sufficient evidence to find the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.' And in that event, a plaintiff need not necessarily introduce additional, independent evidence of discrimination'") (in turn quoting *Reevs v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000) (internal citation provided by Court)). She insists Defendants are incorrect to assert there is no evidence that a decision-maker or "influencer" harbored discriminatory bias against her, maintaining "[t]he institution itself saw its foreign-born doctors as risks," and "Dr. Waddell, the chief of surgery, who has a domineering control over the hierarchy . . . has demonstrated a bias against foreign-born surgeons, whom he assumes are not going to stay around," and "treats women differently than men." *Id.* at 11 (citing PSAMF ¶¶ 3-4, 6-20, 23-26, 71-77).

Dr. Michailidou also argues the Defendants' reason for her disparate treatment was pretextual and rejects the Defendants' reliance on Dr. Villanueva's deposition testimony to support the opposite conclusion, insisting "Villanueva makes clear that the stated non-discriminatory reason is pretext." *Id.* (citing PSAMF ¶¶ 30, 34-39, 42-43, 63-65). Furthermore, the Plaintiff alleges "[u]nderstanding that the dismissal of

the [BOLIM] complaint against her demonstrates clearly that her patient care was not a basis for forcing her to resign, Defendants turn to other reasons for their decision," which she maintains "are obviously pretextual." *Id.* at 12. She claims Defendants "ignore the mountains of evidence that demonstrate that Dr. Waddell was able to influence the complaints of others, couch the complaints of others, that he was motivated to see Dr. Michailidou unsuccessful, and that it was those over whom he had influence he ultimately influenced to sink her." *Id.* (citing PSAMF ¶¶ 6-9, 13, 15, 23-26, 43, 46, 58-59, 62, 64, 66-68, 71, 73-75).

She also argues that Dr. Waddell's hiring of Dr. Bernaiche, a U.S.-born male surgeon, less than a week before Dr. Michailidou's administrative suspension, is further evidence that the Defendants' proffered reasons for their actions against her were pretextual. *Id.* at 12-13 (citing *Ripoli*, 123 F.4th at 578; *Conward v. Cambridge Sch. Comm.*, 171 F.3d 12, 20 (1st Cir. 1999)). Dr. Michailidou insists "[t]he facts here are simple, plain and clear":

> Bernaiche was hired to replace Michailidou, and forcing her out made room for him. . .. This was done despite several of the partners disagreeing with the decision to hire Bernaiche and in the background of a challenging business case for justification retention of both Bernaiche and Michailidou. . .. In short, Waddell chose Michailidou, and forced her failure to justify his hire.

*Id.* at 13 (citing PSAMF ¶¶ 31-32, 43, 45-59, 71-74, 77).

Finally, Dr. Michailidou rejects the Defendants' "attempt to diminish the significance of Dr. Waddell's actions by saying that they could have been worse, because he could have involved medical staff," insisting "[t]he decision to not include medical staff was perhaps the most damning and damaging aspect of Dr. Waddell

69

and EMMC's actions [because] [a]s EMMC acknowledges, given the patient care issues, this is a case that would have generally included medical staff." *Id.* (citing PSAMF ¶ 47). She claims that if Dr. Waddell had involved medical staff, Dr. Michailidou would not have had any disruption to her employment until after her visa waiver had been completed; "[i]nstead, Dr. Waddell pushed Jude Tardy to report his concerns based on false pretenses to Dr. Clarke and forced her administrative suspension," eventually causing Dr. Michailidou not to complete her visa waiver. *Id.* at 13-14 (citing PSAMF ¶¶ 45, 47, 60-67). She concludes "[n]ot only did Dr. Waddell's failure to involve medical staff get Dr. Michailidou out of EMMC[,] it forced her out of the country." *Id.* at 14.

In sum, Dr. Michailidou urges the Court to reject the Defendants' motion for summary judgment on Counts I – IV because "[t]here are significant questions of material fact remaining and more than enough evidence for Plaintiff's discrimination claims to go to a fact-finder." *Id.*

## 2. Count V: The Maine Whistleblower Protection Act

Responding to Defendants' argument that she has not made out a prima facie case pursuant to the MWPA because her report does not constitute protected activity, Dr. Michailidou insists "[i]t most certainly does" and "[s]he was questioning what she took to be direction that it was now, contrary to hospital policy and what she understood to be the applicable standard of care, unnecessary for each physician to see their patients daily." *Id.* at 14-15 (citing *Stewart-Dore v. Webber Hosp. Ass'n*, 13 A.3d 773, 775 (Me. 2011) (reporting that the MWPA expressly protects an employee

"when she reports a deviation from the applicable standard of patient care") (in turn citing 26 M.R.S. § 833(1)(E)).

Next turning to the Defendants' challenge that she has not established causation on account of the "large amount of time elapsed between the protected activity and Dr. Michailidou's forced resignation," *id.* at 15, Dr. Michailidou contends that "this ignores the adverse employment actions occurring prior to the ultimate forced resignation," "ignores that the predicate of Defendant's legitimate non-discriminatory reason, that senior PAs were no longer willing to work with her, was in part caused by her complaint," and "over-emphasizes the need for temporal proximity." *Id.* (citing *Brady v. Cumberland Cnty.*, 2015 ME 143, ¶ 23, 126 A.3d 1145) (explaining that while temporal proximity is valuable for inferring causation, "[t]he inverse, however, is not true: the *lack* of temporal proximity, although potentially persuasive, is not dispositive, and in the context of a summary judgment motion it does not compromise a plaintiff's prima facie case") (in turn citing *Murphy v. United States Dep't of Veterans Affs.*, No. 1:12-cv-00379-DBH, 2013 U.S. Dist. LEXIS 119869, at *20 (D. Me. Aug. 23, 2013) (citation amended)).  Plaintiff concludes summary judgment is inappropriate in Count V because "[t]here is certainly a sufficient causal connection between Dr. Michailidou's protected activity and her mistreatment by Dr. Waddell and certainly the ultimate asserted complaints of the PAs who were upset with her protected activity." *Id.* at 15-16.

### 3.    Counts VI and VII: Breach of Contract and Intentional Infliction of Emotional Distress

Dr. Michailidou addresses Count VI and VII together because she views "[t]he conduct giving rise to both EMMC's breach of the disparagement provisions of the contract and the intentional infliction of emotional distress [as] the same." *Id.* at 16. She asserts that both "involve the decision by EMMC to go well beyond what was required for them to report to BOLIM and tank her opportunity to continue her [visa] waiver in the United States, and accordingly force her to return to Greece." *Id.*

Regarding Count VI, and as an initial matter, Plaintiff clarifies that she "does not pursue claims for IIED regarding actions prior to [her] forced resignation, [and] accordingly no response to Workers' Compensation Exclusivity is necessary, as it does not apply to claims subsequent to employment." *Id.* at 16 n.2. She proceeds to argue that "Dr. Waddell utilized his influence to *de facto* deport Dr. Michailidou from the United States," alleging the evidence in the record "demonstrates that Dr. Waddell not only destroyed her career with obvious malice by utilizing his influence at EMMC, he went further by utilizing his influence on behalf of EMMC with the State's medical disciplinary BOLIM to make obtaining further employment in the United States an impossibility." *Id.* at 16. She contends Dr. Waddell should not only have recused himself from the BOLIM's consideration of Plaintiff's case but should have taken further action to protect the BOLIM from his bias in her case. *Id.* at 16-17. Given Dr. Waddell's involvement and influence with the BOLIM, and the "host of unproven assertions" he included in his report to the BOLIM, which went beyond what he was

72

required to report, Plaintiff asserts "[t]hat the Complaint did not amount to discipline is a miracle." *Id.* at 17-19.

Turning to Count VII, Plaintiff argues "[i]f the defendants' conduct is outrageous enough, the resulting severe emotional distress can be inferred without the requirement of other evidence of the distress," *id.* at 19 (citing *Latremore v. Latremore*, 584 A.2d 626, 632-33 (Me. 1990), and "[a]s long as the court has determined that extreme and outrageous [conduct] *could* be found, the question of the degree of resulting severe emotional distress is more appropriate for a jury." *Id.* at 19 (citing *Bratton v. Donough*, 2014 ME 64, ¶ 23, 91 A.3d 1050; Restatement (Second) of Torts § 46 cmt. h (1965)).

Finally, and returning to Count VI, Plaintiff rejects Defendants' opposition to Plaintiff's breach-of-contract claim based on the covenant not to sue, insisting "Defendant[s], as [they] did at the Motion to Dismiss stage[,] still ignores that the choice to disparage Plaintiff in excess of their statutory duty under the MSHA constitutes a breach of the contract, and therefore relieves Plaintiff of the covenant not to sue." *Id.* at 20. She says that "[t]he simple fact of the matter is that . . . Dr. Waddell's report was unnecessary, malicious, and breached the non-disparagement provisions that had served as the predicate for Dr. Michailidou's resignation," adding "[i]t's hard to avoid that the ultimate consequence for her, had she decided to contest the contentions made against her to Medical Staff, would have been that she was able to complete her visa waiver and stay in the United States. Instead, she received a

two-year battle at the BOLIM and an end to her opportunity to achieve the American dream." *Id.* (citing PSAMF ¶ 45).

Plaintiff concludes by urging the Court to reject the Defendants' motion for summary judgment. *Id.*

## C.   The Defendants' Reply

Defendants oppose Dr. Michailidou's opposition to their motion for summary judgment, insisting that her response "rests on conclusory, argumentative, and internally inconsistent assertions, none of which justifies submission of her claims to the factfinder." *Defs.' Reply* at 1.

### 1.   Counts I – IV: Federal and State Discrimination

For Dr. Michailidou to withstand summary judgment, Defendants report, she "must present evidence from which a reasonable jury could supportably conclude 'that [EMMC's] explanation [for placing her on an FPPE and, later, terminating her employment] is not just wrong, but that it is so implausible that [EMMC] more likely than not does not believe it.'" *Id.* (quoting *Dusel v. Factory Mut. Ins. Co.*, 52 F.4th 495, 508 (1st Cir. 2022) (in turn quoting *Forsythe v. Wayfair, Inc.*, 27 F.4th 67, 80 (1st Cir. 2022) (Defendants' alterations)).  Here, Defendants insist, Dr. Michailidou's opposition relies "more on speculation and surmise than on plausible parallel inferences drawn from competent evidence." *Id.* (quoting *Mirabella v. Town of Lexington, Mass.*, 64 F.4th 55, 58 (1st Cir. 2023)).

First, Defendants respond to Dr. Michailidou's contention that, had partners done more to help her while she was on the FPPE, she would still be employed by

EMMC, insisting that, "[c]ontrary to Dr. Michailidou's position, there is significant evidence in the record about written and verbal communications with her over time, and the FPPE's requirements appear on the face of the document itself." *Id.* at 2 (citing DRPSAMF ¶ 30). Furthermore, Defendants insist, "to the extent Dr. Michailidou has succeeded in identifying a factual dispute concerning how carefully her partners crafted the FPPE, how diligently they monitored her progress under the FPPE, or how effectively they supported her development thereunder, it is wholly immaterial without evidence of discriminatory animus or antipathy toward Dr. Michailidou because of her sex or national origin." *Id.* (citing *Rodriguez-Cardi v. MMM Holdings, Inc.*, 936 F.3d 40, 50 (1st Cir. 2019) (discussing and citing cases that support the general rule that mistakes, administrative failures, or flawed business judgment, standing alone, are insufficient to establish pretext)).

Next, Defendants reject Plaintiff's contention that EMMC employees' reports expressing concern for her clinical skills owes to Dr. Waddell's hierarchical approach to leadership, on the ground that this is "pure conjecture" and "the record contains no evidence that Dr. Waddell in fact pressured or directed [EMMC] employees to complain about her communications, to express alarm about her clinical practices, or to refuse to assist her[ ]in the Operating Room." *Id.* at 2-3.

Regarding Dr. Michailidou's claims of disparate treatment on account of sex, Defendants argue her assertion that Dr. Waddell treated female employees less favorably than male employees "finds no support in the record" and "[t]he only record material Dr. Michailidou cites in support of this assertion is her own testimony to the

75

effect that, during meetings, there were 'a lot of times' when Dr. Waddell spoke to her in an unprofessional manner and 'look[ed] down on [her]'[] and after one such meeting, a female oncologist called her to apologize for Dr. Waddell's treatment." *Id.* at 3 (citing PSAMF ¶ 12). "Whatever the factfinder might conclude about Dr. Waddell's treatment of Dr. Michailidou and Dr. Villanueva," Defendants say, "it could not attribute such treatment to discrimination without evidence that Dr. Waddell treated males or individuals born in the United States more favorably." *Id.* Defendants argue instead that Dr. Michailidou in fact "offers evidence tending to establish precisely the opposite":

> In her quest to show that Dr. Waddell may have influenced others—including Jude Tardy, a male—to come forward with manufactured concerns about her, Dr. Michailidou relies upon testimony that Dr. Waddell frequently "raise[d] his voice," "gave commands," and "ma[de] people cry." (PSAMF ¶ 26.) (See also PSAMF ¶ 25: asserting "[p]eople were scared of [Dr. Waddell].") At best, Dr. Michailidou has succeeded in creating a factual dispute about whether Dr. Waddell is an equal opportunity tyrant.

*Id.* Furthermore, while "the evidence supports that Dr. Bernaiche and Dr. Michailidou both injured patients' ureters and only Dr. Michailidou was placed on an FPPE," the Defendants argue this difference cannot rationally be attributed to unlawful discrimination because, first, "Dr. Bernaiche and Dr. Michailidou are decidedly dissimilar in ways that matter," namely, "[u]nlike Dr. Bernaiche, who experienced a single patient complication, Dr. Michailidou had numerous poor outcomes," and, second, Dr. Michailidou has introduced evidence of a third physician, Dr. Villanueva, a female born in Venezuela, "who also caused a ureteral injury at

76

[EMMC], . . .. and like Dr. Bernaiche, Dr. Villanueva was not placed on an FPPE." *Id.* at 4.

Defendants argue Dr. Michailidou's claim of disparate treatment on account of national origin is similarly unsupported by the record. *Id.* Responding to Dr. Michailidou's contention that concerns about her professionalism have a "cultural" element, "insofar as what Americans characterize as rude is acceptable behavior in Greece," Defendants argue "[t]his theory does not advance her claim of disparate treatment, which (as the label suggests) is grounded in differential treatment." *Id.* at 4-5. Defendants insist "[t]he anti-discrimination statutes do not require employers to adjust expectations or rules of conduct to best align with the cultural norms of an employee's birthplace." *Id.* at 5.

Defendants reject Plaintiff's argument that Dr. Waddell treated Dr. Michailidou as he did because he intended to replace her with Dr. Bernaiche as internally inconsistent. *Id.* "On the one hand," Defendants say, "she argues that Dr. Waddell (and [EMMC] generally) viewed J-1 physicians as a retention 'risk' and therefore unfairly assumed she would voluntarily leave the organization at the conclusion of her waiver period," and "[o]n the other hand, she argues that Dr. Waddell intended to push her out of the organization under false pretenses because she is a Greek woman and to make room for a male Mainer." *Id.* Defendants suggest "Dr. Michailidou's retention risk theory holds that Dr. Waddell assumed she would leave [EMMC] after her waiver period based on an unfair and unlawful stereotype about J-1 physician rates," an argument Defendants argue "goes nowhere for at least

two reasons." *Id.* "First, "Dr. Michailidou effectively admits that, as of January 2020—the time Defendants began to consider Dr. Bernaiche—it was in fact her intention to leave [EMMC] in the summer of 2021, after completing her J-1 waiver," and, thus, "to the extent Dr. Waddell anticipated her departure, he was correct and his attempts to plan for that eventuality were prudent." *Id.* Furthermore, Defendants contend, "immigration status and citizenship are neither proxies for national origin nor independently protected characteristics under Title VII or the MHRA," meaning that "proving that Defendants pushed her out because of her immigration status or because of misplaced stereotypes about J-1 physician turnover does not bring Dr. Michailidou any closer to establishing that [EMMC] violated these anti-discrimination statutes." *Id.* (citing *Hod v. Brigham and Women's Hosp., Inc.*, No. 1:19-cr-10365-IT, 2021 U.S. Dist. LEXIS 62164, at *18-19 (D. Mass. Mar. 30, 2021) (citation amended). Defendants continue, "Dr. Michailidou's alternate argument—that Dr. Waddell sought to push her out under false pretenses to make room for Dr. Bernaiche because she is 'foreign-born,' and Dr. Bernaiche is not— ignores the undisputed timeline and the absence of evidence that Dr. Waddell caused or contributed to the timing of Dr. Clarke's decision to suspend her." *Id.* at 6.

Finally, Defendants reject Plaintiff's claim that, after Dr. Clarke placed her on paid administrative leave, she was "absolutely willing" to participate in the investigation process and hoped to continue her employment at EMMC, insisting the Plaintiff's subjective intentions and perspective are "entirely immaterial." *Id.* (quoting PSAMF ¶ 78). "Not only does Dr. Michailidou fail to establish that she or

anyone else told [EMMC] she wanted to remain employed and was prepared to participate in the investigatory process, but she effectively concedes that her lawyer told [EMMC] precisely the opposite," and nothing in the record indicates her counsel lacked either actual or apparent authority. *Id.* at 6-7. Thus, Defendants proffer, a factfinder "could not possibly, let alone rationally, conclude that [EMMC] compelled Dr. Michailidou to resign because of her sex or national origin," insisting a factfinder "could reach only one conclusion: [EMMC] stopped its efforts to investigate and turned to negotiating a separation agreement because [EMMC] reasonably believed and understood that approach to be consistent with her wishes and intentions." *Id.* at 7.

### 2. Count V: The Maine Whistleblower Protection Act

Observing that Dr. Michailidou "acknowledges that her [M]WPA claim rests entirely on a single email to colleagues," Defendants, as an initial matter, reject that this email constitutes a report for purposes of the MWPA, explaining "[i]n her March 2020 email, Dr. Michailidou said nothing more than that she believed a surgeon should see every patient in the morning, that she planned to do so when on call, and that she believed everything would be 'ok' if the team communicated effectively." *Id.* "Whatever she intended to convey in this email," Defendants say, "the communication cannot reasonably be characterized as expressing opposition to an unsafe or professionally negligent practice." *Id.* Defendants also ague summary judgment is appropriate because she has not shown her belief that EMMC's policy deviated from the standard of care is objectively reasonable. *Id.* at 7-8 (citing *Galouch v. Dep't of*

*Prof. and Fin. Regulation*, 2015 ME 44, ¶¶ 14-15, 114 A.3d 988).  Defendants continue to argue that, even if this email constituted protected activity under the MWPA, Dr. Michailidou has failed to identify a genuine issue of material fact concerning whether she experienced retaliation as a result.  *Id.* at 8.

### 3.    Count VI: Breach of Contract

Defendants first assert it is unclear whether Dr. Michailidou intends to press her claim for breach of the Employment Agreement, but argue, "[w]hatever her intentions, the claim should be dismissed because of the covenant not to sue and, more importantly, because she concedes [EMMC] terminated her employment only after her lawyer informed [EMMC] she would not participate in an investigation and wished to separate." *Id.* at 10.  Defendants argue Dr. Michailidou's breach-of-contract claim based on the Separation Agreement "is similarly due for dismissal as Dr. Michailidou has failed to make a showing of recoverable damages," and, furthermore, "has failed to articulate any basis for depriving Defendants of immunity under the MHRSA." *Id.*

### 4.    Count VII: Intentional Infliction of Emotional Distress

Defendants suggest that the gravamen of Dr. Michailidou's IIED claim is a one-page witness statement Dr. Waddell submitted to the BOLIM on January 6, 2021 in response to the BOLIM's December 22, 2020 letter requesting additional information, and argue this claim is frivolous and does not constitute conduct sufficiently extreme and outrageous to ground the claim Plaintiff raises in Count VII. *Id.* at 8-9.  Defendants argue the record does not support concluding that Dr. Waddell

submitted his statement with the intent of inducing bias or that the submission of this statement caused her extreme emotional distress. *Id.* at 9. Defendants also highlight, on the element of causation, that she returned to Greece the month before EMMC sent this document to the BOLIM. *Id.* at 9-10. Finally, Defendants reassert their argument that they enjoy statutory immunity on this submission to the BOLIM because the submission was legally required. *Id.* at 10.

## IV. LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Genuine issues of fact are those that a factfinder could resolve in favor of the nonmovant, while material facts are those whose 'existence or nonexistence has the potential to change the outcome of the suit.'" *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 38 (1st Cir. 2014) (quoting *Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011)).

When the movant "has made a preliminary showing that there is no genuine issue of material fact, the nonmovant must 'produce specific facts, in suitable evidentiary form, to . . . establish the presence of a trialworthy issue.'" *McCarthy v. City of Newburyport*, 252 F. App'x 328, 332 (1st Cir. 2007) (alteration in original) (quoting *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999)). The nonmoving party must provide "'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims." *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Bos.*, 985 F.2d

1113, 1116 (1st Cir. 1993)).  Then, a "court views the facts and draws all reasonable inferences in favor of the nonmoving party," *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011), disregarding "[c]onclusory allegations, improbable inferences, acrimonious invective, or rank speculation." *Mancini v. City of Providence ex rel. Lombardi*, 909 F.3d 32, 38 (1st Cir. 2018) (quoting *Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir. 2010)).  "[T]he plain language of Rule 56(c) mandates entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## V.    DISCUSSION

### A.    Counts I – IV: Federal and State Discrimination

Title VII forbids employment discrimination based on "race, color, religion, sex, or national origin."  42 U.S.C. § 2000E-2(a).  As relevant to the Defendants' motion for summary judgment, Title VII also makes it unlawful for certain employers "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Similarly, the MHRA makes it unlawful for an employer "to discharge an employee or discriminate with respect to hire, tenure, promotion, transfer, compensation, terms, conditions or privileges of employment or any other matter directly or indirectly related to employment" because of sex or national origin.  5 M.R.S. § 4572(1)(A).

82

### 1.    A Preliminary Note

Before addressing the merits of Defendants' motion for summary judgment as to Counts I, II, III, and IV, the Court takes a moment to discuss the framing for its evaluation.    Dr. Michailidou's complaint contains four counts regarding discrimination: sex discrimination pursuant to the MHRA (Count I), ancestry and national origin discrimination pursuant to the MHRA (Count II), sex discrimination pursuant to Title VII (Count III), and ancestry and national origin discrimination pursuant to the MHRA (Count IV). *See Compl.* ¶¶ 64-76.  In the summary judgment motion sequence, however, both the Defendants and the Plaintiff address Counts I through IV in tandem, applying the same standard to address the alleged violation of state and federal law, and, further, considering Plaintiff's claims of discrimination on the basis of her sex and national origin in harmony.  On the first issue, the Court agrees with the parties' like treatment of the MHRA and Title VII and adopts this approach for its own analysis. *See Crawford v. City of Westbrook*, No. 2:23-cv-00123-JDL, 2024 U.S. Dist. LEXIS 74285, at *7 (D. Me. April 24, 2024) (observing that the MHRA and Title VII are similar in terms of their "text and purpose," and federal and state courts "have looked to federal case law addressing Title VII [when] evaluating claims arising under the [MHRA]")    (internal quotation omitted) (alterations in original).

The Court turns to the second issue.  While the Plaintiff raises discrete claims of discrimination on the basis of her gender and national origin, respectively, in the complaint, at the summary judgment stage, her framing and argument resembles a

"sex-plus" theory of discrimination, in that she alleges the Defendants discriminated against her because she is a Greek woman. *See Franchina v. City of Providence*, 881 F.3d 32, 52 (1st Cir. 2018) ("In short, 'sex plus claims' are a flavor of gender discrimination claims where 'an employer classifies employees on the basis of sex plus another characteristic" (quoting *Chadwick v. WellPoint, Inc.*, 561 F.3d 38, 43 (1st Cir. 2009) (emphasis in original)). Observing that the Defendants have taken this same approach and addressed Counts I through IV at once, the Court adopts the approach taken by the parties and considers whether Defendants have shown their entitlement to summary judgment on Plaintiff's claims of discrimination on account of her sex plus national origin, in violation of state and federal law.[111]

### 2. Sex-Plus Discrimination Claim

The First Circuit has recognized that "sex-plus claims are a flavor of gender discrimination claims where an employer classifies employees on the basis of sex *plus* another characteristic." *Franchina*, 881 F.3d at 52 (emphasis in original); *see also id.* at 53-54 (observing that a claim of sex-plus discrimination "does not mean that more than simple sex discrimination must be alleged"; instead, "the simple question posed . . . is whether the employer took an adverse employment action at least in part

---

[111] Defendants in their motion for summary judgment question whether Dr. Michailidou intended to assert a disparate treatment claim or a hostile work environment claim in Counts I – IV, *Defs.' Mot.* at 6, and argued they are entitled to summary judgment under either approach. *Compare id.* at 6-9 (addressing disparate treatment) *with id.* at 10 (addressing hostile work environment). Dr. Michailidou's opposition to the Defendants' motion addresses only disparate treatment. *Pl.'s Opp'n* at 10-13. The Court follows her lead and interprets Counts I – IV as asserting a disparate treatment theory of discrimination and based on her failure to argue the hostile work environment theory, Dr. Michailidou has waived this theory for purposes of this motion.

because of an employee's sex") (quoting *Chadwick*, 561 F.3d at 43) (emphasis in original)).

In the absence of direct evidence or a "smoking gun" demonstrating that the employer's bias against his employee's protected attribute motivated his actions, courts in the First Circuit have applied the three-step, burden-shifting analysis articulated in *McDonnell Douglas Corp. Smith v. F.W. Morse & Co.*, 76 F.3d 413, 420 (1st Cir. 1996) (citing *McDonnell Douglas Corp.*, 411 U.S. at 802); *see also Trott v. H.D. Goodall Hosp.*, 2013 ME 33, ¶ 15, 66 A.3d 7 (same). In *Trott*, the Maine Law Court described the framework:

(1) the employee bears the initial burden to produce evidence that unlawful discrimination motivated the employer's adverse employment action against the employee;

(2) if the employee meets that burden, the burden shifts to the employer to produce evidence of a legitimate, lawful reason for the adverse employment action; and

(3) if the employer meets that burden, the burden shifts back to the employee to produce evidence that the employer's proffered reason is a pretext to conceal an unlawful reason for the adverse employment action.

*Id.* (citing *Fuhrmann v. Staples the Office Superstore East, Inc.*, 2012 ME 135, ¶ 13, 58 A.3d 1083).

To prove a case of sex discrimination under Title VII, a plaintiff "must present evidence that he or she is a member of a protected class, was qualified for the position at issue, and was adversely treated by the employer based on gender." *Johnson v. York Hosp.*, 222 A.3d 624, 632 (Me. 2019). "If, in the context of summary judgment motion practice, the employee meets the burden of production for 'these three

elements, the burden then shifts to the employer to produce evidence of a legitimate, nondiscriminatory basis for its action.'" *Id.* (quoting *Daniels v. Narraguagus Bay Health Care Facility*, 45 A.3d 722, 726 (Me. 2012)). "Finally, if the employer presents such evidence, 'the burden shifts back to the plaintiff to demonstrate that the nondiscriminatory reason is pretextual or irrelevant and that the unlawful discrimination brought about the adverse employment action.'" *Id.* (quoting *Doyle v. Dep't of Hum. Servs.*, 824 A.2d 48, 54 (Me. 2003)).

### a.    The Prima Facie Case

At the first step of the *McDonnell Douglas* framework, Dr. Michailidou must "establish, by a preponderance of the evidence, a prima facie case of discrimination." *Caraballo-Caraballo v. Corr. Admin.*, 892 F.3d 53, 57 (1st Cir. 2018). To establish a prima facie case, "(1) the plaintiff must be a member of a protected class; (2) she must be qualified for her job; (3) she must suffer an adverse employment action at the hands of her employer; and (4) there must be some evidence of a causal connection between her membership in a protected class and the adverse employment action, e.g., in the case of a firing, that the position was filled by someone with similar qualifications." *Bhatti v. Trustees of Bos. Univ.*, 659 F.3d 64, 70 (1st Cir. 2011).

Defendants concede that Dr. Michailidou has made out a prima facie showing of discrimination based on a protected attribute. *Defs.' Mot.* at 7.

### b.    Legitimate Business Reason

At step two of the *McDonnell Douglas* framework, the Defendants must articulate a legitimate, nondiscriminatory reason for placing Dr. Michailidou on an

FPPE and her subsequent suspension. *Caraballo-Caraballo*, 892 F.3d at 62. Here, EMMC and Dr. Waddell argue their concerns about Dr. Michailidou's job performance, quality of care, and patient safety provide such a legitimate reason, and add that these concerns were based on multiple complaints and written reports from trusted and experienced hospital staff. *Defs.' Mot.* at 7. Indeed, the record confirms that before EMMC placed Dr. Michailidou on a FPPE on October 30, 2019, PAs, including Jude Tardy and Rochelle Loeb, expressed concern regarding the safety of Dr. Michailidou's surgical techniques, in 2018 and 2019, DSMF ¶ 16; PRDSMF ¶ 16, Dr. Michailidou left a sponge inside a patient during a surgery in December of 2018, later causing complications, DSMF ¶ 17; PRDSMF ¶ 17, Plaintiff injured a patient's ureter during a surgery in which she operated in September of 2019, also causing complications, DSMF ¶ 19; PRDSMF ¶ 19; PSAMF ¶ 37; DRPSAMF ¶ 37, a nurse submitted a written complaint describing Dr. Michailidou as rude to staff and not labeling or properly storing a patient specimen in January of 2019, DSMF ¶ 21; PRDSMF ¶ 21, and Plaintiff sent an email to the Director of Clinical Documentation in May 2019 that she later acknowledged as unprofessional. DSMF ¶¶ 23-24; PRDSMF ¶¶ 23-24. Furthermore, in August of 2019, Dr. Michailidou reviewed a patient's medical chart "out of curiosity" and quickly acknowledged it was in violation of EMMC's policy and HIPPA, DSMF ¶ 25; PRDSMF ¶ 25, Dr. Michailidou admittedly failed to meet communication standards regarding evening orders in September of 2019, DSMF ¶ 27; PRDSMF ¶ 27, and in early October of 2019, a nurse reached out to Dr. Waddell to report Dr. Michailidou's aggressive and rude communication style

87

in one instance, which the nurse saw as consistent with a pattern of behavior by Plaintiff.  DSMF ¶ 28; PRDSMF ¶ 28.

Furthermore, after Dr. Michailidou was placed on an FPPE on October 30, 2019, and before she was suspended on October 8, 2020, the record indicates she did not complete the ten major colon resections required by the FPPE, DSMF ¶ 37; PRDSMF ¶ 37; PSAMF ¶ 44; DRPSAMF ¶ 44, Dr. Villanueva raised an issue with Dr. Michailidou's placement of a chemotherapy port, leading to a patient's punctured lung, DSMF ¶ 39; PRDSMF ¶ 39, Dr. Villanueva shared her concerns regarding a separate surgery she had observed Dr. Michailidou perform, DSMF ¶ 41; PRDSMF ¶ 41, Dr. Waddell and Dr. Villanueva expressed their concerns with Dr. Michailidou's safety precautions regarding a patient's ureter in surgery, DSMF ¶¶ 43-44; PRDSMF ¶¶ 43-44, and Dr. Michailidou perforated a patient's colon during a colonoscopy. DSMF ¶ 46; PRDSMF ¶ 46.  Furthermore, in June of 2020, Nurse Manager Endoscopy Lisa Dorr reported to Dr. Waddell that that several endoscopy staff had expressed concerns to Lisa Dorr about Dr. Michailidou's clinical practices, including that Dr. Michailidou was not careful, had difficulty identifying anatomy, held the scope in a way that increased the risk of perforation, and routinely asked for assistance from gastrointestinal practitioners, but then did not pay attention to their actions or expressly disregarded their guidance,  DSMF ¶ 47; PRDSMF ¶ 47, and, the following month, PA Tardy submitted a 360 evaluation of Dr. Michailidou indicating Dr. Michailidou "almost never" "encourages others to share their opinions" and "almost never" listens and considers what other team members say about relevant

issues; PA Tardy represented that he would "never" "feel comfortable referring friends and family to [Dr. Michailidou]." DSMF ¶ 48; PRDSMF ¶ 48. On October 8, 2020, the day after a needle tip broke off in a patient's perineum during a surgery performed by Dr. Michailidou, PA Tardy informed Dr. Waddell that he and the other PAs were no longer comfortable supporting Dr. Michailidou in the OR and would not do so any longer, as they were not seeing improvement, were afraid for patient safety, and feared implications for their own licensure. DSMF ¶ 61; PRDSMF ¶ 61. Shortly after meeting with PA Tardy, Dr. Waddell received an email from Dr. Huang, forwarding a communication from PA Loeb, who similarly stated that she would no longer agree to support Dr. Michailidou in the operating room due to concerns about patient safety. DSMF ¶ 62; PRDSMF ¶ 62.

Based on the foregoing, the Court concludes the Defendants have produced sufficient evidence to rebut the presumption of disparate treatment which Plaintiff's prima facie case generated. *See Byrd v. Ronayne*, 61 F.3d 1026, 1031 (1st Cir. 1995) (finding employer's proffers of employee's failure to perform adequately sufficed to displace prima facie presumption in Title VII sexual discrimination case); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 508 (1993) ("By producing evidence (whether ultimately persuasive or not) of nondiscriminatory reasons, petitioners sustained their burden of production").

### c.    Pretext

"At the final stage of the *McDonnell Douglas* scheme, the burden returns to [the plaintiff] to demonstrate that [the employer's] asserted reasons for [her]

termination were pretextual." *Dusel*, 52 F.4th at 506.  "[W]hen a plaintiff seeks to show pretext by debunking the stated reason for the adverse employment action, they must present evidence from which a reasonable jury could supportably conclude 'that the employer's explanation is not just wrong, but that it is so implausible that the employer more likely than not does not believe it.'"  *Id.* at 508 (quoting *Forsythe v. Wayfair Inc.*, 27 F.4th 67, 80 (1st Cir. 2022)).  At step three, to avoid summary judgment, the Plaintiff must "show by a preponderance of the evidence that [the Defendants'] proffered reason is pretextual and that the actual reason for the adverse employment action is discriminatory."  *Johnson*, 714 F.3d at 54.

"At the third and final phase of the *McDonnell Douglas* burden-shifting analysis we ask: whether, after assessing all of the evidence on the record in the light most favorable to [Dr. Michailidou], she has raised a genuine issue of material fact as to whether [the Defendants'] stated reason for [placing her on an FPPE and subsequently suspending her] . . . was merely pretext for discrimination."  *Theidon v. Harvard Univ.*, 948 F.3d 477, 497 (1st Cir. 2020).  To meet this burden, Dr. Michailidou "must offer 'some <u>minimally sufficient</u> evidence, direct or indirect, both of pretext and of [the Defendants'] discriminatory animus.'"  *Id.* (quoting *Pearson v. Mass. Bay Transp. Auth.*, 723 F.3d 36, 40 (1st Cir. 2013) (emphasis in original) (in turn quoting *Acevedo-Parrilla v. Novartis Ex-Lax, Inc.*, 696 F.3d 128, 140 (1st Cir. 2012)).  "[M]ere questions regarding the employer's business judgment are insufficient to raise a triable issue as to pretext."  *Id.* (quoting *Pearson*, 723 F.3d at 40 (alteration in original) (in turn quoting *Acevedo-Parrilla*, 696 F.3d at 140)

(affirming grant of summary judgment where employer's "merely questionable behavior" did not constitute minimally sufficient evidence of pretext for discrimination).

Dr. Michailidou argues the Defendants' proffered reasons for placing her on an FPPE and, later, suspending her are pretext and the real reason for these actions is that "[t]he institution itself saw its foreign-born doctors as risks," and "Dr. Waddell, the chief of surgery, who has a domineering control over the hierarchy . . . has demonstrated a bias against foreign-born surgeons, whom he assumes are not going to stay around," and "treats women differently than men." *Pl.'s Opp'n* at 11 (citing PSAMF ¶¶ 3-4, 6-20, 23-26, 71-77). She points to EMMC's hiring of Dr. Bernaiche in support of her argument that summary judgment is inappropriate because there is a genuine dispute of material fact on whether she was placed on an FPPE and suspended because of the Defendants' legitimate business reasons or on account of their bias against her as a Greek woman on a J-1 visa. *Id.* Dr. Michailidou also argues there is a genuine dispute as to whether her patient care fell below an acceptable standard, pointing to the BOLIM's ultimate dismissal of the administrative complaint against her. *Id.* at 10-12.

The Court concludes Dr. Michailidou has not shown the Defendants' proffered reasons for her FPPE and subsequent suspension were merely pretextual. First, the Court is not persuaded by Dr. Michailidou's argument that Dr. Waddell intended to force her out to make room for Dr. Bernaiche because Dr. Bernaiche is a U.S.-born male and Dr. Michailidou is a Greek woman. As Defendants point out, the record

indicates that Dr. Bernaiche first came on EMMC's radar in February of 2020, extended an offer of employment in May of 2020, and welcomed him to EMMC in October of 2020; Dr. Michailidou's FPPE commenced on October 30, 2019. While lack of temporal proximity is not dispositive in addressing causation, the fact that Dr. Michailidou's first adverse employment action predated the Defendants' awareness of Dr. Bernaiche by multiple months does not support her causation theory. Even if this had not been the case, the record is replete with examples of Defendants' legitimate performance and care concerns regarding Dr. Michailidou, as addressed above, lending support to the Defendants' argument that her FPPE and suspension were on account of their legitimate business interests.

Second, the ultimate resolution of the BOLIM complaint does not change the Court's determination, both because the BOLIM determined Dr. Michailidou met the standard of care in only 50% of the cases of concern the Board reviewed, and because "in assessing pretext, a court's focus must be on the perception of the decisionmaker, that is, whether the employer believed its stated reason to be credible." *Theidon*, 948 F.3d at 497 (internal citations omitted). Here, as Dr. Michailidou concedes, the BOLIM's Letter of Guidance was issued after both EMMC placed her on an FPPE and, later, suspended her; even if the BOLIM's determination regarding her patient care had been more favorable, the Defendants did not have this information before them at the time they took the adverse employment actions Plaintiff now challenges. What Defendants did have at the time, as noted above, was numerous complaints from well-respected hospital staff, including PAs, nurses, and Dr. Michailidou's fellow

colorectal surgeons, challenging her standard of care, patient interactions, decision-making, openness to constructive feedback, and ability to work with others.

"Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Adamson v. Walgreens Co.*, 750 F.3d 73, 79 (1st Cir. 2014) (quoting *Gómez-González v. Rural Opportunities Inc.*, 626 F.3d 654, 662-63 (1st Cir. 2010)). "[I]t is not enough for a plaintiff merely to impugn the veracity of the employer's justification; [s]he must elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real and unlawful motive of discrimination." *Theidon*, 948 F.3d at 497 (internal citations omitted). "Conclusory allegations, improper inferences, and unsupported speculation" will not defeat a motion for summary judgment. *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

The Court concludes Dr. Michailidou has not met this bar and grants the Defendants' motion for summary judgment on Counts I, II, III, and IV.

## B.   Count V: The Maine Whistleblower Protection Act

The Maine Whistleblower Protection Act provides: "No employer may discharge . . . an employee . . . because . . . [t]he employee, acting in good faith . . . reports to the employer or a public body, orally or in writing, what the employee has reasonable cause to believe is a condition or practice that would put at risk the health

or safety of that employee or any other individual." 26 M.R.S. § 833(1)(B). The elements of a prima facie MWPA claim are (1) the employee engaged in protected activity; (2) the employer imposed adverse employment action against the employee; and (3) there was a causal connection between the protected activity and the adverse employment action. *Cormier v. Genesis Healthcare LLC*, 2015 ME 161, 129 A.3d 944, 948 (Me. 2015); *see also Theriault v. Genesis Healthcare LLC*, No. 2:15-CV-530-GZS, 2017 U.S. Dist. LEXIS 59598, at *7 (D. Me. Apr. 19, 2017), *aff'd*, 890 F.3d 342 (1st Cir. 2018); *Flaherty v. Unum Grp.*, No. 2:18-cv-00240-GZS, 2019 U.S. Dist. LEXIS 197284, at *23-24 (D. Me. Nov. 14, 2019).

When reviewing MWPA claims at the summary judgment stage, the Law Court has developed a "Maine-specific retaliation paradigm." *Theriault*, 890 F.3d at 351 (discussing *Brady v. Cumberland Cnty.*, 2015 ME 143, 126 A.3d 1145). Under this paradigm, the Court asks "whether the record as a whole would allow a jury to reasonably conclude that the adverse employment action was motivated at least in part by retaliatory intent." *Brady*, 126 A.3d at 1158 (Me. 2015) (emphasis added). To answer this question, the Court must, "in a seamless inquiry, recognize any evidence that the employer had a lawful reason for the adverse action taken against the employee, and any evidence that the proffered reason is merely a pretext." *Theriault*, 890 F.3d at 350 (citation and internal quotations omitted). "The Law Court no longer applies *McDonnell Douglas* burden shifting to MWPA claims; however, the plaintiff must still 'adduce precisely the same quantum of proof . . . to defeat summary

94

judgment.'" *Ako-Annan v. E. Me. Med. Ctr.*, No. 1:19-cv-00544-JAW, 2021 U.S. Dist. LEXIS 157866, at *92 (D. Me. Aug. 20, 2021) (quoting *Theriault*, 890 F.3d at 350).

Here, the parties dispute the first and third prong. Addressing whether Dr. Michailidou's March 30, 2020 email addressing rounding during the COVID-19 pandemic constitutes protected activity, Defendants acknowledge the MWPA prohibits retaliation against an employee who, "acting in good faith . . . reports to the employer . . . what the employee has reasonable cause to believe is an act or omission that constitutes a deviation from the applicable standard of care for a patient by an employer shared with the care of that patient," *Defs.' Mot.* at 11 (quoting 26 M.R.S. § 833(1)(E)), but contend Plaintiff's email does not qualify because "[n]owhere in th[e] [March 30, 2020] email exchange does Dr. Michailidou assert that the standard of care, patient safety, or any law requires patients to be examined daily by a surgeon." *Id.* at 11-12 (citing DSMF ¶¶ 83-84; *Compl.* ¶ 35). Dr. Michailidou rejects this, insisting, in her email, "[s]he was questioning what she took to be direction that it was now, contrary to hospital policy and what she understood to be the applicable standard of care, unnecessary for each physician to see their patients daily." *Pl.'s Opp'n* at 14-15 (citing *Stewart-Dore*, 13 A.3d at 775 (reporting that the MWPA expressly protects an employee "when she reports a deviation from the applicable standard of patient care") (in turn citing 26 M.R.S. § 833(1)(E)). Although Dr. Michailidou does not allege a violation of a specific law, the Court concludes, viewing the facts in the light most favorable to the Plaintiff as the non-moving party, that she has shown a "reasonable belief" that EMMC's new policy regarding rounding during

95

the pandemic had "cross[ed] the line" and that she had "communicated that belief to [her] employer in good faith," noting that it does not change the result.  *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 261-62 (1st Cir. 1999).

The parties also dispute whether there was a causal connection between the protected activity and the adverse employment action.  "An employee's protected activity is causally connected to the adverse employment action when the alleged retaliation was a substantial, even though perhaps not the only, factor motivating the adverse employment action."  *Johnson v. York Hosp.*, 2019 ME 176, ¶ 23, 222 A.3d 624, 631) (cleaned up).  "Any relevant evidence, including temporal proximity, may be considered in determining whether there is an arguable causal nexus."  *Id.*  The plaintiff "has the burden of producing some evidence from which a reasonable jury could find a causal link."  *Brady*, 126 A.3d at 1154.  "[P]retext evidence can also serve as causation evidence that bears on a plaintiff's prima facie case."  *Brady*, 126 A.3d at 1151.

The Court therefore "determine[s] whether, cumulatively, [the evidence] would allow a reasonable jury to infer that" Dr. Michailidou was placed on an FPPE or suspended "in part due to [her] protected activity."  *Brady*, 126 A.3d at 1151; *see also id.* at 1158 ("Without *McDonnell Douglas*, the court will now consider that evidence in a unitary way and simply determine whether the record as a whole would allow a jury to reasonably conclude that the adverse employment action was motivated at least in part by retaliatory intent").  The Court concludes that it would not, for many of the same reasons as the Court addressed regarding Counts I – IV.

96

First, the record does not contain evidence allowing the Court to conclude that either of the adverse employment actions she experienced—to wit, her placement on the FPPE on October 30, 2019 and her suspension on October 8, 2020—had a temporal connection to her March 30, 2020 email.  The FPPE predated the March 30, 2020 email, and cannot have been caused by it.  While Dr. Michailidou was suspended after she sent the email, the temporal gap of over six months weighs against finding a causal connection.  *Calero-Cerezo*, 355 F.3d at 25-26 (observing that a three- or four-month temporal lag between protected activity and adverse action "have been held insufficient" to establish causation); *Moron-Barradas*, 588 F.3d at 481 (eight-month delay between protected activity and adverse action held insufficient).  Furthermore, Dr. Michailidou began to follow the hospital's pandemic rounding policy almost immediately after she sent her March 30, 2020 email, DSMF ¶ 87; PRDSMF ¶ 87, and the Defendants correctly report "there is no evidence that Dr. Michailidou's alleged protected activity led to even "some consternation," much less that Dr. Waddell was angry or concerned about Dr. Michailidou's fleeting stance on this issue of patient rounding during a pandemic.  *Defs.' Mot.* at 12-13 (citing *Compl.* ¶ 36).

To state a claim under the MWPA, the alleged retaliation does not need to be the only factor motivating the adverse action, but it must still be a "substantial . . . factor." *Johnson*, 2019 ME 176, ¶ 23).  Here, Defendants provide legitimate business reasons explaining their actions regarding Dr. Michailidou's employment, and the record does not contain sufficient evidence such that a reasonable jury could infer the Defendants' proffered reasons for her FPPE placement and subsequent suspension

were pretextual and that she was placed on an FPPE or suspended due in part to her March 30, 2020 email.

### C.    Count VI: Breach of Contract

"Under Maine law, to recover under a breach of contract claim, a plaintiff must establish (1) breach of a material contract term; (2) causation; and (3) damages." *Tate & Lyle Ingredients Ams., Inc. v. Transp. Distrib., LLC*, 746 F. Supp. 2d 189, 196 (D. Me. 2010); *accord Tobin v. Barter*, 2014 ME 51, ¶10, 89 A.3d 1088, 1092.  Here, the parties dispute the first and third elements.  Because the Court concludes that Dr. Michailidou cannot establish breach, the Court does not address damages.

Dr. Michailidou argues EMMC breached her Employment Agreement by "forcing her to resign" and separately breached the non-disparagement provision of her Separation Agreement by providing Dr. Waddell's witness statement to the BOLIM.  For the reasons already articulated, this Court does not conclude that Dr. Michailidou was forced to resign.   The Court now addresses the Separation Agreement, as it is decisive in resolving whether summary judgment is appropriate on Count VI.

Defendants respond to Plaintiff's argument that EMMC breached the non-disparagement provision of her Separation Agreement by sending Dr. Waddell's witness statement to the BOLIM, contending "[g]iven that the Separation Agreement expressly contemplates [EMMC's] report to BOLIM, a jury could not rationally find that [EMMC's] response to BOLIM's written request for additional information was a breach." *Defs.' Mot.* at 15.  To the extent the Court disagrees, Defendants continue,

EMMC is still entitled to summary judgment because any agreement by EMMC to withhold information it is statutorily required to report pursuant to the MSHA to BOLIM would be contrary to public policy and, therefore, unenforceable. *Id.* at 15-16 (citing, e.g., 25 M.R.S. § 2501 *et seq.*; 32 M.R.S. § 3269). Plaintiff responds in opposition that "Defendant[s], as [they] did at the Motion to Dismiss stage[,] still ignore[] that the choice to disparage Plaintiff in excess of their statutory duty under the MSHA constitutes a breach of the contract, and therefore relieves Plaintiff of the covenant not to sue." *Pl.'s Opp'n* at 20. She says that "[t]he simple fact of the matter is that . . . Dr. Waddell's report was unnecessary, malicious, and breached the non-disparagement provisions that had served as the predicate for Dr. Michailidou's resignation." *Id.*

The Court reviewed the Separation Agreement attached to Attorney Megan Randlett's declaration. *Decl. of Megan Randlett, Esq.*, Attach. 10, *Ex. J* (ECF No. 45) (*Separation Agreement*). This Agreement contains several relevant provisions. First, the parties agreed that they would not disparage each other. The Agreement's non-disparagement provides:

> **Mutual Non-Disparagement.** Neither party will make, nor share, nor reproduce in any way any new or existing disparaging statements or references, orally or in writing, directly or indirectly, to any other person about the other party by any means or in any forum. . .. This non-disparagement provision applies to [EMMC] management and physician leaders (chief of staff, medical staff office, department chair, human resources and hospital executives).
>
> A disparaging comment or reference, includes but is not limited to, any communication which would cause or tend to cause the recipient of the communication to question the integrity, competence, good will, fairness

or good character of the person or entity or cause any negative inference regarding to whom the communication relates.

*Separation Agreement* ¶ 6.

However, as EMMC argues, the Agreement also contemplated that the Defendants would be required to make a report to the BOLIM:

Physician acknowledges that [EMMC] is required by law to report her suspension and resignation of employment to the Maine Board of Medicine.

*Id.* ¶ 1. The Agreement also addresses how EMMC would respond to requests for information from third parties:

If any third parties (e.g. potential employers, <u>credentialing organizations, professional membership societies, etc.), formally or informally, request reference or credentialling information about Physician, [EMMC] will confirm the dates of employment and position held and restate the content of the mutually-agreed upon language set forth in Exhibit A hereto and incorporated herewith by reference.</u>

*Id.* ¶ 7 (emphasis added). Exhibit A reads:

Dr. Maria Michailidou was an employee of [EMMC] from August 19, 2018 to November 17, 2020, as Colorectal and General Surgeon. In accordance with [EMMC's] standard practice for former employees, [EMMC] confirms only the dates of employment and the employee's position.

*Id.*, *Ex. A.*

Defendants do not appear to contest that Dr. Waddell's witness statement made disparaging comments about Dr. Michailidou but insist these comments did not breach the Separation Agreement because (1) "the Separation Agreement expressly contemplates [EMMC's] report to BOLIM," and, thus, "a jury could not rationally find that [EMMC's] response to BOLIM's written request for additional information was

100

a breach," and (2) "any agreement by [EMMC] to withhold information it is statutorily required to report to BOLIM would be contrary to public policy and, therefore, unenforceable." *Defs.' Mot.* at 15 (citing *State Farm Mut. Auto. Ins. Co. v. Koshy*, 2010 ME 44, ¶ 42, 995 A.2d 651) ("A contract is unenforceable as violating public policy in Maine . . . if it violates a well-defined and dominant policy that may be ascertained from the law and legal precedent").

Both arguments implicate the scope of what the Maine Health Security Act, 24 M.R.S. § 2501, *et seq.*, requires health providers and entities to report to BOLIM. The MHSA has mandatory reporting provisions. *See* 24 M.R.S. §§ 2505-2507. Section 2505 provides:

> Any professional competence committee within this State and any physician or physician assistant licensed to practice or otherwise lawfully practicing within this State shall . . . report the relevant facts to the appropriate board relating to the acts of any physician or physician assistant in this State if, in the opinion of the committee, physician, physician assistant or other person, the committee or individual has reasonable knowledge of acts of the physician . . . amounting to gross or repeated medical malpractice, misuse of alcohol, drugs, or other substances that may result in the physician's . . . performing services in a manner that endangers the health or safety of patients, professional incompetence, unprofessional conduct or sexual misconduct identified by board rule.

24 M.R.S. § 2505. Section 2506 states that:

> A health care provider or health care entity shall, within 60 days, report in writing to the disciplined practitioner's board or authority the name of any licensed . . . employee or person privileged by the provider or entity whose employment . . . or privileges have been revoked, suspended, limited or terminated or who resigned while under investigation or to avoid investigation for reasons related to clinical competence or unprofessional conduct, together with pertinent information relating to that action. Pertinent information includes: a description of the adverse action; the name of the practitioner involved;

the date, the location and a description of the event or events giving rise to the adverse action; and identification of the complainant giving rise to the adverse action. . . . The report must include situations in which employment . . . or privileges have been revoked, suspended, limited or otherwise adversely affected by action of the health care practitioner while the health care practitioner was the subject of a proceeding regarding employment or a disciplinary proceeding, and it also must include situations where employment . . . or privileges have been revoked, suspended, limited or otherwise adversely affected by act of the health care practitioner in return for the health care provider's or health care entity's terminating such proceeding. Any reversal, modification or change of action reported pursuant to this section must be reported immediately to the practitioner's board or authority, together with a brief statement of the reasons for that reversal, modification or change. If the adverse action requiring a report as a result of a reversal, modification or change of action consists of the revocation, suspension or limitation of employment . . . or clinical privileges of a physician . . . by a health care provider or health care entity for reasons relating to clinical competence or unprofessional conduct and is taken pursuant to personnel or employment rules or policies, medical staff bylaws or other credentialing and privileging policies, whether or not the practitioner is employed by that health care provider or entity, then the provider or entity shall include in its initial report to the disciplined practitioner's licensing board or authority the names of all patients whose care by the disciplined practitioner gave rise to the adverse action. . . .

Carriers providing managed care plans are subject to the reporting requirements of this section when they take adverse actions against a practitioner's credentials or employment for reasons related to clinical competence or unprofessional conduct that may adversely affect the health or welfare of the patient.

24 M.R.S. § 2506.

The MHSA also has an immunity provision. *See* 24 M.R.S. § 2511. It states:

Any person acting without malice, any physician, podiatrist, health care provider, health care entity or professional society, any member of a professional competence committee or professional review committee, any board or appropriate authority and any entity required to report under this chapter are immune from civil liability.

25 M.R.S. § 2511.

This civil immunity provision covers "making any report or other information available to any board, appropriate authority, professional competence committee or professional review committee pursuant to law." *Id.*

Here, Defendants argue EMMC was mandated to report pursuant to § 2506, which requires reporting the name and other "pertinent information" of physicians whose "employment . . . or privileges have been revoked, suspended, limited or terminated or who resigned while under investigation or to avoid investigation for reasons related to clinical competence or unprofessional conduct." 24 M.R.S. § 2506. The December 22, 2020 letter from Dennis E. Smith, Esq., Executive Director of BOLIM, requested Dr. Clarke, in his role as Senior Vice President and Senior Physician Executive of EMMC, confirms 24 M.R.S § 2506 is the basis for BOLIM's request, and provides:

> Pursuant to Title 24 M.R.S.A. § 2506, please provide the Board with the following information concerning your investigation: (1) the names of any patients whose care gave rise to the adverse action; (2) medical records relating to the event or events giving rise to the adverse action . . . ; (3) written statements signed or prepared by any witness, together with any documents related to the investigation; and (4) any and all related correspondence between Dr. Michailidou and your facility related to the adverse action . . ..

JSR, Attach. 5, *Ex. E* at 1 (*Dec. 22, 2020 BOLIM Letter*). The BOLIM letter thus demanded four specific categories of information from EMMC concerning EMMC's investigation of Dr. Michailidou. EMMC says that its December 28, 2020 response to the BOLIM inquiry of December 22, 2020 fit within the Separation Agreement's provision that allowed EMMC to report her suspension and resignation to the BOLIM and further that the December 18, 2020 letter is entitled to civil immunity under 24

103

M.R.S. § 2506.   Dr. Michailidou answers that the content of EMMC's December 28, 2020 response violated the Separation Agreement because it unnecessarily disparaged her.

The question for the Court is whether EMMC's December 28, 2020 letter to the BOLIM conformed to 24 M.R.S § 2506 so as to be entitled to the immunity afforded by 24 M.R.S. § 2511.   At the motion to dismiss stage, the Court denied the Defendants' motion to dismiss Count VI as to EMMC in part because "the Court does not have before it what precisely Dr. Waddell's report said.   As a result, the Court is unable to ascertain whether Dr. Waddell's submission conformed with the statutory requirements of 'relevant facts' and 'pertinent information' or crossed into non-mandated comments that disparaged Dr. Michailidou, thereby running afoul of NLEMMC's agreement to not disparage." *Order on Mot. to Dismiss* at 32.

The Court again encounters the same problem.   The Defendants allege that "[o]n December 28, [EMMC] responded to BOLIM's request for more information, providing all the items that BOLIM had requested, including witness statements." DSMF ¶ 80 (citing *Clarke Decl.* ¶ 10).   Dr. Clarke's declaration, however, only confirms that EMMC submitted this response on December 28, 2020; it does not provide any detail to the Court on what the report itself contained.   *Clarke Decl.* ¶ 10. Moreover, while Dr. Clarke's declaration cites EMMC's December 9, 2020 initial report to the BOLIM and BOLIM's December 22, 2020 response to EMMC, both of which are attached to the joint stipulated record, he does not similarly cite EMMC's December 28, 2020 reply, including Dr. Waddell's witness statement, and, upon the

Court's independent review, it is not attached to any other filing. *See id.* (citing JSR, Attach. 4, *Ex. D – Initial BOLIM Rep.*; *id.*, Attach. 5, *Ex. E – 12/22/2020 BOLIM Letter*).

Although the Court has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts," D. ME. LOC. R. 56(f), in the interest of addressing this claim on the merits, the Court reviewed the declarations and attachments both parties submitted in support of their arguments regarding summary judgment. Dr. Waddell's declaration says:

> In late December 2020, Dr. Clarke informed me that the BOLIM had requested additional information about the facts and circumstances surrounding Dr. Michailidou's suspension and separation. He asked me to identify specific medical record numbers reflecting Dr. Michailidou's patient complications and asked me to prepare a written statement, both of which were specifically requested by the BOLIM. I provided a written statement that accurately described the facts as I knew them to be.

*Waddell Decl.* ¶ 55. Dr. Waddell's declaration attaches twenty-five exhibits, but not EMMC's December 28, 2020 report to the BOLIM.

The Court is also unable to locate a December 28, 2020 report among the Plaintiff's submissions. Dr. Michailidou's declaration reports: "When I received a BOLIM complaint, I ultimately obtained all of the documents that EMMC provided the Board. I provided a comprehensive response to those allegations. True and accurate copies of EMMC's submission and my response are attached hereto and incorporated herein." *Michailidou Decl.* ¶ 9 (citing *id.*, Attach. 6, *Ex. F*). However, Exhibit F contains, as relevant, unredacted versions of only a February 24, 2021 email from BOLIM to Dr. Michailidou, EMMC's initial report, sent to the BOLIM on

105

December 9, 2020, and BOLIM's December 22, 2020 request for more information. *Ex. F* at 1-9. Exhibit F also contains a January 8, 2021 letter from Dr. Clarke to BOLIM, communicating that his letter included "[t]he names of patients whose care gave rise to the adverse action," marked as Attachment 1; "[m]edical records relating to the event or events giving rise to the adverse action, presented in chronological order," marked as Attachment 2; "[w]ritten statements by witnesses," specifically Dr. Waddell, Dr. Toder, PA Tardy, and RN Lisa Dorr, marked as Attachment 3; "[d]ocuments related to the events and the responses to those events," namely, "[l]etter of concern from Dr. Waddell to Dr. Michailidou[,] delivered to Dr. Michailidou prior to the Chief initiated FPPE of 10/30/2019," "Chief initiated FPPE 10/30/2019," "Draft of new FPPE by Dr. Brad Waddell, prepared in 9/2020 [that] was not initiated because of the administrative suspension," marked as Attachment 4; and "[a]ny related correspondence between Dr. Michailidou and our facility related to this adverse action," marked as Attachment 5. *Id.* at 10.

Upon the Court's review, Attachments 1 and 2 are redacted in their entirety, redactions the Court believes are consistent with the Defendants' motion to seal Dr. Michailidou's declaration and its attachments to protect patient privacy.[112] *Id.* at 11-92; *see also Defs.' Mot. to Seal* (ECF No. 65); *Order* (ECF No. 68) (granting Defendants' motion to seal). Attachment 3, which includes the witness statements, is not redacted, and includes a one-page statement from Dr. Waddell. *Id.* at 94. Attachments 4 and 5 contain minor redactions but are largely unredacted. *Id.* at 97-

---

[112] The fully redacted patient records confirm that EMMC filed patient records with the BOLIM in response to requests one and two in BOLIM's December 22, 2020 letter.

126.   Again, the Court cannot locate a December 28, 2020 report from EMMC to BOLIM elsewhere on the docket.

In the absence of the December 28, 2020 EMMC report, the Court turns to what evidence Dr. Michailidou has produced when, viewed in a light most favorable to her, that raises a genuine issue of material fact as to whether the December 28, 2020 report to BOLIM contained unnecessarily derogatory information about her. The first fact is that after BOLIM undertook its own independent investigation of EMMC's allegations against Dr. Michailidou, on March 23, 2023, BOLIM unanimously voted to dismiss the EMMC's complaint and to issue a letter of guidance, which is not considered a disciplinary action and is not reportable to any data bank.  PSAMF ¶ 92; DRPSAMF ¶ 92; *Decl. of Pl. Maria Michailidou* ¶ 10, Attach. G, *Letter from BOLIM Chair Maroulla S. Gleaton, M.D. to Maria Michailidou, M.D.* (Mar. 23, 2023).  But simply because BOLIM came to a different conclusion than EMMC does not mean that EMMC's report to BOLIM was unnecessarily derogatory.

From what the record reveals, it appears that the gravamen of Dr. Michailidou's complaint rests on Dr. Waddell's four paragraph statement that Dr. Clarke included in EMMC's response to the BOLIM's request for information. *Michailidou Decl.*, Attach. 6 at 94 (*Written Statement of Witness Dr. Brad Waddell*) (*Waddell Statement*).   In reviewing the statement, despite Dr. Michailidou's characterization of the statement as a "narrative diatribe" against Dr. Michailidou, *Pl.'s Opp'n* at 16, even viewing the statement in a light most favorable to Dr.

Michailidou, the Court does not conclude that the Waddell statement is unnecessarily derogatory. Instead, Dr. Waddell states that he had "no concerns" when she began. *Waddell Statement* at 94. Dr. Waddell describes the two FPPEs that he oversaw as Chief, and the "small amount of progress" she made during the second FPPE but stated that she still "needed work." *Id.* Dr. Waddell then describes a Dr. Michailidou surgery that resulted in her "second retained foreign body case" in which he was called to assist the retrieval of the foreign body. *Id.* Finally, he describes as the "final straw" the lead Physician's Assistant's groups determination that they did not feel comfortable assisting in Dr. Michailidou's surgeries. *Id.* Nothing in Dr. Waddell's witness statement supports her allegation that he was unnecessarily derogatory in his witness statement to the BOLIM, and the Court cannot conclude that there is a genuine issue of material fact regarding Dr. Waddell's witness statement.

Even if it could be argued that the Waddell statement was unnecessarily derogatory, both he and EMMC are immune as a matter of from civil liability in submitting witness reports to the BOLIM. As Dr. Michailidou resigned while under investigation, EMMC and Dr. Waddell were mandated to file a report with the BOLIM. 25 M.R.S. § 2506 ("A health care provider or health care entity shall, within 60 days, report in writing to the disciplined practitioner's board or authority the name of any licensed . . . employee or person privileged by the provider or entity . . . who resigned while under investigation or to avoid investigation for reasons related to clinical competence or unprofessional conduct, together with pertinent information relating to that action"). Having filed the mandatory report, once BOLIM requested

information, the statute required EMMC and Dr. Waddell to respond to BOLIM's inquiries.  Section 2506 states:

> Upon written request, the following information must be released to the board . . . within 20 days of receipt of the request: the names of the patients whose care by the disciplined practitioner gave rise to the adverse action; medical records relating to the event or events giving rise to the adverse action; <u>written statements signed or prepared by any witness or complainant to the event</u>; and related correspondence between the practitioner and the provider or entity.

*Id.* (emphasis supplied).  Thus, EMMC filed its response and Dr. Waddell's written statement with BOLIM consistent with the requirements of the statute.  The language of § 2511 is especially clear: "any physician . . . [and] any entity required to report under this chapter are immune from civil liability."  Furthermore, even though the Separation Agreement contained a non-disparagement provision, it also expressly acknowledged that EMMC would be "required by law to report her resignation and suspension to the [BOLIM]."  *Separation Agreement* at 1.  Thus, Dr. Michailidou agreed that EMMC would be required to report her resignation to BOLIM and implicitly to cooperate as required by law with any BOLIM requests and investigation.

To escape the immunity provision of 25 M.R.S. § 2511, Dr. Michailidou makes two points: malice and recusal.  Neither withstands analysis.  Although Dr. Michailidou's response asserts that Dr. Waddell acted "with malice and with misrepresentation," *Pl.'s Opp'n* at 16, the Maine Supreme Judicial Court has ruled that the "malice exception" to civil immunity in 25 M.R.S. § 2511 does not apply to physicians who are required to report to the BOLIM.  *Argereow v. Weisberg*, 2018 ME

140, ¶ 24, 195 A.3d 1210 ("Based on the plain language of the statute, we concluded that the immunity provided by section 2511 to a physician is not conditioned on the absence of malice"); *Strong v. Brakeley*, 2016 ME LEXIS 63, ¶ 12, 137 A.3d 1007 ("As physicians, Brakeley and Bausman are not subject to the 'acting without malice' requirement").  Thus, even if Dr. Waddell acted with malice in his report to the BOLIM (and there is no evidence he did), he would still be immune under section 2511.

Dr. Michailidou's second objection to civil immunity under section 2511 is that Dr. Waddell was a member of the BOLIM and therefore should have recused himself from involvement with EMMC's report to the BOLIM.  Here, she relies on a single decision of the Maine Superior Court, *Moore v. State*, No. AP-07-65, 2008 Me. Super. LEXIS 152 (Me. Super. Apr. 18, 2008), in which a Superior Court Justice concluded that the involvement of a Board Member of the Maine Board of Dental Examiners (BDE) in a disciplinary action against a dentist "risked intolerable bias and unfair disadvantage against the petitioner."  *Id.* *11.  In *Moore*, a dentist performed a procedure that resulted in complications.  *Id.* at *2.  The patient was referred to Dr. Fister, an oral surgeon and member of the BDE.  *Id.* at *3.  Dr. Fister treated the patient and not only recommended to the patient that she file a complaint with the BDE but also testified as an expert in favor of the patient and against the dentist in the disciplinary proceeding before the BDE.  *Id.* at *3-5.  The Superior Court Justice concluded that Dr. Fister's participation in the matter before the BDE impermissibly conflated the roles of investigator and adjudicator:

> While Dr. Fister was not himself the investigator or prosecutor, his role as a sitting board member combined with his pre-complaint treatment of NF, his role in advising NF t8 file a complaint, his expressed opinions of the efficacy of the complaint as seen by the Board, and his designation as an expert witness in front of a Board on which he sat, combine to create an intolerable risk of bias or unfairness.

*Id.* at *6.

In the Court's view, the facts in *Moore* differ markedly from Dr. Michailidou's case. Dr. Waddell's participation in the referral to the BOLIM is consistent with the role of a Chief of a medical department when a physician is referred to the licensing board. Dr. Waddell recused himself from the BOLIM for purposes of Dr. Michailidou's matter and did not testify as an expert before the BOLIM. He merely provided, as required by statute, a recitation of events leading to her resignation. *See Kippax v. State*, No. AP-20-17, 2021 Me. Super. LEXIS 49 (Me. Super. June 9, 2021). Here, the BOLIM ultimately decided against Dr. Waddell's position in Dr. Michailidou's case so any argument that it was unduly influenced by Dr. Waddell's position on the BOLIM is contradicted by the facts.

In sum, the statutory immunity provision of Maine law grants the institutions and physicians who participate in making mandatory reports to the BOLIM immunity from civil lawsuits, including this one.

Finally, Dr. Michailidou's breach of contract claim fails for another reason: she agreed not to sue for breach of contract. The Separation Agreement provides:

> Physician agrees that in exchange for [EMMC] allowing her to resign, Physician will not pursue any potential breach of contract claims regarding the Employment Agreement.

111

*Separation Agreement* at 1.  This lawsuit, to the extent it is based on a breach of contract claim, on its face violates this contractual provision.  Furthermore, with certain restrictions not argued as relevant here, covenants not to sue are generally enforceable.  *See generally Already, LLC v. Nike, Inc.*, 568 U.S. 85 (2013).  Dr. Michailidou does not attack the general legality of her covenant not to sue but asserts that because EMMC's choice to "disparage Plaintiff in excess of their statutory duty under the MSHA constitutes a breach of contract, and therefore relieves Plaintiff of the covenant not to sue." *Pl.'s Opp'n* at 20.  But the Court has just concluded that EMMC acted appropriately in responding to BOLIM's request for information.  Therefore, Dr. Michailidou's argument that the covenant not to sue should not be enforced against her rings hollow.  By bringing this breach of contract claim, Dr. Michailidou breached her agreement not to sue EMMC, and the Court concludes that EMMC is entitled to summary judgment on the contract claim.

### D.    Count VII: Intentional Infliction of Emotional Distress

To prove a claim of intentional infliction of emotional distress, a plaintiff must present factual support for each of the following:

> (1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from her conduct; (2) the conduct was so "extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized community"; (3) the actions of the defendant caused the plaintiff's emotional distress; and  (4) the emotional distress suffered by the plaintiff was "so severe that no reasonable person could be expected to endure it."

*Curtis v. Porter*, 2001 ME 158, ¶ 16, 784 A.2d 18 (citing *Champagne v. Mid-Maine Med. Ctr.*, 1998 ME 87, ¶ 15, 711 A.2d 842); *accord Bratton v. McDonough*, 2014 ME

112

64, ¶ 22, 91 A.3d 1050. "The determination of whether the facts alleged are sufficient to establish that the defendant's conduct is 'so extreme and outrageous to permit recovery' is a question of law for the court to decide." *Argereow v. Weisberg*, 2018 ME 140, ¶ 27, 195 A.3d 1210 (quoting *Champagne*, 1998 ME 87, ¶ 16, 711 A.2d 842).

In her opposition to the Defendants' motion for summary judgment, Plaintiff clarifies that she "does not pursue claims for IIED regarding actions prior to [her] forced resignation," and only pursues this claim for the period after she resigned. *Pl.'s Opp'n* at 16 n.2. Defendants respond that Dr. Michailidou's claim for post-employment IIED is "frivolous" and based only on Dr. Waddell's one-page witness statement in response to the BOLIM's December 22, 2020 letter requesting additional information, *Defs.' Reply* at 8-9, and argue further that they are protected by the MHSA, which, as discussed, confers immunity upon health care entities and providers reporting to BOLIM, assisting in investigation conducted by BOLIM, or otherwise helping BOLIM carry out its legally prescribed duties, in order to encourage compliance with reporting and disclosure obligations. *Defs.' Mot.* at 19 (citing 24 M.R.S. § 2511; *Argereow*, 2018 ME 140, 195 A.3d 1210).

For the same reasons Dr. Michailidou's breach of contract claim fails, her IIED claim must fail as well. Dr. Michailidou's claim is grounded on a witness statement submitted by Dr. Waddell in response to a request for information from BOLIM and both he and EMMC are immune from civil liability for their submissions under 25 M.R.S. § 2511. Furthermore, even viewing the facts in the light most favorable to Dr. Michailidou, the Court cannot conclude that the facts in this case meet the high

standards under Maine law for an IIED claim.  *See Curtis v. Porter*, 2001 ME 158, ¶ 16.

## VI.    CONCLUSION

The Court GRANTS Defendants' Motion for Summary Judgment (ECF No. 43) on all counts.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 3rd day of October, 2025